Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940
Email:     jsaveri@saverilawfirm.com
           swilliams@saverilawfirm.com

Eric L. Cramer
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:  (215) 875-4604
Facsimile:   (215) 875-5707
Email:    ecramer@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone:  (202) 559-9745
Facsimile:   (215) 875-5707
Email:    dwalker@bm.net

*Counsel for Individual and Representative Plaintiffs*

Additional Counsel on Signature page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMON AND SIMON, PC d/b/a CITY SMILES; and VIP DENTAL SPAS, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>　　　　　　　　Defendant. | **AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Simon and Simon, PC d/b/a City Smiles ("City Smiles") and VIP Dental Spas ("VIP") (collectively, "Plaintiffs") bring this antitrust action against Align Technology, Inc. ("Align" or "Defendant") under Section 2 of the Sherman Act, 15 U.S.C. § 2, on behalf of themselves and a proposed class of similarly-situated dental and orthodontic practices (collectively, "Dental Practices"), and allege as follows:

## I.    NATURE OF THE CASE

1.    This antitrust suit arises from Align's willful acquisition and maintenance of monopoly power in the markets for two products: (1) custom-manufactured, transparent, removable dental aligners made from clear plastic (Defendant's product is called "Invisalign", and the category of product is generally called "Aligners"), and (2) hand-held digital intraoral scanners used to generate scans to order Aligners (Defendant's product is called "iTero", and the category of product is generally called "Scanners"). The relevant Aligner and Scanner markets are defined in more detail below.

2.    Align has dominated the Aligner market for decades with its Invisalign brand Aligners. Align controls approximately 90 percent of the market for Aligners and earns well over a billion dollars a year selling Invisalign, with durable profit margins above 75 percent.

3.    Align has also come to dominate the market for Scanners with its iTero product, controlling approximately 80 percent of the market and earning hundreds of millions of dollars a year selling iTero, with profit margins above 60 percent. Align's only real competitor in the Scanner market is 3Shape, who sells the Trios Scanner that, like iTero, is designed for ordering Aligners.

4.    Aligners and Scanners are designed to work together for Dental Practices. Scanners take a digital image of the jaws, teeth, and bite of a patient. These scans are sent to an Aligner manufacturer, which uses the images to create custom-manufactured Aligners for patients. Patients typically undergo regular scans and have numerous sets of Aligners manufactured during a course of treatment, with Aligners being adjusted as the patients' teeth move.

5.    The use of Scanners creates a "digital workflow" designed to make it more convenient, cheaper, and quicker for Dental Practices to order Aligners. Align has noted that the iTero is "so critical from a digital workflow standpoint" because of the way iTero and Invisalign are linked together.

6.      This digital workflow was thus expected to increase the use of Invisalign Aligners by Dental Practices, and indeed, Align has noted that "Invisalign doctors with an iTero scanner have notably higher utilization rates than non-iTero doctors." Align itself has also emphasized that Dental Practices need a fast and accurate way to create digital scans that can be used to create Aligners and to transfer those scans to the Aligner manufacturer.

7.      There are only two Scanners designed specifically for ordering Aligners: Align's iTero and 3Shape's Trios. But while Trios is an "open system" Scanner that can be used to order Aligners from a range of Aligner manufacturers, iTero is a *de facto* "closed system" Scanner that imposes substantial costs on Dental Practices who try to use the iTero to send Aligner orders to manufacturers other than Align.

8.      Thus, as Dental Practices commit to Align's iTero closed-system Scanner, that drives sales toward Invisalign and excludes rival Aligner manufacturers. Indeed, in 2018, Align touted this linkage of its products as a key competitive advantage in the face of increased competition, telling investors that "to obtain the results we have, you have to have that whole entire technology ready and integrated, something that our competitors don't have today."

9.      Invisalign has always been Align's crown jewel. For many years, Align had been able to charge high prices and earn high profit margins on Invisalign because the product was protected by a thicket of hundreds of patents that Align wielded aggressively to protect its Aligner monopoly. As Align CEO Joe Hogan stated in 2017:

> We've been in business now for almost 20 years, and we've had so few competitors and people think it's because we have this great IP, it's true we have good intellectual property, but it took 15 years for people to really believe that you can move teeth with plastics[.] … It gave us this period of time to really iterate and learn *without the outside influence of other competitors coming in.*[1]

10.      Align's monopoly started to come under threat in 2017 due to the expiration of several of its key patents. Having enjoyed many years operating without "the outside influence of other

---

[1] Michela Tindera, *Out of Silicon Valley, A Billion-Dollar Orthodontics Business Built with Plastic and Patents*, Forbes (April 25, 2017) (emphasis added).

2

competitors coming in," and having raised investors' expectations of continued high revenues and profit margins, Align now faced competition in the Aligner market.

11.    Align could have responded to that competition by lowering prices or spending more money on research and development to improve the quality of its own Aligners, but instead responded to the threat of competition with a multifaceted anticompetitive scheme to monopolize both the Scanner and Aligner markets ("Scheme"). The Scheme includes: (1) multiyear exclusive dealing contracts with two of the largest dental service organizations ("DSO") that have the effect of preventing Dental Practices that are DSO members from dealing with Align's rivals in both the Scanner and Aligner markets, (2) the "Fusion Program," which bundled iTero with sales of Invisalign orders, and thereby prevented Dental Practices from ordering either Aligners or Scanners from Align's rivals, (3) the "Advantage Program," which effectively forces Dental Practices to use iTero to obtain non-penalty prices for Invisalign that they need to offer patients a competitive price for Aligner treatments, (4) the design of iTero and Invisalign such that the products operate as a *de facto* integrated product bundle that penalizes Dental Practices who utilize competing products, and (5) the unilateral termination of Align's longstanding and profitable agreement with 3Shape that allowed the Trios Scanner to be used to order Invisalign ("Interoperability Agreement")—a decision that would have been economically irrational but for the anticompetitive effects of that termination.

