Eric L. Cramer (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-4604
Facsimile: (215) 875-5707
Email: ecramer@bm.net

John Radice (*pro hac vice*)
RADICE LAW FIRM, P.C.
475 Wall Street
Princeton, New Jersey 08540
Telephone: (646) 245-8502
Facsimile: (609) 385-0745
jradice@radicelawfirm.com

Joseph R. Saveri (State Bar No. 130064)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email:    jsaveri@saverilawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*

Additional Counsel on Signature Page

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SIMON AND SIMON, PC d/b/a CITY SMILES** and **VIP DENTAL SPAS,** individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **ALIGN TECHNOLOGY, INC.,** <br><br> Defendant. | Case No. 3:20-cv-03754-VC <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT ALIGN TECHNOLOGY, INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** <br><br> Date: November 5, 2020 <br> Time: 10:00 a.m. <br> Place: Courtroom 4, 17th Floor <br> Judge: The Hon. Vince Chhabria |

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    Introduction ................................................................................................................ 1

II.   Factual Background ..................................................................................................... 2

III.  Argument .................................................................................................................... 5

      A.    Plaintiffs Sufficiently Plead Antitrust Injury ................................................... 5

      B.    Plaintiffs Allege Anticompetitive Conduct ...................................................... 8

            1.    Plaintiffs' allegations concerning Align's Scheme should be considered
                  as a whole ................................................................................................ 8

            2.    Align's web of contracts constitutes illegal exclusive dealing. ............... 10

            3.    Align's termination of the Interoperability Agreement is an illegal refusal
                  to deal ...................................................................................................... 13

IV.   Conclusion ............................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Federal Cases**

*3Shape Trios A/S v. Align Tech., Inc.*,
No. 18-cv-1332, 2020 WL 2559777 (D. Del. May 5, 2020) ....................................1, 8, 10, 13

*Abbott Labs. v. Teva Pharm. USA, Inc.*,
432 F. Supp. 2d 408 (D. Del. 2006)............................................................................................9

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ....................................................................................................5

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996) ........................................................................................................6

*Am. Nat'l Mfg. Inc. v. Select Comfort Corp.*,
No. 16-cv-0582, 2016 WL 9450472 (C.D. Cal. Sept. 28, 2016) ...............................................9

*Am. Prof'l Testing Serv v. Harcourt Brace Jovanovich Legal and Prof'l Publs.*,
108 F.3d 1147 (9th Cir. 1997) ...............................................................................................8, 11

*Apollo Enter. Sols., Inc. v. Lantern Credit, LLC*,
No. 17-cv-02331, 2018 WL 437472 (C.D. Cal. Jan. 16, 2018)................................................11

*Apple iPod iTunes Antitrust Litig.*, Nos. 05-cv-00037, 07-cv-06507, 2010 WL
2629907 (N.D. Cal. Jun. 29, 2010)..........................................................................................15

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)..................................................................................................................14

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
148 F.3d 1080 (D.C. Cir. 1998) .................................................................................................8

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) .....................................................................................................9

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
MDL No. 1917, 2016 WL 7805628 (N.D. Cal. Aug. 4, 2016).................................................6

*Circle Click Media LLC v. Regus Mgmt. Group LLC*,
No. 07-cv-4056 (N.D. Cal. Oct. 14, 2014) ...............................................................................7

*City of Anaheim v. S. Cal. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992) .................................................................................................12

*Cung Le v. Zuffa, LLC*,
216 F. Supp. 3d 1154 (D. Nev. 2016)......................................................................................11

*Dreamstime.com, LLC v. Google, LLC*,
   No. 18-cv-01910, 2019 WL 341579 (N.D. Cal. Jan. 28, 2019)................................................9

*In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*,
   No. 12-cv-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) ........................................................12

*Eastman v. Quest Diagnostics Inc.*,
   No. 15-cv-00415, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016)..............................................9

*In re Flat Glass Antitrust Litig.*,
   191 F.R.D. 472 (W.D. Pa. 1999) ..............................................................................................7

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ....................................................................6, 8, 9, 11

*FTC v. Qualcomm, Inc.*,
   969 F.3d 974 (9th Cir. 2020) ..................................................................................................14

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968)..................................................................................................................6

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) .......................................................................................8, 9, 14

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................................................11

*MetroNet Services Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ..........................................................................................14, 15

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)..........................................................................................................7

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ................................................................................................12

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   No. 12-cv-2102, 2013 WL 6229141 (N.D. Cal. Dec. 2, 2013)...........................................10, 12

*In re Remeron Antitrust Litig.*,
   335 F. Supp. 2d 522 (D.N.J. 2004) ..........................................................................................9

*Ruiz v. City of Santa Maria*,
   160 F.3d 543 (9th Cir. 1998) ..................................................................................................11

*SC Innovations, Inc. v. Uber Techs., Inc.*,
   No. 18-cv-07440-JCS, 2020 WL 2097611 (N.D. Cal. May 1, 2020)........................................8

*Simon and Simon, PC d/b/a City Smiles v. Align Tech., Inc.*,
   No. 19-cv-506, ECF No. 6 (D. Del.)..........................................................................................1

*In re Static Random Access (SRAM) Antitrust Litig.*,
   No. 07-cv-01819, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ...........................................7

*Tawfilis v. Allergan, Inc.*,
   157 F. Supp. 3d 853 (C.D. Cal. 2015) ...................................................................................6

*Tele Atlas N.V. v. NAVTEQ Corp.*,
   397 F. Supp. 2d 1184 (N.D. Cal. 2005) ...............................................................................11

*Tele Atlas N.V. v. NAVTEQ Corp.*,
   No. 05-cv-1673–RS, 2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) .......................................8