12.    This Scheme substantially foreclosed competition in the Aligner and Scanner markets. Through this Scheme, Align ties Invisalign to iTero to maintain dominance in both the Aligner and Scanner markets. For example, because of the closed system architecture of Align's system, the Dental Practices using iTero Scanners are effectively forced to use Invisalign—to order rival Aligners from their iTero scans, they would incur substantial additional expense and difficulty.

13.    A Dental Practice that wants to offer Invisalign must, for all practical purposes, purchase and use an iTero. For example, under the Advantage Program, a Dental Practice must have a Scanner in order to achieve the pricing tiers necessary to offer patients a price that is competitive with other Dental Practices. Additionally, Align's customer referral program steers customers to the top tier prescribers (based on the number of Invisalign treatments ordered), and a Dental Practice can only reach the top

tiers by using a Scanner. But since the implementation of the Scheme, the only Scanner option for these Dental Practices looking to offer Invisalign is the iTero.

14. The DSO contracts themselves also represent long-term, exclusive commitments on the part of DSOs to deal only with Align for Aligners and Scanners. Likewise, the Fusion Program ties iTero discounts to such high levels of Invisalign commitments over a number of years that those customers are essentially locked into using both the iTero and Invisalign exclusively. All of this is compounded by Align's "closed system" design and the termination of the Interoperability Agreement with 3Shape, which means that any Dental Practice who wants to offer the dominant Invisalign product must use only an iTero Scanner.

15. A rival Aligner manufacturer looking to compete against Invisalign would have to offer below-cost prices to offset the penalties and overcome the restrictions Align has placed on its customers through this Scheme. Likewise, Align has foreclosed Trios, its only true rival in the Scanner market, and has, upon information and belief, not authorized interoperability for any other Scanner manufacturer. Because Align controls approximately 90 percent of the Aligner market, that has effectively foreclosed the ability for a rival Scanner manufacturer to compete.

16. The essence of this scheme was that Align was able to use its monopoly power in the Aligner market to drive 3Shape out of the Scanner market, and then to use its increased monopoly power in the Scanner market to maintain its monopoly power in the Aligner market. In this way, Align's ability to leverage both its Scanner and Aligner monopolies to prevent competition in both markets has enabled it to maintain or increase its monopoly power in both markets and to charge supracompetitive prices for both its Aligners and its Scanners.

17. Plaintiffs bring this action on behalf of themselves and other Dental Practices who purchased Aligners and/or Scanners directly from Align during the Class Period (defined below). Plaintiffs seek treble damages and injunctive relief, demanding a trial by jury of all issues so triable, under Section 2 of the Sherman Act (15 U.S.C. § 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

## II.   PARTIES

18.     Plaintiff City Smiles is a Dental Practice located in Chicago, IL that performs scans for Invisalign using the iTero Scanner. City Smiles regularly purchased Invisalign Aligners from Defendant throughout the Class Period (defined below) at prices that were artificially inflated as a result of Defendant's anticompetitive scheme, and thereby suffered antitrust injury. City Smiles also purchased the iTero Scanner from Defendant during the Class Period at a price that was artificially inflated as result of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

19.     Plaintiff VIP is a Dental Practice with offices in the West Hollywood, Los Angeles, and Beverly Hills areas of California. VIP regularly purchased Invisalign aligners from Defendant throughout the Class Period (defined below) at prices that were artificially inflated because of Defendant's anticompetitive scheme, and thereby suffered antitrust injury. VIP also purchased an iTero scanner from Defendant in 2018, at a price that was artificially inflated as result of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

20.     Defendant Align Technology, Inc. is a Delaware corporation, with its headquarters in San Jose, California. Upon information and belief, Defendant has many Invisalign providers in the Northern District of California, which are trained by Defendant to prescribe Invisalign, which purchased iTero Scanners from Defendant, and which purchase Invisalign from Defendant for their patients.

## III.   FACTS

### A. Align's Success Depends Upon Maintaining Its Aligner Monopoly

21.     Align's largest source of revenue comes from its Invisalign brand Aligners, by far the dominant product in the Aligner market, with an approximately 90 percent share of the Aligner market. Align earns well over a billion dollars per year selling Invisalign products at gross margins exceeding 75 percent. Its revenues and profits continue to grow year after year, and it continues to raise prices, despite the (largely unsuccessful) efforts of other companies to break into the Aligner market.

22.     Align also sells the iTero Scanner. Align acquired the iTero technology through a corporate acquisition and then integrated it with the Invisalign system. The iTero Scanner's integration with Invisalign, as well as Align's anticompetitive conduct described herein, have enabled iTero to

become the dominant Scanner. Align now controls approximately 80 percent of the Scanner market, which earns Align hundreds of millions of dollars a year. The iTero Scanner is highly profitable, with profit margins above 60 percent. Align's only real competitor in the Scanner market is 3Shape, which sells the Trios Scanner. Trios, like iTero, is designed for ordering Aligners.

23.     Because of its dominance, Invisalign is a "must have" for Dental Practices that offer Aligner treatment to patients. When a patient seeks Invisalign treatment, that patient would visit a Dental Practice authorized by Align to prescribe the treatment. A dentist or staff member would then normally perform a scan of the patient's jaws, teeth, and bite using a Scanner, and the dentist would review the scan. If the dentist determines that Invisalign treatment is appropriate, the Dental Practice will then purchase a set of custom-made Invisalign Aligners directly from Defendant for that patient's treatment.

24.     Align knew that the use of digital Scanners, like iTero, would make it more likely that a Dental Practice would use Aligners—because of the Scanner's design and "digital workflow," because it provides a more accurate impression of a patient's jaws, teeth, and bite for the improved design of that patient's Aligners, and because once a Dental Practice makes a large investment in a digital Scanner, that practice would be more likely to order more Aligners as a way to pay for the Scanner. In addition, as described below, Dental Practices are able to access non-penalty pricing on Aligners as the number of Invisalign orders increases, thus making Scanners—and in particular ones that can be used to order Invisalign—a critical piece of a Dental Practice's business.