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982) .............................................................................................11

*UFCW Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku
   Pharma USA, Inc.*,
   74 F. Supp. 3d 1052 (N.D. Cal. 2014) .................................................................................15

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) ................................................................................................12

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ..............................................................................................................5

*Viamedia, Inc. v. Comcast Corporation*,
   951 F.3d 429 (7th Cir. 2020) .........................................................................................14, 15

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) .....................................................................................10, 12, 13

**State Cases**

*Caiafa Prof. Law Corp. v. State Farm Fire & Cas. Co.*,
   15 Cal. App. 4th 800 (1993) ..................................................................................................6

*Pinkerton's, Inc. v. Superior Court*,
   49 Cal. App. 4th 1342 (1996) ................................................................................................6

*Savea v. YRC Inc.*,
   34 Cal. App. 5th 173 (2019) ..................................................................................................7

*The Rossdale Grp., LLC v. Walton*,
   12 Cal. App. 5th 936 (2017) ..................................................................................................7

**Rules**

Fed. R. Civ. P. 17(a)(3) ..............................................................................................................6

Fed. R. Civ. P. 17(b)(3) ..............................................................................................................7

Plaintiffs Simon and Simon, PC d/b/a City Smiles ("City Smiles") and VIP Dental Spas ("VIP") (collectively, "Plaintiffs") submit this Memorandum in Opposition to Defendant Align Technology, Inc.'s ("Align") Motion to Dismiss Plaintiffs' First Amended Complaint ("Mot.").

## I.    Introduction

Plaintiffs are dentists who bring this antitrust action under Section 2 of the Sherman Act on behalf of thousands of similarly situated small businesses. The First Amended Complaint ("FAC") details how Align engaged in a multifaceted anticompetitive scheme (the "Scheme," described below) to create and maintain two mutually-reinforcing monopolies: in the market for custom-manufactured, transparent, removable dental aligners made from clear plastic ("Aligners"), and in the market for digital intraoral scanners used to generate scans to order Aligners ("Scanners"). A magistrate judge in the District of Delaware held that substantively identical allegations by the foreclosed competitor in the Scanner market, 3Shape, "plausibly alleged [] anticompetitive conduct," and "recommend[ed] that Align's motion [to dismiss] be DENIED." *3Shape Trios A/S v. Align Tech., Inc.*, No. 18-cv-1332, 2020 WL 2559777, at *1 (D. Del. May 5, 2020) (Report and Recommendation) ("*3Shape*").[1]

With profit margins above 75 percent and over a billion dollars a year in sales, Invisalign is Align's crown jewel. FAC ¶ 2. According to Align's CEO, now-expired patents had allowed it to operate without competition for many years. FAC ¶ 9. Facing the loss of its patent monopoly, Align embarked on its illegal Scheme to maintain its dominant 90 percent share of the Aligner market. FAC ¶¶ 2, 11. Align also sells a Scanner, called iTero, and the Scheme enabled Align to increase its share of the Scanner market to approximately 80 percent. FAC ¶ 3.

Align's Scheme includes (1) the anticompetitive "closed system" design of its iTero Scanner, which locks customers into Invisalign Aligners; (2) the unilateral termination of its

---

[1] Align argues that Plaintiffs filed in this District "seeking a more sympathetic forum," an odd contention given that 3Shape's complaint in Delaware has been upheld. In reality, Plaintiffs refiled in this Court because Align argued that a choice-of-venue provision in City Smiles' Scanner purchase agreement required transfer to this Court. *See Simon and Simon, PC d/b/a City Smiles v. Align Tech., Inc.*, No. 19-cv-506, ECF No. 6 (D. Del.). And while the Delaware magistrate judge recommended dismissal without prejudice of both 3Shape's and Plaintiffs' *initial* complaints, 3Shape filed an amended complaint, which is similar to Plaintiffs' FAC in this case, that was upheld by the Delaware magistrate judge. *3Shape*, 2020 WL 2559777, at *1.

profitable interoperability agreement with 3Shape (the "Interoperability Agreement") that had enabled users of 3Shape's Trios scanner to order Invisalign Aligners; and (3) a series of de facto exclusive contracts that further lock customers into the iTero and Invisalign products. FAC ¶ 11. Through this Scheme, Align substantially foreclosed competition from 3Shape, the only other Scanner designed for ordering Aligners, and Align then used its Scanner monopoly, in turn, to insulate Invisalign from competition in the Aligner market. FAC ¶¶ 12-16. As a result, Plaintiffs and members of the proposed Class have reduced choice of products (for them and their patients) and have paid and continue to pay supracompetitive prices on their purchases of iTero and Invisalign from Align. FAC ¶¶ 73-75.

Align's arguments are unavailing. First, Align argues that Plaintiffs failed to allege antitrust injury, but Plaintiffs properly alleged injury in the form of overcharges in *both* the Aligner and Scanner markets, even though allegations concerning overcharges in *either* market would suffice. Second, Align's argument that the effects of the Scheme cannot be considered as a whole—and that every facet must be anticompetitive on its own—is wrong as a matter of law. Finally, Plaintiffs allege that Align engaged in anticompetitive conduct, including unlawful exclusive dealing through contracts that act as de facto exclusive restrictions on customers and an unlawful refusal to deal when Align unilaterally terminated the profitable Interoperability Agreement with 3Shape. Align's Scheme substantially foreclosed Aligner and Scanner market competition, increased Align's monopoly power in both markets, and enabled Align to charge supracompetitive prices to Plaintiffs and the proposed Class. Align's Motion should be denied.