25.     The primary focus of Align is selling more Aligners at extremely high profit margins. As Align's Chief Executive Officer, Joe Hogan, stated in a July 2017 investor call, "[W]e're in the clear aligner business and anything that help us to sell more clear aligners directly . . . would be in our . . . range. So, that's why we have a scanner business. We have a scanner business not from a diversification standpoint. We have a scanner business because it allows us to sell more clear aligners."

26.     The bottom line was that more iTero Scanners meant more Invisalign orders for Align. As Joe Hogan told investors in an April 2018 call, "So yeah, [iTero] is another component of growth in the company overall. What's great is it's synergistic growth, right. You have equipment growth, but it

really leads to the growth of our core product line which is Invisalign." And as Mr. Hogan reminded Wall Street analysts when discussing Scanner sales in an October 2018 investor call: "[R]emember, it's just a wonderful footprint for us for future Invisalign business once we have those scanners in place."

27.     The fact that Scanners make it easier to order Aligners *could* have spelled trouble for Align's market dominance in the Aligner market *if* the two available Scanners (iTero and Trios) were able to send scans to any Aligner manufacturer. Then Dental Practices could have offered Invisalign and competing Aligners on equal footing, which would have engendered competition among Aligner manufacturers that would have lowered prices and/or improved quality or innovation. Indeed, Trios is such an "open" platform—as a technological matter, Trios can be used to order Aligners from a wide range of manufacturers. But Align has created a "closed" system for iTero, which limits the ability of Dental Practices to use it to order competing Aligners. And Align has imposed contractual commitments to limit access to Trios and competing Aligners and—after 3Shape refused Align's demand to send scans for Aligner orders only to Align—terminated the highly profitable Interoperability Agreement with 3Shape, all to create a bulwark to defend Invisalign from competition.

28.     Thus, for Align, monopolizing the Scanner market was not just about increasing price (and profits) in the Scanner market—which it did—but also about maintaining its monopoly power in the Aligner market, and thereby maintaining its supracompetitive prices and profits on Aligners.

**B. Align's Patents Started to Expire, Exposing it to Potential Competition**

29.     Defendant held hundreds of patents on its Aligner technology. These patents, along with other high barriers to entry, largely deterred entrants into the Aligner market. Align has aggressively wielded those patents as well, filing patent and trade proceedings against potential competitors in the Aligner market as necessary to maintain its monopoly position.

30.     The Invisalign brand has become synonymous with Aligners generally. As a result, Dental Practices engaged in the business of straightening teeth must carry Invisalign to satisfy the demands of customers. And as described below, for those Dental Practices who want to offer Invisalign, Align has essentially made it impossible to offer competing Aligners or to use Scanners that compete with Align's iTero.

31.     Align's monopoly started to come under threat in 2017 due to the expiration of many of its key patents, with additional key patents expiring by the end of 2019. Having enjoyed years of operating without "the outside influence of other competitors coming in," as patent expiry loomed, Align changed its message to investors from reliance on the patents to protect its monopoly, to concern that "[w]hen patents expires, we lose the protection and competitive advantages they provided to us, which could negatively impact . . . operating results." But instead of competing on the merits of its products and its pricing, Align responded to the emerging threat of competition by implementing the Scheme, described in detail below, to use its monopoly power in both the Aligner and Scanner markets to maintain and/or increase its monopoly power in each market and continue to charge supracompetitive prices for both Aligners and Scanners.

**C. Align's "Closed System" Protects It from Competition**

32.     One piece of the bulwark protecting Align's monopoly power is Align's "closed system" design of its Scanner and Aligner technology. For example, iTero is the only Scanner with integration into the Align treatment system, including Align's Invisalign Outcome Simulator. Because of the way iTero is integrated into the "digital workflow" a Dental Practice would use to order Invisalign, Align knew that placing its Scanners in Dental Practices was going to drive those Dental Practices to use Invisalign exclusively.

33.     Second, iTero is intentionally designed in such a way that it is expensive, inefficient, and impracticable to use it to order non-Invisalign Aligners. For example, iTero does not create scans in the standard file format used by other Aligner manufacturers, and thus, a Dental Practice wishing to order non-Invisalign Aligners using iTero scans must either undertake an expensive and time-consuming process of converting iTero scans to a format that can be used for other Aligners, or use silicone-based molds to create a cast of a patient's mouth and teeth, which is a messy, uncomfortable for the patient, time-consuming, and inefficient method. By contrast, 3Shape's Trios Scanner uses standard file formats and cloud technology to work with numerous Aligner brands, including Invisalign (prior to Align's termination of 3Shape's Interoperability Agreement). For this reason, Trios represented a breach in Align's bulwark protecting Invisalign from competition.

34.     Third, Align intentionally does not accept scans from any Scanner for Invisalign orders, but rather, only allows Invisalign orders from a limited group of authorized scanners. Until the termination of Align's Interoperability Agreement with 3Shape, discussed below, the Trios Scanner was one such authorized Scanner. Upon information and belief, Align has only allowed interoperability for scanners that are not designed for ordering Aligners, that do not compete with iTero in the Scanner market, and that do not represent a threat to Align's dominance of the Aligner market. According to 3Shape, at the Greater New York dental meeting in November 2017, Align executive Raphael Pascaud communicated to 3Shape that Align will no longer validate any non-iTero intraoral scanner for use with Invisalign. Given that Invisalign orders are highly profitable for Align, this decision by Align terminated a previously highly profitable course of conduct for Align for the sole reason of furthering Align's exclusionary conduct.

35.     Scanners are essential for Dental Practices to offer and sell Aligners (particularly Invisalign) to their patients, and Dental Practices typically do not purchase more than one Scanner due to the expense. In the case where a Dental Practice buys more than one Scanner, that practice nonetheless would tend to use only one *brand* of Scanner due to the cost of maintaining multiple software subscriptions and the time and expense to train personnel to use different Scanners and software programs. And like most such capital investments, a Scanner is meant to last several years.