## II.    Factual Background

Plaintiffs allege that Align's anticompetitive Scheme foreclosed competition and enabled Align to maintain monopoly power in the Scanner and Aligner markets.

First, Align designed its iTero as a "closed system" Scanner so that iTero owners would find it expensive, inefficient, and impracticable to use it to order non-Invisalign Aligners. FAC ¶¶ 7-8, 32-33; *see also id.* ¶¶ 22, 25-27, 68, 72-75. A dental practice with an iTero cannot electronically order non-Invisalign Aligners unless it uses an expensive and time-consuming conversion process. *Id.* ¶ 33. In 2018, Align touted this linkage between its market dominant

Scanner and maintaining dominance in Aligners as a key barrier to entry, telling investors that "to obtain the results we have, you have to have that whole entire technology ready and integrated, something that our competitors don't have today." *Id.* ¶ 8.

Align also touted its push for increasing the installed base of Scanners to drive customers to its Aligners, telling investors: "[W]e're in the clear aligner business and anything that help [sic] us to sell more clear aligners directly . . . would be in our . . . range. So that's why we have a scanner business. We have a scanner business not from a diversification standpoint. We have a scanner business because it allows us to sell more clear aligners." *Id.* ¶ 25. That equation is only true if, as is the case here, iTero is designed to work *only with Invisalign*; otherwise, increasing the use of Scanners could potentially drive business to competing Aligners, which would endanger Align's profitable monopoly in the Aligner market. *See id.* ¶ 27. By contrast, rival company 3Shape's Trios Scanner is an "open system" Scanner that can easily order Aligners from other manufacturers without those difficulties. *Id.* ¶¶ 7, 27, 37-38.

Second, in 2018, Align unilaterally terminated its profitable Interoperability Agreement, entered into in 2015, which allowed users of 3Shape's Trios Scanner to use that Scanner to order Invisalign. *Id.* ¶¶ 11, 14, 27, 34, 37-50. The Interoperability Agreement resulted in tens of thousands of Invisalign orders from Trios owners and was highly profitable to Align. *Id.* ¶¶ 38-39, 45-47, 50. Recognizing that an "open system" Scanner like Trios (which facilitated the sale of Invisalign *and* rival Aligners) threatened Invisalign's dominance, beginning in 2016, Align proposed an agreement whereby 3Shape would make its Trios Scanners send scans *exclusively* to Align for Invisalign Aligners. *Id.* ¶¶ 26-27, 39-43. 3Shape refused exclusivity. *Id.* ¶¶ 41-42.

Unsuccessful in the effort to get 3Shape to agree to an exclusionary relationship, in December 2017, Align terminated the Interoperability Agreement effective January 31, 2018, cutting off Trios users' access to Invisalign. *Id.* ¶¶ 43-45. An outcry by dental practices and the American Association of Orthodontists followed but Align refused to continue its profitable course of dealing with 3Shape. *Id.* ¶ 45. Internationally, though, where Invisalign does not have Aligner dominance, Align continues to allow Trios users to order Invisalign. *Id.* ¶ 47-48. Given the tens of thousands of Invisalign orders coming from Trios, and the fact that each such

treatment costs several thousand dollars, Align's unilateral termination of the Interoperability Agreement cost Align millions of dollars in profits, which only made economic sense because it enabled Align to extend its monopoly power. *Id.* ¶¶ 46-48, 50.

Third, beginning in 2018, Align entered into long-term exclusive contracts with two of the largest dental service organizations ("DSOs"), Heartland Dental and Aspen Dental, that effectively exclude 3Shape from their members' dental offices. *Id.* ¶¶ 11, 14, 51-56, 70, 72-75. Heartland and Aspen, each with thousands of member practices, are a "strategic part of [Align's] overall strategy" because they are a "force multiplier" for Align and are the most efficient means of reaching large numbers of independent dental practices. *Id.* ¶¶ 51-54, 56. Align's agreements with Heartland and Aspen tied iTero discounts to multi-year Invisalign commitments. *Id.* ¶¶ 52-54, 70. According to 3Shape, even though Trios scored higher in DSO practice evaluations, DSOs nevertheless told 3Shape that its Trios was not a viable option because it could not be used to order Invisalign, and thus would not allow the DSO practices to obtain the discounts that were dependent on Invisalign orders. *Id.* ¶ 55. Then, in the anticompetitive feedback loop designed by Align, because iTero can only be used to order Invisalign, the DSO contracts also excluded Aligner competitors from these DSO practices. *See id.* ¶ 52-53. Indeed, Align said that Heartland's "front-loading their businesses with iTero" will "give them a very strong position in clear aligners." *Id.* ¶ 53. These contracts excluded Scanner and Aligner competition from a substantial share of the market. *Id.* ¶¶ 11-12, 14, 16, 51-53, 55-56; *see also id.* ¶¶ 67-75.

Fourth, Align launched the "Fusion" program, in which the iTero Scanner price depends on meeting certain minimum sales targets for Invisalign. *Id.* ¶¶ 11, 14, 57-61, 70. A dental practice that fails to meet those minimum sales targets would incur penalties of up to $10,000 per iTero Scanner. *Id.* ¶¶ 58-59. Align sets the sales targets at levels that require participants to exclusively order Invisalign to avoid the penalties, and, in turn, the practice must use iTero because it is the only Scanner that can be used to order Invisalign. *Id.* ¶¶ 58-59, 70. This program further excludes Scanner and Aligner rivals from large portions of the markets. *Id.* ¶¶ 60, 67-75.