36.     Thus, the iTero Scanner and Invisalign operate as a *de facto* product bundle by (a) making iTero the only viable option for Dental Practices seeking to sell the market-dominant Invisalign to their patients, and (b) preventing other Scanners from becoming established in the market that would allow dentists to order competing Aligners without undue burden. In order to cause the vast majority of Dental Practices to have long-term dependence on both the iTero Scanner and Invisalign Aligners, Align has engaged in the anticompetitive Scheme to entrench its monopoly power in the Aligner and Scanner markets.

**D. Align Terminated 3Shape's Interoperability to Foreclose Competition**

37.     3Shape has been selling the Trios Scanner internationally since 2011, and in the United States since 2012. Unlike Align's iTero, the Trios can send scans to any manufacturer of Aligners without any fees, delays, conversion process, or loss of image resolution. This was an advantage to Trios customers because it allowed for choice of Aligners and would have benefitted Dental Practices had other Aligner manufacturers been able to compete with Invisalign on the merits with lower prices and/or better quality for Aligners.

38.     Indeed, Align's then-Chief Operating Officer told industry analysts in an April 23, 2015 investor call (when its Aligner market dominance was protected by patents), such open systems

> are better for our customers. No one wants to have to redesign, start over, buy multiple pieces of equipment if they can have greatest utility from a scanner… So, we believe what we hear from our customers is they don't want to be forced to buy a system from you for the pleasure of offering Invisalign to their patients and other therapies we may have down the road. So we feel actually very strongly . . . . There's no reason for us not to act in complementary ways because it's good for the customer. So in our minds, we don't need to own the channel. We don't need to have exclusivity. *In fact, we want probably more high-quality scanners that can make it easier to do Invisalign and other chair-side procedures that we have the unique capabilities to fulfill.*

39.     In December 2015, Align and 3Shape entered into the Interoperability Agreement, under which the parties worked together to build an interface so that dental professionals could send Trios scans into Align's Invisalign workflow. According to 3Shape, Align executive Raphael Pascaud testified in prior litigation that Align had entered into this Interoperability Agreement to increase Aligner sales, including from Dental Practices that were already using the Trios Scanner.

40.     But even as Align was preparing to enter into the Interoperability Agreement, according to 3Shape, Align was seeking to change the terms of its relationship with 3Shape by proposing an agreement whereby 3Shape would agree to make its Trios Scanners send scans *exclusively* to Align for Invisalign Aligners. Align also did not want 3Shape to promote or offer alternative software capable of staging treatments from non-Invisalign Aligners. Align knew that 3Shape's open system and popularity represented a breach in the bulwark it had erected around Invisalign, and thus, the purpose of this proposed exclusive arrangement was for Align to impair other Aligner manufacturers.

41.     3Shape refused to make the Trios exclusive to Align, as Align had asked. Instead, 3Shape sought to continue to allow the Trios to send scans to any Aligner manufacturer in the interests of open competition. 3Shape wanted to maintain 3Shape's relationships with other Aligner manufacturers, as well as to allow 3Shape to develop its own software to compete with Align. The Interoperability Agreement ultimately permitted 3Shape to provide scans to other Aligner manufacturers as well as to continue to promote and offer its own software.

42.     According to 3Shape, shortly after the Interoperability Agreement was signed, Align began again to seek to change the terms. In a February 2016 meeting, attended by top Align executives, Align made clear that as part of any further collaboration between the companies, 3Shape would need to treat Invisalign as the "preferred partner" for Aligners. In a November 2016 meeting, Align asked 3Shape to enter into a joint venture that would allow Align to control Trios. 3Shape again refused.

43.     According to 3Shape, throughout 2017, including at the International Dental Show in March 2017, Align executive Raphael Pascaud continued to demand that 3Shape agree to the joint venture that would exclude Invisalign competitors. During this time, 3Shape has alleged that it heard from resellers and distributors that Align had threatened that it would end interoperability with Trios.

44.     On December 20, 2017, Align announced that it would terminate the Interoperability Agreement with 3Shape as of January 17, 2018, and the Trios would no longer be able to submit scans for Invisalign.

45.     After many Dental Practices and the American Association of Orthodontists expressed dismay at the termination, Align extended the date of termination to January 31, 2018, and then terminated the Interoperability Agreement on that date, making Trios Scanners no longer capable of ordering Invisalign.

46.     This termination represented a sacrifice of revenue for Align, and it was economically irrational but for the market exclusion this profit sacrifice created. Indeed, according to 3Shape, Align had profited from the interoperability agreement with 3Shape that allowed Trios users to order Invisalign, and in fact received 40,000 Invisalign orders from Trios in the United States between October 2016 and January 2018. Upon information and belief, at an estimated consumer price of $3,000

to $8,000 per treatment with high profit margins, Align's termination of the interoperability agreement represented a profit sacrifice of many millions of dollars.

47.     Because Align has not blocked Trios users outside of the United States from ordering its Aligners, there are approximately 23,000 Invisalign orders per month from those Trios users, which is nearly 40 percent of all Invisalign global submissions to Align. Align sacrificed profits in the short run by refusing to allow the Trios or other potential Scanners to order Invisalign in the United States, and Align engaged in this conduct solely to make the iTero the only viable Scanner for dental professionals in the United States to purchase and use, which would allow it to enhance its monopoly power in the Scanner market, and would allow it to maintain its monopoly power in the Aligner market.

48.     Although the Interoperability Agreement extends beyond the United States, Align terminated interoperability only with respect to the United States. In the rest of the world, where Align has a materially lower Aligner market share, Align has continued to accept scans from the Trios scanner because it cannot effectively force customers to use iTero by threatening to withhold access to Invisalign, and because Align profits from interoperability there just as it did when Trios interoperability existed in the United States.

49.     Interoperability had also been a benefit to Dental Practices who had increased choice of Scanners and Aligners, and who would have benefitted from increased competition in the form of lower prices but for Align's conduct. Upon termination of the Interoperability Agreement, those Dental Practices with Trios Scanners were forced either to quit offering Invisalign to patients (and many of those patients were in the middle of multi-month treatment programs with Invisalign), to order a new Scanner (despite having spent thousands or tens of thousands of dollars on a Trios, which many Dental Practices find to be a superior Scanner), or to go back to using silicone-based molds. According to 3Shape, for American Dental Practices seeking to order Invisalign Aligners, termination of interoperability in the United States made the Trios "basically a paperweight," as one dental professional complained.