Fifth, Align altered the requirements for its "Advantage" program to make it a de facto exclusive-dealing program. *Id.* ¶¶ 11, 13, 62-66. Align offers a tiered discount program called the

Advantage Program, under which a dental practice's Invisalign price discount is tied to its number of Invisalign orders. *Id.* ¶¶ 11, 13, 62-63. Align changed the Aligner purchase requirement from lifetime sales to those in the last six or twelve months, which means that a practice must maintain its level of purchases continuously in order to qualify for the prices it needs to offer Invisalign to its patients at competitive prices. *Id.* ¶¶ 62-63. Thus, a dental practice that wants to offer Invisalign at a competitive price is essentially required (1) to use an iTero Scanner, because it is the only Scanner that is able to order Invisalign under commercially reasonable terms; and (2) to only prescribe Invisalign because otherwise the practice will not reach the high sales tiers that would give it the low Invisalign prices that allow it to be competitive in the marketplace. *Id*. ¶¶ 62, 64-66.

In sum, Align used its monopoly power in the Scanner market to maintain and increase its dominance of the Aligner market, and likewise, used its monopoly power in the Aligner market to maintain and increase its dominance of the Scanner market. *See, e.g.*, *id.* ¶¶ 11-16, 67-75. This substantially foreclosed rival Aligner and Scanner manufacturers from competing and has allowed Align to charge supracompetitive prices for Aligners and for Scanners. *Id.*

## III.    Argument

Plaintiffs allege in detail two claims under the Sherman Act § 2, which has two elements: "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). In addition, a plaintiff must allege antitrust injury. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal*., 190 F.3d 1051, 1055-56 (9th Cir. 1999). Align does not challenge Plaintiffs' allegations that Align possesses monopoly power over Aligners and Scanners. Align instead argues that Plaintiffs failed to allege (a) antitrust injury or (b) that Align engaged in any anticompetitive conduct. Align is wrong.

### A.    Plaintiffs Sufficiently Plead Antitrust Injury

Plaintiffs sufficiently pled antitrust injury by alleging that they paid overcharges when they purchased Invisalign and iTero at prices inflated by Align's Scheme. FAC ¶¶ 18-19. An

overcharge is the difference between the price paid and the competitive price. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489, 494 (1968). It is the quintessential antitrust injury. *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012).[2]

Align argues that Plaintiffs failed to allege injury because (1) both Plaintiffs purportedly failed to allege post-2017 Invisalign purchases; (2) Plaintiff VIP supposedly "never purchased a scanner or Invisalign" from Align because the purchase orders were signed by VIP's sole proprietor, Dr. Matian; and (3) Plaintiff City Smiles purportedly purchased its Scanner before the Scheme began. Mot. at 6-8. Align is wrong.

First, even assuming *arguendo* that the Scheme began in 2017, both Plaintiffs allege that they "regularly purchased Invisalign . . . ***throughout the Class Period***," which runs from March 15, 2015, until the anticompetitive conduct ceases. FAC ¶¶ 18-19, 87 (emphasis added). Each such purchase incurred an overcharge and therefore caused antitrust injury.[3]

Second, it is immaterial that Plaintiff VIP's sole owner, Dr. Matian, is listed on purchase orders rather than VIP. Dr. Matian operates his dental practice as a professional corporation— Sherwin Matian DMD, A Dental Corporation d/b/a VIP Dental Spas. There is no legal distinction between VIP and Dr. Matian because use of a d/b/a "*does not create an entity distinct from the person operating the business*." *Pinkerton's, Inc. v. Superior Court*, 49 Cal. App. 4th 1342, 1348 (1996) (emphasis in original).[4] Because Dr. Matian is the sole owner of VIP,[5] VIP is not separate from Dr. Matian, and VIP paid overcharges on both products.[6]

---

[2] *See also*, *e.g.*, *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 864 (C.D. Cal. 2015); *cf. Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996) ("[I]t is difficult to image a more typical example of anti-competitive effect than higher prices.").

[3] Align has documentation of these direct purchases and cannot claim not to know the precise details of Plaintiffs' purchases, which have continued into 2020.

[4] Likewise, a professional corporation and its sole shareholder are "[p]lainly . . . substantially identical parties." *Caiafa Prof. Law Corp. v. State Farm Fire & Cas. Co.*, 15 Cal. App. 4th 800, 807 n.5 (1993) (quotation marks omitted).

[5] Similarly, Dr. Matian purchased the iTero on behalf of VIP and for use at VIP, and a company does not lose antitrust standing because its agent or employee signs a purchase order. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 7805628, at *14-15 (N.D. Cal. Aug. 4, 2016) (citing cases).

[6] If deemed necessary, Plaintiffs will seek leave to amend the Complaint to include Dr. Matian as a party, although that is form over substance given his complete ownership of Plaintiff VIP. *See* FED. R. CIV. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the

Further, to the extent Align argues that VIP lacks capacity to sue, Align is wrong. Mot. at 7. Under California law, which controls, *see* FED. R. CIV. P. 17(b)(3), a company can "file a lawsuit under its fictitious business name." *Savea v. YRC Inc*., 34 Cal. App. 5th 173, 179 (2019); *see also The Rossdale Grp., LLC v. Walton*, 12 Cal. App. 5th 936, 945-46 (2017). Plaintiffs sufficiently alleged that VIP suffered antitrust injury.