50.     In short, Align was willing to forego short-term profits on its Aligners (from Trios owners ordering Invisalign), and to sacrifice customer goodwill, in order to engage in the

anticompetitive Scheme described herein and thereby further its dominance in the Aligner and Scanner markets. By gaining and/or maintaining its monopoly power in the Aligner and Scanner markets, and foreclosing competition in both markets, Align would profit far more than it lost by terminating the Interoperability Agreement, all at the expense of Align's customers.

**E.  Align Entered into Multi-Year Exclusionary Contracts to Entrench its Monopoly Power**

51.     Beginning in mid-2018, Align entered into multiyear contracts with at least two of the nation's largest dental service organizations ("DSOs"), Heartland Dental and Aspen Dental, that effectively exclude 3Shape from their members' dental offices. DSOs provide business support to independent Dental Practices, including by managing purchasing contracts with suppliers. Align has reported that DSOs are an important "strategic part of [Align's] overall strategy," are a "force multiplier" for Align, and were a significant factor in Align's 2018 "[r]ecord Q4 volumes [of sales]."

52.     In line with its "Fusion Program," described below, Align dramatically dropped the price of the iTero to major DSOs in exchange for multi-year Invisalign order commitments. Those commitments could practicably be achieved only if a DSO sent Aligner scans exclusively to Align, and not to its Aligner competitors. As a result, sales of iTero scanners to DSOs increased dramatically, and sales of Invisalign were accordingly higher than they would have been absent these agreements.

53.     On July 25, 2018, Align announced a multi-year deal with Heartland Dental, the nation's largest DSO with more than 850 supported dental offices, to place iTero scanners in member dental offices, under a timeline that would place iTero in 90 percent of supported offices nationwide by the end of the year. As a result of the deal, Heartland Dental purchased 900 iTero scanners in 2018. The Heartland "endeavor represent[ed] the industry's single-largest scanner deployment." And as with Align's overall efforts to use iTero to lock practices into Invisalign, Heartland's "front-loading their businesses with iTero" will, in turn, "give them a very strong position in clear aligners."

54.     On July 25, 2018, Align announced that it had also secured a deal with Aspen Dental, another of the nation's largest DSOs with nearly 700 locations, to equip all Aspen locations with iTero scanners.

55.     3Shape has stated that it bid for the Aspen Dental contract, and its Trios scanner scored the highest in Aspen Dental's evaluations, but Aspen Dental informed 3Shape that Aspen Dental did not select the Trios scanner because Align did not permit the Trios to interoperate with Invisalign. In other words, because of Align's dominant position in the Aligner market, Aspen Dental was forced to select Align's less desirable iTero scanner.

56.     These DSO contracts have enabled Align to rapidly increase its market share in the Scanner market and, because of Align's conduct as alleged herein, to use its increased monopoly power in the Scanner market to maintain and enhance its monopoly power in the Aligner market. Align reported an 84 percent growth in its scanner sales in North America in the first quarter of 2018. And in Q3 2018, Align saw "strong volume growth from the Dental Service Organizations (DSOs) channel which increased over 40% Y/Y in Q3."

**F.   Align's "Fusion Program" Links iTero Prices and Invisalign Sales**

57.     In late 2017, as patent expiry loomed, Align launched the Fusion Program, a bundled pricing mechanism for iTero that further entrenched its dominance in the Aligner and Scanner markets.

58.     Upon information and belief, under the Fusion Program, the price of the iTero Scanner depended on a Dental Practice's purchases of Invisalign. Failure to meet a minimum threshold of Invisalign cases each year for a three-year period resulted in substantial annual back-end penalties. Align set these targets in a manner that forced the Dental Practices either to stop sending cases to Align's Aligner competitors or trigger the substantial penalties.

59.     The penalties could total $10,000 over three years, or 30 percent or more of the cost of the iTero scanner. A Dental Practice that incurred these penalties would be at a substantial disadvantage to other Dental Practices that avoided these penalties. Given Align's dominant position in the market for Aligners, Dental Practices who wanted to offer Aligner treatment could not forego Invisalign orders entirely.

60.     The effect of Align bunding its Scanner with its market dominant Aligners is that Dental Practices are substantially foreclosed from ordering Aligners from Align's rivals. Indeed, according to 3Shape, experts have described the Fusion Program as "a not-so-subtle effort on the part of

management to lock these customers in for a fairly long time, in our view, just as Clear Aligner competition is likely set to rise over the next 3-6+ months."

61.     Absent the bundled pricing, the Trios and iTero scanners were sold at similar list prices. In the bundle, however, the effective price of the iTero (when incorporating the incentives for effectively agreeing not to purchase Aligners from Align's competitors) was $10,000 cheaper (as reflected in the penalty provisions of the program). According to 3Shape, dropping the Trios price to offset the penalties on such sales would represent a loss of a third of the Trios Scanner revenue, yet Align could make up the lost revenue with the sales of just a few cases of Invisalign per iTero Scanner.

**G. Align's Advantage Program Further Forecloses Competition**

62.     Align offers a tiered discount program, called the Advantage Program, that conditions a Dental Practice's prices for Invisalign on that Dental Practice's ability to maintain certain levels of Invisalign cases over time. In the most recent iterations of the Advantage Program, a Dental Practice's prices are based on its ability to maintain recent (either the prior six-month or 12-month) numbers of Invisalign orders. The structure of the Advantage Program is such that Dental Practices must maintain a very high prescribing level of Invisalign in order to keep the prices that would allow their practice to offer competitive prices to patients.

63.     Upon information and belief, in 2018, Align changed the program by changing the pricing criteria from focusing on the number of lifetime cases for a Dental Practice to a system based on the number of cases submitted by a Dental Practice in the previous six months. The Advantage Program was then changed again more recently to base discounts on the number of cases submitted in the most recent 12-month period.