Third, Align argues that the Scheme began in 2017, and that City Smiles did not suffer antitrust injury because it purchased its iTero in December 2016. Mot. at 6-7. This argument is irrelevant to antitrust standing because City Smiles alleged antitrust injury by virtue of paying overcharges on Invisalign throughout the Class Period. *Supra* p. 6. Indeed, the FAC defines the Class to include "[a]ll persons or entities in the United States that purchased Invisalign Aligners *and/or* iTero Scanners," FAC ¶ 87 (emphasis added), and thus, the Class includes direct purchasers who paid overcharges on either Aligners *or* Scanners. It is sufficient that each Plaintiff paid one overcharge on one product for each to have antitrust standing and represent the proposed Class. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("'Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage.'" (quoting Joshua P. Davis & Eric L. Cramer, *Antitrust, Class Certification, and the Politics of Procedure*, 17 Geo. Mason L. Rev. 969, 984-85 (2010))); *In re Static Random Access (SRAM) Antitrust Litig.*, No. 07-cv-01819, 2008 WL 4447592, at *3 (N.D. Cal. Sept. 29, 2008); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999).[7]

In sum, Plaintiffs alleged antitrust injury.

---

name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to . . . be substituted into the action.").

[7] Moreover, Plaintiffs do not "recognize" that Align had a lawful patent monopoly prior to 2017. Mot. at 7. Plaintiffs allege a Class Period, and injury, going back to 2015. FAC ¶ 18. Whether the Scheme existed prior to 2017 is a factual dispute, and "[a]t the motion to dismiss stage, the Court must resolve all disputed facts in the Plaintiffs' favor." *Circle Click Media LLC v. Regus Mgmt. Group LLC*, No. 07-cv-4056, at *3 (N.D. Cal. Oct. 14, 2014) (citations omitted). But the Court need not even engage with this dispute because Plaintiff City Smiles alleges injury on purchases of Invisalign.

**B.      Plaintiffs Allege Anticompetitive Conduct**

The FAC describes Align's anticompetitive conduct in detail. "According to the Ninth Circuit, anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Free FreeHand*, 852 F. Supp. 2d at 1180 (internal citations, quotation marks, and alterations omitted). "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.'" *SC Innovations, Inc. v. Uber Techs., Inc.*, No. 18-cv-07440-JCS, 2020 WL 2097611, at *10 (N.D. Cal. May 1, 2020) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). But using monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor" is anticompetitive conduct. *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997).

Plaintiffs allege that Align, through its "closed system" Scanner design, unilateral termination of the profitable Interoperability Agreement, and web of exclusionary contracts, used its monopoly power to foreclose the ability of rival Aligner and Scanner manufacturers to compete. *Supra* pp. 2-5. This enabled Align to increase its monopoly power in both markets and overcharge Plaintiffs and Class members. Those allegations are sufficient at the pleading stage.

**1.      Plaintiffs' allegations concerning Align's Scheme should be considered as a whole.**

Plaintiffs' allegations, taken together, explain how Align impaired the ability of rivals to compete in both the Aligner and Scanner markets. Align does not address this overall anticompetitive effect nor explain why these allegations, already found cognizable in the *3Shape* case in Delaware, do not constitute anticompetitive conduct under controlling law. Instead, Align asserts that each element of the Scheme is legal individually, and thus, that the Court cannot consider the "synergistic effects" of the Scheme. Mot. at 14. Align is incorrect both because components of the Scheme are illegal on their own, and because each component need not be.

"[A]nticompetitive conduct may include otherwise *legal* conduct." *Tele Atlas N.V. v. NAVTEQ Corp.*, No. 05-cv-1673–RS, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008)

(emphasis in original).[8] Courts should thus consider the aggregated anticompetitive effects of a multifaceted scheme even where one part of the alleged anticompetitive activity "could not stand alone as a Sherman Act violation," provided the alleged anticompetitive activities, viewed in the aggregate, "tended 'to impair the opportunities of rivals' and 'did not further competition on the merits.'" *Free FreeHand*, 852 F. Supp. 2d at 1184 (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008)).

Align primarily relies on *Dreamstime.com, LLC v. Google, LLC*, No. 18-cv-01910, 2019 WL 341579 (N.D. Cal. Jan. 28, 2019), for its argument that Plaintiffs' Scheme allegations should not be considered together. Mot. at 14. *Dreamstime* does not support Align. The court considered the plaintiff's allegations as a whole, but then dismissed the complaint because the plaintiff alleged no exclusionary conduct that impaired rivals or harmed consumers, stating that "showing harm to one *customer* does not on its own demonstrate anticompetitive conduct," and that "'the real intent of a consumer welfare test is to identify practices that both exclude rivals from the market and harm consumers.'" *Dreamstime*, 2019 WL 341579 at *7 (emphasis added).[9]

Here, Plaintiffs allege exclusionary conduct that impaired rivals' ability to compete, foreclosed the relevant markets, and thereby caused injury to consumers in the form of reduced choice and artificially inflated prices. FAC ¶¶ 8, 11-16, 32-75. Through its overall Scheme, Align used its monopoly power "to foreclose competition, to gain a competitive advantage, [and] to destroy a competitor," *Image Tech. Serv.*, 125 F.3d at 1208, to maintain or enhance its monopoly power in the Aligner and Scanner markets. Those allegations describe anticompetitive conduct that violates the Sherman Act § 2.

---

[8] *See also Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 428 (D. Del. 2006) ("Plaintiffs are entitled to claim that individual acts are antitrust violations, as well as claiming that those acts as a group have an anticompetitive effect even if the acts taken separately do not."); *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522, 528 (D.N.J. 2004).

[9] The court went on to hold that the plaintiff "disavowed" the theory that would have alleged harm to competition. *Id.* at *6. Similarly, *Eastman v. Quest Diagnostics Inc.*, No. 15-cv-00415, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016), and *Am. Nat'l Mfg. Inc. v. Select Comfort Corp.*, No. 16-cv-0582, 2016 WL 9450472 (C.D. Cal. Sept. 28, 2016), do not support Align's argument. In both cases, the court held that a scheme should be considered as a whole, but that a plaintiff still must allege conduct that, if proven, could constitute anticompetitive conduct.