64.     One practical effect of the Advantage Program is that for Dental Practices to obtain the pricing for Invisalign necessary to offer Invisalign at competitive rates, those Dental Practices would, for all practical purposes, need to purchase a Scanner. Because Trios is no longer interoperable with Invisalign, the Advantage Program forces Dental Practices to either stop purchasing and/or using Trios or lose favorable pricing. According to 3Shape, Align's Advantage program has thus caused Dental Practices to forego 3Shape's Trios entirely, or in some cases, drastically reduce purchases from 3Shape.

65.     Another practical effect of the Advantage Program is that Dental Practices would have a strong incentive to forego competing Aligners at least until it was clear that the practice had achieved the minimum number of Invisalign orders necessary to maintain its prices. Further, for those Dental Practices who have now been forced over to iTero, those practices are also effectively foreclosed for rival Aligner manufacturers because of the "closed system" architecture of the iTero system.

66.     In this way, the Advantage Program substantially forecloses competition from rival Aligner and Scanner manufacturers and has allowed Align to maintain and/or increase its monopoly power in the Aligner and Scanner markets.

### H.  Align's Scheme Substantially Foreclosed Competition and Harmed Consumers

67.     Align's Scheme has substantially foreclosed competition in both the Aligner and Scanner markets and has enabled Align to impose supracompetitive prices for Scanners and Aligners.

68.     Through this Scheme, Align ties Invisalign to iTero to maintain dominance in both the Aligner and Scanner markets. For example, because of the closed system architecture of Align's system, the Dental Practices using iTero Scanners are effectively forced to use Invisalign or incur the expense and difficulty of using iTero to order rival Aligners.

69.     A Dental Practice that wants to offer Invisalign must, for all practical purposes, purchase and use an iTero. For example, under the Advantage Program, a Dental Practice must have a Scanner in order to achieve the pricing tiers necessary to offer patients a competitive price for Invisalign. Additionally, Align's customer referral program steers customers to the highest-volume prescribers, and a Dental Practice can only reach those tiers by using a Scanner. Since the implementation of the Scheme, the only true Scanner option for these Dental Practices looking to offer Invisalign is the iTero.

70.     The DSO contracts themselves also represent long-term, exclusive commitments on the part of DSOs to deal only with Align for Aligners and Scanners. Likewise, the Fusion Program ties iTero discounts to such high levels of Aligner commitments over a number of years that those customers are essentially locked into using both the iTero and Invisalign exclusively. All of this is compounded by Align's "closed system" design and the termination of the Interoperability Agreement with 3Shape,

which means that any Dental Practice who wants to offer the dominant Invisalign product must use only an iTero Scanner.

71.     A rival Aligner manufacturer looking to compete against Invisalign would have to offer below-cost prices to offset the penalties and overcome the restrictions Align has placed on its customers through this Scheme. Likewise, Align has foreclosed Trios, its only true rival in the Scanner market, and has, upon information and belief, not authorized interoperability for any other Scanner manufacturer. Because Align controls approximately 90 percent of the Aligner market, that has substantially foreclosed any ability for a rival Scanner manufacturer to compete.

72.     As discussed above, Align's Scanner and Aligner monopolies are self-reinforcing. Align sought to use its substantial market power to eliminate competition from the Trios and other competing Scanners that are able to order Aligners from other manufacturers, and thereby make the iTero the only viable option for Dental Practices to purchase and use. Not only would that allow Align to enhance its monopoly power in the Scanner market, but that would also allow Align to prevent other Aligner manufacturers from becoming established and competing with Invisalign, allowing Defendant to enhance its monopoly power in the Aligner market.

73.     Indeed, these foreclosure effects and the harm to competition and consumers are not hypothetical. After the expiration of key patents, Align began to face the prospect of competition in the Aligner market from large companies with substantial experience in the dental field, such as Straumann, a global tooth replacement and orthodontics manufacturer who had purchased Align's largest (though still minimal) competitor ClearCorrect; Henry Schein, a worldwide distributor of medical and dental supplies that tried to introduce a competing Aligner product; and 3M, a global manufacturer who tried to introduce a competing Aligner product in May 2018. Yet despite the size and resources of the potentially competing Aligner manufacturers, none of them have been able to gain a foothold in the Aligner market, where Align has maintained an approximately 90 percent share. Indeed, according to 3Shape, Align's CEO insisted that it could "still jack price in the marketplace" notwithstanding potential competitors, and indeed, Align did increase prices in 2019. Thus, because of Align's Scheme, choice has been limited and prices have continued to be supracompetitive.

CLASS ACTION COMPLAINT

74.     Additionally, according to 3Shape, since Align has engaged in this Scheme, 3Shape's business has been injured. Its market share has dropped precipitously in the Scanner market and Align has gained that market share due to the Scheme. This has not only allowed Align to gain a monopoly in the Scanner market, but that Scanner market monopoly has enabled Align to maintain its monopoly in the Aligner market. As a result of the Scheme alleged herein, Defendant's sales of the iTero grew 84% in the first quarter of 2018 and rose by another 50% from the first quarter of 2018 to the third quarter. In 2017, Defendant had over an 80% market share in the market for Scanners in the United States. Were the Scanner market competitive, purchasers would have benefited from greater choice and lower prices.

75.     Defendant intended to harm, and indeed its anticompetitive actions have harmed competition in the Aligner and Scanner markets, resulting in higher prices, reduced competition, and reduced product choice. This is the type of injury that the antitrust laws were intended to prevent and is a direct and proximate result of Defendant's anticompetitive scheme, and therefore Defendant has caused antitrust injury to the Class.

## IV.     JURISDICTION AND VENUE

76.     Plaintiffs bring claims under Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

77.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District. Venue is also proper in this District because of contractual venue provisions imposed by Defendant.

78.     This Court has personal jurisdiction over the Defendant, as it has its headquarters in the District, markets and distributes Aligners and Scanners in this District, enters into contracts within this District, and otherwise transacts business within this District.