### 2.    Align's web of contracts constitutes illegal exclusive dealing.

Plaintiffs' allegations state a claim for exclusive dealing, which requires a showing of "significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 12-cv-2102, 2013 WL 6229141, *5 (N.D. Cal. Dec. 2, 2013) (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012)). Courts "'look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world.'" *Id.* (quoting *ZF Meritor*, 696 F.3d at 270)).

Plaintiffs allege that Align entered a series of exclusionary contracts, including long-term exclusive contracts with DSOs, the Fusion program that tied iTero prices to Invisalign purchases, and the Advantage program that conditioned Invisalign prices on commitments that would exclude other Aligners. FAC ¶¶ 51-66. The FAC then alleges in detail how these contracts, in conjunction with the exclusionary "closed system" iTero design and the unilateral termination of the Interoperability Agreement, operated as de facto exclusive contracts that penalized customers who purchase from rivals in both the Aligner and Scanner markets and locked customers into the Align system, thus substantially foreclosing competition in both markets and enabling Align to continue charging supracompetitive prices for Invisalign and iTero. *Id.* ¶¶ 12, 50, 67-75. A magistrate judge in Delaware already has upheld 3Shape's substantially identical exclusive dealing allegations, finding "enough detail to make it plausible that the effect of the alleged exclusive dealing arrangements was to substantially foreclose competitors from the relevant markets." *3Shape*, 2020 WL 2559777, at *5.

Align nevertheless argues that Plaintiffs' allegations fail because Plaintiffs purportedly did not allege substantial foreclosure or exclusivity. Align is wrong.

First, in arguing that Plaintiffs fail to allege plausible substantial foreclosure, Align incorrectly focuses only on the DSO contracts and ignores the Fusion and Advantage programs, as well as the other components of the Scheme that enable Align to foreclose competition. It is well established that plaintiffs may allege foreclosure as a result of *cumulative* conduct and that

courts do not consider the anticompetitive effects of each element in isolation. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303 (9th Cir. 1982) (noting that "arguably innocuous single contracts" may support an exclusive dealing claim where the contracts "belong to a pattern of contractual relations that significantly restrain trade in a relevant market"); *Free FreeHand*, 852 F. Supp. at 1184; *Cung Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1168 (D. Nev. 2016) ("Plaintiffs allege multiple acts that, as a whole, constitute an anticompetitive scheme. Exclusive dealing arrangements are but a part of this scheme.").

Second, Align asserts that Plaintiffs fail to allege substantial foreclosure because Plaintiffs do not plead a specific market share foreclosed by the Scheme.[10] But to survive a motion to dismiss, a plaintiff need only put a defendant on notice of how a "scheme operates," not provide specific facts or numerical precision. *Tele Atlas N.V. v. NAVTEQ Corp.,* 397 F. Supp. 2d 1184, 1190 (N.D. Cal. 2005). "Plaintiff need not plead specific facts plausibly showing that the exclusivity provisions in [defendant's] contracts are anticompetitive. . . . Such conduct may be inferred, for example, by market share." *Le*, 216 F. Supp. 3d at 1167 (quoting *Am. Prof'l Testing Serv v. Harcourt Brace Jovanovich Legal and Prof'l Publs.*, 108 F.3d 1147, 1151 (9th Cir. 1997)). Substantial foreclosure is plausibly alleged where the defendant's exclusionary conduct "plac[es] a significant amount of potential . . . business beyond the grasp of any competitors." *Twin City Sportservice, Inc.*, 676 F.2d at 1304 (affirming judgment for plaintiff on exclusive dealing claim where defendants controlled only 24 percent of the market). And "if the defendant occupies a dominant position in the market, its exclusive dealing arrangements

---

[10] Align's Request for Judicial Notice (ECF No. 25) ("RJN") should be denied. First, the figures concerning total dentists in the U.S. and DSO-affiliated dentists are irrelevant for purposes of this action and therefore not subject to judicial notice. *Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (9th Cir. 1998). "Total dentists" include numerous professionals who do not offer Aligners, dental school faculty, and student interns (Marenberg Decl., Ex. 2 at 3); "DSO-affiliated dentists" only include those affiliated with a small subset of DSOs. *See* Marenberg Decl., Ex. 1 at 2. Second, Align relies on the statement from Heartland Dental's website for its truth, which Align's authority finds improper. *See, e.g., Apollo Enter. Sols., Inc. v. Lantern Credit, LLC*, No. 17-cv-02331, 2018 WL 437472, at *2-3 (C.D. Cal. Jan. 16, 2018) ("When a court takes judicial notice of publications like websites and newspaper articles, the court merely notices what was in the public realm at the time, *not whether the contents of those articles were in fact true.*"). Third, Align uses these "facts" to create factual disputes that cannot be resolved at this stage. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1001 (9th Cir. 2018).

invariably have the power to exclude rivals." *ZF Meritor*, 696 F.3d at 284.

Plaintiffs allege that Align controls 90 percent of the Aligner market, and that Align used its contracts and other components of the Scheme to block Trios (the lone Scanner competitor) from that market. FAC ¶¶ 2, 67-75. Plaintiffs also allege that Align controls approximately 80% of the Scanner market, and that Align's Scheme has locked those iTero customers into Invisalign, thereby foreclosing that portion of the market to rival Aligner manufacturers. FAC ¶¶ 3, 32-36, 72-74. Plaintiffs allege substantial foreclosure in both markets. FAC ¶¶ 73-75. That is sufficient at the pleading stage. *See, e.g.*, *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("We are not dealing with a mathematical equation. We are dealing with what has been called the 'synergistic effect' of the mixture of the elements.").