## V.     INTERSTATE COMMERCE

79.     The market for Aligners in the United States is a national market.

80.     Defendant has marketed its Invisalign Aligners to Dental Practices and patients in all 50 states.

81.     Defendant has sold its Invisalign Aligners to Dental Practices in all 50 states.

82.     Defendant has recruited and trained dental and orthodontic professionals to perform scans for Invisalign patients in all 50 states, and there are dental and orthodontic professionals who actively perform scans for Invisalign patients in all 50 states.

83.     The market for Scanners in the United States is a national market.

84.     Defendant has marketed and sold its iTero Scanner to Dental Practices in all 50 states.

85.     Defendant's business in Aligners and Scanners involves a continuous and uninterrupted flow of commerce across state lines.

86.     Defendant's anticompetitive actions have had a substantial effect on interstate trade and commerce in the markets for Aligners and Scanners.

## VI.     CLASS ACTION ALLEGATIONS

87.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23 as representative of a Class defined as follows:

> All persons or entities in the United States that purchased Invisalign Aligners and/or iTero Scanners directly from Defendant Align Technology, Inc. during the period beginning March 15, 2015 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). Excluded from the Class are (a) Defendant, its subsidiaries, affiliate entities, and employees, and (b) all federal or state government entities or agencies.

88.     The members of the Class are so numerous that joinder is impracticable. Tens of thousands of Dental Practices have purchased Invisalign Aligners and iTero Scanners directly from Defendant during the Class Period.

89.     There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, *inter alia*:

a.     Whether Defendant terminated its agreement with 3Shape in order to maintain and/or enhance its monopoly power in the market for Aligners;

1          b.      Whether Defendant terminated its agreement with 3Shape in order to

2 maintain and/or enhance its monopoly power in the market for Scanners;

3          c.      Whether Defendant's practice of allowing only its iTero Scanner to send

4 scans directly to Defendant for Invisalign patients on commercially reasonable terms, and

5 preventing 3Shape's Trios Scanner and other potentially competing Scanners from doing so,

6 constitutes a violation of the antitrust laws;

7          d.      Whether Defendant's policy of requiring dentists who wish to prescribe

8 Invisalign Aligners, but who do not use Defendant's iTero Scanner or another approved scanner,

9 to create manual casts of patients' teeth from a silicone mold, involves imposing a burdensome

10 and inefficient alternative;

11          e.      Whether Defendant's refusal to accept, for Invisalign orders, the standard

12 file format used by other Aligner manufacturers, has legitimate medical or technical reasons or is

13 anticompetitive;

14          f.      Whether Defendant's contractual restrictions and penalties imposed on

15 customers for dealing with rivals are anticompetitive;

16          g.      Whether Defendant has substantial market power in the market for

17 Aligners sold in the United States;

18          h.      Whether Defendant has substantial market power in the market for

19 Scanners sold in the United States;

20          i.      Whether Defendant has substantially foreclosed competition in the

21 markets for Aligners and/or Scanners;

22          j.      Whether Defendant's Scheme has artificially raised prices and reduced

23 competition in the market for Aligners;

24          k.      Whether Defendant's Scheme has artificially raised prices and reduced

25 competition in the market for Scanners;

26          l.      Whether Defendant's Scheme has a legitimate pro-competitive

27 justification;

28

m.     Whether the conduct alleged herein artificially maintained, preserved, or enhanced Defendant's market power in the market for Aligners;

n.     Whether the conduct alleged herein artificially maintained, preserved, or enhanced Defendant's market power in the market for Scanners;

o.     The operative time period and extent of Defendant's antitrust violations;

p.     Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for Aligners, and the proper measure of such overcharge damages;

q.     Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for Scanners, and the proper measure of such overcharge damages; and

r.   The appropriate injunctive and equitable relief for the Class.

90.     Plaintiffs' interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that they can fairly and adequately represent and protect the interests of the Class members.

91.     Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions, including substantial experience litigating such cases within this District.

92.     Class treatment of Plaintiffs' federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

93.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

CLASS ACTION COMPLAINT

1

## VII.   RELEVANT MARKETS

2      94.     At all relevant times, Align had substantial market power in the market for Aligners. It

3  had the power to maintain the price of Invisalign at supracompetitive levels profitably without losing

4  substantial sales to other products used for the same purposes as Invisalign.

5      95.     To the extent Plaintiffs' claims require the definition of a relevant market for Aligners,

6  the relevant product market is the market for custom-manufactured, transparent, removable dental

7  aligners made from clear plastic or similar materials.

8      96.     To the extent Plaintiffs' claims require the definition of a relevant market for Aligners,

9  the relevant geographic market is the United States. The Food and Drug Administration has to approve

10  medical devices such as Aligners, and consumers in the United States cannot practically seek out

11  alternative Aligners from other countries that have not been approved for sale and use in the United

12  States. Therefore, the price of Aligners in other countries does not affect the market for Aligners in the

13  United States.

14      97.     There are also high barriers to entry in the Aligner market, due in part to the cost of

15  establishing and running manufacturing facilities and the cost of regulatory approval.

16      98.     At all relevant times, Align has had an approximately 90 percent share of the market for

17  Aligners in the United States. Moreover, there are substantial barriers to entry for potential competitors

18  in the Aligner market.

19      99.     Metal braces are not a reasonable substitute for Aligners. Aligners are used for patients

20  with moderate tooth misalignment, or who cannot receive metal braces due to activities in which they

21  are involved, such as certain sports. Metal braces are used for patients with severe tooth misalignment,

22  for whom Aligners would not be sufficient for proper treatment. Metal braces are also far more

23  uncomfortable, typically take a longer period for treatment to complete, require patients to avoid certain

24  foods, and require repeated visits to an orthodontist.

25      100.    A small but significant and non-transitory artificial inflation of the price of Aligners

26  would not cause any significant number of consumers to purchase other potentially substitutable

27  products, including metal braces, instead, so as to make such price inflation unprofitable. A small but

28

CLASS ACTION COMPLAINT

significant and non-transitory artificial inflation of the price of metal braces would not cause any significant number of consumers to purchase Aligners instead, so as to make the artificial price inflation unprofitable.