Further, Align's assertions that there might be other markets or means of distribution for its potential rivals to exploit, Mot. at 10, is unavailing at the pleadings stage because Plaintiffs have plausibly alleged that Align used its monopoly power to substantially foreclose competition. *See Pro Search Plus*, 2013 WL 6229141, at *7 ("[T]he Court finds it premature to determine whether the agreements do in fact leave open alternative channels of distribution.").[11] Plaintiffs' allegations detailing Align's restrictions on competition—by cutting off DSOs as distribution channels for competitor Scanners and Aligners, foreclosing Dental Practices from ordering non-Invisalign Aligners through the Fusion and Advantage Programs, and terminating the Interoperability Agreement to bar Dental Practices from using 3Shape's Scanner to order Invisalign Aligners—are sufficient to satisfy Plaintiffs' burden at the pleading stage. *See, e.g.*, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit.").

---

[11] Align cites *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), for the proposition that "[t]he foreclosure effect . . . depends on the market share involved." Mot. at 9. The lower court's order on appeal in *Omega* was an entry of judgment following summary judgment, not a motion to dismiss. *Omega* therefore does not disrupt the well-established rule that "[t]he question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage." *In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, No. 12-cv-711, 2013 WL 812143, at * 19 (D.N.J. Mar. 5, 2013).

Third, Align argues that Plaintiffs' claims should be dismissed because Plaintiffs purportedly fail to allege exclusive contracts. Mot. at 9. This is wrong. Express exclusivity is not required where "the effect of the agreement 'in the real world' demonstrates that competitors are excluded from a substantial share of the relevant market." *3Shape*, 2020 WL 2559777, at *5 (quoting *ZF Meritor*, 696 F.3d at 270-272, 282-83). Plaintiffs allege that the contracts—in conjunction with the termination of the Interoperability Agreement and the exclusionary iTero design—effectively require exclusive use of Invisalign by iTero owners and exclusive use of iTero by Invisalign prescribers. FAC ¶¶ 13-16, 52, 58-60, 64-65, 68-70.[12]

Magistrate Judge Hall, in the District of Delaware, analyzed these same facts in *3Shape* and concluded that 3Shape "plausibly alleges unlawful exclusive dealing" in the Scanner and Aligner Markets. *3Shape*, 2020 WL 2559777, at *6. Like Plaintiffs, 3Shape based its exclusive dealing claim on Align's DSO arrangements, Fusion program, and Advantage program, arguing these actions had "actual anticompetitive effects, including higher costs for consumers." *Id.* at *2-3, 6. Despite dismissing a previous iteration of 3Shape's complaint, Magistrate Judge Hall concluded "there is enough detail to make it plausible that the effect of the alleged exclusive dealing arrangements was to substantially foreclose competitors from the relevant markets." *Id.* at *5. Align does not explain why the Court should reach a different conclusion here.

### 3. Align's termination of the Interoperability Agreement is an illegal refusal to deal.

Align violated the Sherman Act § 2 when it unilaterally terminated the Interoperability Agreement, foregoing millions of dollars in short-term profits for the purpose of monopolizing the Aligner and Scanner markets. FAC ¶¶ 37-50. "Section 2 of the Sherman Act prohibits a monopolist's unilateral . . . refusal to deal[] if that conduct harms the competitive process in the

---

[12] Moreover, Align asserts that Plaintiffs have not alleged that the contractual discounts are conditioned on exclusivity, but that is not true. *See, e.g.*, FAC ¶ 14 (Align's DSO contracts and Fusion Program "tie[] iTero discounts to such high levels of Invisalign commitments over a number of years that those customers are essentially locked into using both the iTero and Invisalign exclusively."); *id.* ¶ 62 (Align's Advantage Program requires Dental Practices to "maintain a very high prescribing level of Invisalign in order to keep the prices that would allow their practice to offer competitive prices to patients").

absence of a legitimate business justification." *Image Tech. Serv.*, 125 F.3d at 1209-11. At the

pleading stage, a plaintiff need only allege "evidence of market structure (i.e., market power and

relevant markets)," "exclusionary effect," and "that the refusal to deal has *some* of the key

anticompetitive characteristics identified in *Aspen Skiing*." *Viamedia, Inc. v. Comcast

Corporation*, 951 F.3d 429, 462 (7th Cir. 2020) (emphasis added) (citing *Aspen Skiing Co. v.

Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). The *Aspen Skiing* factors include, *e.g.*,

whether there was "a voluntary and profitable course of dealing," whether "the only conceivable

rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long

run from the exclusion of competition," and whether "the refusal to deal involves products that

the defendant already sells in the existing market to other similarly situated customers." *FTC v.

Qualcomm, Inc.*, 969 F.3d 974, 994 (9th Cir. 2020) (internal quotation marks and citations

omitted).

Plaintiffs allege that Align has substantial market power in both relevant markets and that

3Shape lost market share in the Scanner market because Align terminated the Interoperability

Agreement. FAC ¶¶ 16, 73-74, 94, 101. Plaintiffs further allege: (1) the Interoperability

Agreement was profitable and voluntary; (2) Align sacrificed millions of dollars in Invisalign

profits by terminating the agreement; (3) the only rationale for the termination was the promise

of even greater monopoly profits; (4) Align allows scanners not specially designed for use with

Aligners to order Invisalign; and (5) Align allows the Trios to be used to order Invisalign in

Europe, where Align does not have dominance in the Aligner market. *Id.* ¶¶ 11, 26, 33, 43-47.