101.    At all relevant times, Align had market power in the market for Scanners. It had the power to maintain the price of iTero Scanners at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as iTero Scanners.

102.    To the extent Plaintiffs' claims require the definition of a relevant market for Scanners, the relevant product market is the market for hand-held digital intra-oral scanners designed for ordering Aligners.

103.    To the extent Plaintiffs' claims require the definition of a relevant market for Scanners, the relevant geographic market is the United States. The Food and Drug Administration has to approve medical devices such as Scanners, and dental professionals in the United States cannot practically seek out alternative Scanners from other countries that have not been approved for sale and use in the United States. Therefore, the price of Scanners in other countries does not affect the market for Scanners in the United States.

104.    There are also high barriers to entry in the Scanner market, due in part to the cost of establishing and running manufacturing facilities and the cost of regulatory approval.

105.    At all relevant times, Align has had an approximately 80 percent share in the market for Scanners in the United States. Additionally, there are substantial barriers to entry for potential competitors in the Scanner market.

106.    3Shape's Trios and Defendant's iTero are part of the relevant market for Scanners.

107.    3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners are designed to scan individual teeth for crowns and other localized dental restorative work, and they are not as suitable for performing a full-mouth scan for the customized design of a patient's Aligners, and they are thus not reasonable economic substitutes for Scanners.

108.    Accordingly, 3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners are not part of the relevant market for Scanners.

109.   Silicone molds are not adequate or reasonable substitutes for Scanners. They are unpleasant for patients, and they provide lower accuracy than Scanners.

110.   A small but significant and non-transitory artificial inflation in the price of Scanners would not cause any significant number of consumers to purchase other potentially substitutable products, including 3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners, instead, so as to make the artificial price inflation unprofitable.

**COUNT ONE**

**Monopolization of the Aligner Market (15 U.S.C. §2)**

111.   Plaintiffs repeat and reiterate each of the allegations contained in paragraphs above as if fully set forth herein.

112.   The relevant product market is the Aligner market, and the relevant geographic market is the United States.

113.   As more fully alleged above, Align has willfully and intentionally engaged in conduct that has had the anticompetitive effects of allowing Align to unlawfully maintain and enhance its monopoly in the Aligner market and preventing its rivals from competing for Aligner sales.

114.   Defendant's actions were carried out willfully and with the specific intent to maintain its monopoly power in the Aligner market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

115.   The direct, foreseeable, and proximate result of Defendant's anticompetitive conduct was to increase prices and harm competition in the Aligner market.

116.   There is no legitimate pro-competitive justification for Defendant's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

117.   As a direct, material, and proximate result of Defendant's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

118.   Plaintiffs and the Class seek treble damages for Defendant's violations of § 2 under § 4 of the Clayton Act.

119.     Plaintiffs and the Class also seek an injunction against Defendant, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT TWO

### Monopolization of the Scanner Market (15 U.S.C. §2)

120.     Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

121.     The relevant product market is the Scanner market, and the relevant geographic market is the United States.

122.      As a result of the scheme alleged herein, Defendant possesses monopoly power in the Scanner market, with a market share over 80%.

123.     As more fully alleged above, Align has willfully and intentionally engaged in conduct that has had the anticompetitive effects of allowing Align to unlawfully maintain and enhance its monopoly in the Scanner market and preventing its rivals from competing for Scanner sales.

124.     Defendant's actions were carried out willfully and with the specific intent to maintain its monopoly power in the Scanner market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

125.     The direct, foreseeable, and proximate result of Defendant's anticompetitive conduct was to increase prices and harm competition in the Scanner market.

126.     There is no legitimate pro-competitive justification for Defendant's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

127.     As a direct, material, and proximate result of Defendant's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

128.     Plaintiffs and the Class seek treble damages for Defendant's violations of § 2 under § 4 of the Clayton Act.

129.     Plaintiffs and the Class also seek an injunction against Defendant, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**WHEREFORE, Plaintiffs demand a trial by jury and hereby respectfully request:**

(a)     That the Court determine that Plaintiffs' claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)     That the Court appoint Plaintiffs as the representatives of the Class;

(c)     That Plaintiffs' counsel be appointed as counsel for the Class;

(d)     That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendant's violations of the Sherman Act;

(e)     That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendant from continuing its unlawful acts in violation of the Sherman Act;

(f)     That Plaintiffs and the Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this action;

(g)     That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

(h)     Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Dated:  August 14, 2020

By: _____*/s/ Joseph R. Saveri*_____
        Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940

CLASS ACTION COMPLAINT

Eric L. Cramer
Joshua T. Ripley
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:  (215) 875-4604
Facsimile:   (215) 875-5707
ecramer@bm.net
jripley@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone:  (202) 559-9745
Facsimile:   (215) 875-5707
dwalker@bm.net

John Radice
Daniel Rubenstein
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, New Jersey 08540
Telephone: (646) 245-8502
Facsimile: (609) 385-0745
jradice@radicelawfirm.com
drubenstein@radicelawfirm.com

Daniel J. Mogin (State Bar No. 95624)
Jennifer M. Oliver (State Bar No. 311196)
Timothy Z. LaComb (State Bar No. 314244)
**MOGINRUBIN LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone:  (619) 687-6611
Facsimile:   (619) 687-6610
dmogin@moginrubin.com
joliver@moginrubin.com
tlacomb@moginrubin.com

Gary M. Klinger (pro hac vice forthcoming)
**MASON LIETZ & KLINGER, LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60630
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
gklinger@masonllp.com

CLASS ACTION COMPLAINT

David K. Lietz (pro hac vice forthcoming)
**MASON LIETZ & KLINGER, LLP**
5101 Wisconsin Ave., NW, Ste. 305
Washington, DC 20016
Telephone: (202) 640-1160
Facsimile: (202) 429-2294
dlietz@masonllp.com

Kevin Landau
Miles Greaves (pro hac vice forthcoming)
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, New York 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
klandau@tcllaw.com
mgreaves@tcllaw.com

*Counsel for Individual and Representative Plaintiffs*

CLASS ACTION COMPLAINT