These allegations state a claim under the Sherman Act § 2.[13]

---

[13] Align misstates the holding from *MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th
Cir. 2004), which does not require allegations that a defendant refuses to sell a product to a
plaintiff at retail price; it simply identifies this as one factor that the Supreme Court "found
significant for creating antitrust liability" in *Aspen Skiing* because it "indicated a willingness to
sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of
competition." *Id.* at 1132. Plaintiffs allege that Align sacrificed short-term profits to exclude
rivals and obtain higher long-term profits. FAC ¶ 46. Plaintiffs also allege that prior to
terminating the Interoperability Agreement, Align repeatedly pressured 3Shape to discard its
"open" system, which enables Trios scans to be sent to various Aligner manufacturers, and
instead deal exclusively with Align. *Id.* ¶¶ 39-42. These allegations support the inference that

Align argues that Plaintiffs fail to allege that the only conceivable rationale for the termination was to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition because "[t]he FAC itself identifies the procompetitive rationale: the multiple patent enforcement actions Align filed against 3Shape, before terminating interoperability." Mot. at 13. This is unavailing, for three reasons.

First, Plaintiffs allege that the "termination [of the Interoperability Agreement] represented a sacrifice of revenue for Align, and it was economically irrational but for the market exclusion this profit sacrifice created." FAC ¶ 46. Second, Plaintiffs need not prove the absence of legitimate procompetitive justification at the pleading stage because "the calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a *pleading* standard." *Viamedia*, 951 F.3d. at 462 (emphasis in original) (reversing dismissal of refusal to deal claim); *see also UFCW Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1067 & n.16 (N.D. Cal. 2014) (explaining that a "procompetitive" justification is "an affirmative defense to an antitrust claim that may not be raised in a motion to dismiss") (collecting cases).[14] Third, taking this procompetitive justification on its own terms, it is implausible given that (a) Align entered into the Interoperability Agreement when it had patents that purportedly were being infringed by 3Shape, (b) Align only terminated the Interoperability Agreement when 3Shape refused to commit to exclusivity, and (c) Align continued to accept scans from 3Shape's Scanner internationally, where Align has a less secure market position. FAC ¶¶ 37-50.

In short, Plaintiffs' allegations state an unlawful refusal to deal under Sherman Act § 2.

## IV.   Conclusion

Align's Motion should be denied.

---

Align's willingness to sacrifice short-term profits by terminating interoperability was "prompted not by competitive zeal but by anticompetitive malice." *MetroNet Services*, 383 F.3d at 1132.
[14] *See also*, *e.g.*, *Apple iPod iTunes Antitrust Litig.*, Nos. 05-cv-00037, 07-cv-06507, 2010 WL 2629907, at *7 (N.D. Cal. Jun. 29, 2010) (noting "validity of a claimed business justification is a question of fact" and denying motion to dismiss in § 2 case).

Dated: September 30, 2020                      Respectfully submitted,


                                              By: */s/ Joseph R. Saveri*
                                              Joseph R. Saveri

                                              Joseph R. Saveri (State Bar No.
                                              130064)
                                              Steven N. Williams (State Bar No.
                                              175489)
                                              Kevin E. Rayhill (State Bar No.
                                              267496)
                                              **JOSEPH SAVERI LAW FIRM,
                                              INC.**
                                              601 California Street, Suite 1000
                                              San Francisco, California 94108
                                              Telephone: (415) 500-6800
                                              Facsimile:  (415) 395-9940
                                              Email: jsaveri@saverilawfirm.com
                                                      swilliams@saverilawfirm.com
                                                      krayhill@saverilawfirm.com


                                              Eric L. Cramer (*pro hac vice*)
                                              Joshua T. Ripley (*pro hac vice*)
                                              **BERGER MONTAGUE PC**
                                              1818 Market Street, Suite 3600
                                              Philadelphia, PA 19103
                                              Telephone: (215) 875-4604
                                              Facsimile:  (215) 875-5707
                                              Email: ecramer@bm.net
                                                      jripley@bm.net


                                              Daniel J. Walker (*pro hac vice*)
                                              **BERGER MONTAGUE PC**
                                              2001 Pennsylvania Avenue, NW, Suite
                                              300
                                              Washington, DC 20006
                                              Telephone: (202) 559-9745
                                              Facsimile:  (215) 875-5707
                                              Email: dwalker@bm.net

John Radice (*pro hac vice*)
April Lambert (*pro hac vice*)
Natasha Fernandez-Silber (*pro hac vice
forthcoming*)
Daniel Rubenstein (*pro hac vice*)
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, New Jersey 08540
Telephone: (646) 245-8502
Facsimile:  (609) 385-0745
Email: jradice@radicelawfirm.com
        alambert@radicelawfirm.com
        nsilber@radicelawfirm.com
        drubenstein@radicelawfirm.com


Daniel J. Mogin (SBN No. 95624)
Jennifer M. Oliver (SBN 311196)
Timothy Z. LaComb (SBN 314244)
**MOGINRUBIN LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile:  (619) 687-6610
Email: dmogin@moginrubin.com
        joliver@moginrubin.com
        tlacomb@moginrubin.com


Kevin Landau (*pro hac vice*)
Miles Greaves (*pro hac vice
forthcoming*)
**TAUS, CEBULASH & LANDAU,
LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704
Facsimile:  (212) 931-0703
Email: klandau@tcllaw.com
        mgreaves@tcllaw.com

17

David K. Lietz (*pro hac vice*)
Gary M. Klinger (*pro hac vice*)
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (202) 640-1168
Facsimile:  (202) 429-2294
Email: dlietz@masonllp.com
          gklinger@masonllp.com

*Attorneys for Plaintiffs and the*
*Proposed Class*