UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMON AND SIMON, PC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>Defendant. | Case No.  20-cv-03754-VC<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. No. 52 |

     This case involves Invisalign, the popular dental aligner that dentists sell patients to straighten their teeth. According to the plaintiffs, the company that makes Invisalign has a monopoly in the aligner market as well as the market for scanners that are used to produce aligners. The company has allegedly engaged in a multifaceted scheme to stifle competition in these markets—a scheme that has achieved its intended result of entrenching the company's monopoly power, reducing consumer choice in both markets, and preserving its ability to charge supracompetitive prices for aligners and scanners. Although the complaint could have done a better job of explaining aspects of the alleged scheme, and although not every aspect of the alleged scheme gives rise to an antitrust claim on its own, the totality of the conduct does—if the plaintiffs are able to prove that it actually occurred—violate the antitrust laws. In fact, one aspect of the alleged scheme, the termination of an agreement with another scanner company, amounts to an antitrust violation even when it is considered in isolation. Accordingly, the motion to dismiss the complaint is denied.

I

     Aligners are transparent, removable mouthpieces that slip over and straighten teeth. To

order aligners for a patient, a dental practice must send an aligner manufacturer some sort of image or imprint of the patient's teeth and jaws. Historically, dental practices used silicon molds to fit an aligner to a patient's teeth, but handheld scanners that take digital images of jaws and teeth have emerged as a more accurate and efficient tool. Aligner manufacturers use the images to create custom aligners. Patients typically undergo multiple scans and use multiple sets of aligners to shift their teeth over time, with the aligners being adjusted as their teeth move. This case arises out of Align Technology's sale of its aligner as well as its scanner for making that aligner. The aligner is called "Invisalign," and the scanner is called "iTero."

The plaintiffs are two dental practices, both of which use iTero scanners to offer Invisalign to their patients. City Smiles is a practice located in Chicago, Illinois. VIP Dental Spas is a practice with offices in Los Angeles and Beverly Hills, California. Both City Smiles and VIP Dental Spas allegedly purchased an iTero to scan patients' teeth for Invisalign orders—orders they regularly made from Align from 2015 onward. The plaintiffs allege that the prices they paid for these aligners and scanners were artificially inflated due to an anticompetitive scheme that Align implemented in response to new competition in the aligner market. That scheme, they allege, was orchestrated to monopolize both the scanner and aligner markets. The following is a description of the allegations in the plaintiffs' complaint. At this stage, the Court is required to assume the truth of these allegations, so long as they are adequately articulated and not contradicted by any document that the complaint relies upon.

According to the plaintiffs, for years, Align faced little competition in the aligner market and enjoyed large profit margins on Invisalign, thanks in large part to its patents. Although some key patents have expired and other aligner companies have attempted to break into the market, Align still allegedly controls roughly 90 percent of that market. During this time, Invisalign has

become synonymous with aligners generally, and the product is considered a "must have" for dental practices that offer aligners.

The plaintiffs allege that Align has also come to dominate the scanner market to the point that iTero accounts for roughly 80 percent of that market. The complaint defines the relevant scanner market with reference to scanners that are designed specifically to produce images for making aligners, excluding scanners that perform other functions but can also be used to produce images for aligner manufacturers. Align's only competitor in this aligner-specific scanner market is 3Shape. 3Shape sells a scanner called "Trios."

The plaintiffs allege that Align designed its iTero scanner so that, for practical purposes, it can only be used to order Invisalign. According to the complaint, iTero creates scans in a specialized format rather than in the standard file format used by other aligner companies, which means that a dental practice wishing to order another company's aligners using iTero would have to undertake the expensive and time-consuming task of converting the iTero scans into a compatible format. Thus, according to the plaintiffs, a dental practice with an iTero scanner cannot realistically use that scanner to order any type of aligner besides Invisalign.

On the flip side, if a dental practice wishes to offer Invisalign to patients, it is allegedly limited as a practical matter to using the iTero scanner to generate those orders. Align will fill orders for Invisalign from dental practices that use a limited number of preapproved multi-use scanners (i.e., scanners not specifically designed to generate images for aligners), but the complaint does not treat those scanners as viable substitutes. And although the complaint provides little information about the differences between multi-use scanners and aligner-specific scanners, Align does not (for purposes of this motion to dismiss) challenge the plaintiffs' definition of the scanner market. Meanwhile, the only other scanner that is aligner-specific—

3Shape's Trios—cannot be used to order Invisalign because Align will not accept scans from Trios.

That was not always the case. In December 2015, Align and 3Shape entered an "interoperability agreement" and built an interface that allowed dentists to use Trios scans to order Invisalign. Align allegedly entered this agreement to increase Invisalign sales, including from dental practices that were already using the Trios scanner. But the plaintiffs allege that this arrangement ultimately fell apart because 3Shape was unwilling to help Align develop a stranglehold on the aligner market. Even as Align was finalizing the 2015 interoperability agreement with 3Shape, it was allegedly lobbying 3Shape to modify the agreement so that the Trios scanner could only be used to order Invisalign. 3Shape allegedly refused to make the Trios scanner exclusive in this way, so the agreement ultimately permitted Trios to generate orders for aligners made by other companies. But, according to the complaint, Align continued to try to alter the arrangement. The plaintiffs describe a February 2016 meeting, during which Align allegedly conveyed that 3Shape would need to treat Align as the "preferred partner" for aligners to continue the collaboration. The plaintiffs also describe a November 2016 meeting, during which Align allegedly asked 3Shape to enter a joint venture that would allow Align to control Trios. The plaintiffs allege that, although 3Shape consistently rejected these demands, Align continued to insist that 3Shape join some sort of venture that would exclude Align's competitors in the aligner market. Eventually, Align announced that it would terminate the interoperability agreement with 3Shape. The announcement came in December 2017—roughly two and a half years after the arrangement was established. Thus, beginning in January 2018, dental practices with only the Trios scanner were no longer able to order Invisalign for their patients.

And that, according to the plaintiffs, left dental practices in the position where they

remain today: where iTero, as a practical matter, is the only scanner for offering aligners. The plaintiffs allege that this is, in part, thanks to the nature of scanner purchases. While scanners are essential for dental practices selling aligners, practices typically do not purchase more than one scanner because scanners are large capital investments meant to last several years. The plaintiffs also allege that, in the rare case that a dental practice owns more than one scanner, that practice tends to use only one scanner brand (either Align's or 3Shape's) due to the cost of maintaining multiple software subscriptions and the time and expense of training personnel to use different scanners and software programs. According to the complaint, because Invisalign dominates the aligner market and is a "must have" for dental practices, iTero is left as the only sensible scanner option. And as dental practices invest in iTero, the investment creates a long-term dependence on Invisalign, since that is the only aligner for which iTero is designed to make scans.

The termination of the interoperability agreement reflected something of a change in philosophy for Align. In 2015, before Align entered the agreement with 3Shape (and before its key patents expired), Align's then-Chief Operating Officer told industry analysts that the company preferred having multiple scanners generate orders for Invisalign:

> No one wants to have to redesign, start over, buy multiple pieces of equipment if they can have greatest utility from a scanner . . . . So, we believe what we hear from our customers is they don't want to be forced to buy a system from you for the pleasure of offering Invisalign to their patients and other therapies we may have down the road. So we feel actually very strongly . . . . There's no reason for us not to act in complementary ways because it's good for the customer. So in our minds, we don't need to own the channel. We don't need to have exclusivity. In fact, we want probably more high-quality scanners that can make it easier to do Invisalign and other chair-side procedures that we have the unique capabilities to fulfill.

According to the plaintiffs, terminating the agreement with 3Shape is contrary to this goal, as it eliminated the only other high-quality scanner for Align's customers. Moreover, the plaintiffs allege that Align's termination of the interoperability agreement represented a significant short-

term sacrifice of "many millions of dollars" in revenue for Align.

While the plaintiffs commonly refer to Align as having "terminated" the interoperability agreement, they note that the agreement was actually worldwide and that Align did not stop filling orders generated by Trios scanners for Invisalign in other countries. They allege that the reason for terminating the agreement only in the United States was based on Align's relative market shares: because Align has less power in the aligner markets in other countries, it cannot force customers to use iTero by preventing Trios scanners from generating orders for Invisalign, but it can do that in the United States due to Invisalign's dominance and prominence.

The plaintiffs allege that—concurrent with the establishment of a system where a dental practice wanting to offer Invisalign was left with little choice but to use an iTero scanner, and where a practiceusing an iTero scanner had little choice but to refrain from offering any aligner other than Invisalign—Align began executing various contracts that committed dental practices to using its products and blocked competitors in both the aligner and scanner markets.

First, in late 2017, Align launched the Fusion Program. According to the plaintiffs, 3Shape's Trios scanner and Align's iTero scanner are typically sold at similar list prices. But the plaintiffs allege that, under the Fusion Program, Align drops the price of iTero by $10,000 in exchange for a dental practice's commitment to making a minimum number of Invisalign orders during the next three years. The plaintiffs allege that, if a dental practice fails to order the minimum number of aligners, it incurs back-end penalties that could be as large as the entire $10,000 discount. The complaint does not describe the program's minimum Invisalign order requirements, but it does allege that they are so high that dental practices must stop ordering other aligners and focus all their energy on selling Invisalign. According to the plaintiffs, Align's scanner and aligner competitors are unable to compete with this offer: 3Shape would lose one

third of its scanner revenue if it discounted Trios to match iTero's price; and other aligner manufacturers would have to offer below-cost prices to offset Align's iTero discount.[1]

Second, in mid-2018, Align entered multiyear contracts with two of the nation's largest dental service organizations (DSOs), Heartland Dental and Aspen Dental. DSOs provide business support to independent dental practices, including by managing purchase contracts with suppliers. According to the complaint, Heartland Dental and Aspen Dental agreed to work only with Align in providing its member offices with both scanners and aligners. The complaint's description of the contracts focuses mainly on the scanner component. Heartland Dental, the nation's largest DSO with more than 850 supported dental offices, allegedly agreed to place iTero scanners in 90 percent of those offices by the end of 2018, which resulted in the industry's single-largest scanner deployment. At the same time, Align allegedly contracted with Aspen Dental, another of the nation's largest DSOs with nearly 700 locations, to equip each Aspen location with an iTero scanner. The plaintiffs allege that these DSO contracts enabled Align to rapidly increase its share in the scanner market. However, they do not explain the size of these deals relative to the overall scanner market. They also do not say much about the contracts' impact in the aligner market.

Third, also in 2018, Align changed its discount program, the Advantage Program. The

---

[1] It's worth noting that this part of the complaint is difficult to understand. On the one hand, the complaint alleges that dental practices with the iTero scanner are stuck ordering Invisalign because iTero does not, as a practical matter, facilitate orders for other companies' aligners. If that is true, then one wonders if the Fusion Program's purchase requirements should have any effect on a practice's decision to order aligners from other companies, except in the situation where a practice uses both Align's iTero and 3Shape's Trios (which the complaint alleges is quite unusual). Moreover, although the complaint alleges that Align is offering a $10,000 discount on the iTero scanner, it does not allege how significant a discount this is as a matter of percentage. These are just a couple examples of ambiguities in the allegations relating to Align's contractual arrangements with dental offices—ambiguities that, as explained in Section II.A, prevent the Court from concluding that any one contractual arrangement alone constitutes an antitrust violation.

plaintiffs allege that the Advantage Program is a tiered discount program that conditions a dental practice's prices for Invisalign on its ability to maintain certain levels of Invisalign orders over time. According to the plaintiffs, before 2018, the pricing criteria focused on a dental practices' number of "lifetime" cases. The plaintiffs don't explain this term, but presumably it means the number of orders over the entire history of the dental practice. But Align allegedly changed the criteria to focus on the number of orders submitted in the previous six months, and then again more recently, on the number of orders submitted in the previous twelve months. The plaintiffs allege that, to get competitive prices for Invisalign, dental practices must place a very high number of Invisalign orders and have a strong incentive to forego ordering other aligners until they do so.[2]

## II

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. To state an unlawful monopolization claim, a plaintiff must allege "(1) [p]ossession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996).

The complaint summarizes the plaintiffs' monopolization claim as follows: "Align was able to use its monopoly power in the Aligner market to drive 3Shape out of the scanner market,

---

[2] As noted earlier with respect to the Fusion Program, it's not clear why the Advantage Program's allegedly aggressive numbers-based pricing criteria is problematic if it's true, as the plaintiffs allege elsewhere, that a dental practice with an iTero scanner is effectively limited to ordering Invisalign anyway.

and then to use its increased monopoly power in the scanner market to maintain its monopoly power in the aligner market. In this way, Align's ability to leverage both its scanner and aligner monopolies to prevent competition in both markets has enabled it to maintain or increase its monopoly power in both markets and to charge supracompetitive prices for both its aligners and its scanners."

Align does not dispute that the plaintiffs have adequately alleged the first element of a section 2 claim—possession of monopoly power in the aligner and scanner markets. And as previously mentioned, Align does not, at least for purposes of this motion to dismiss, challenge the plaintiffs' definition of the scanner market as consisting only of scanners designed exclusively to produce scans for aligners. But Align contends that the complaint does not adequately allege the next two elements—that Align engaged in the willful acquisition or maintenance of monopoly power in those markets and that the plaintiffs suffered antitrust injury as a result.

A

The "willful acquisition or maintenance of monopoly power" is a difficult concept to pin down. Courts often distinguish it from "growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP,* 540 U.S. 398, 407 (2004). Courts also frequently equate "willful acquisition or maintenance of monopoly power" with "anticompetitive conduct," even though the latter phrase is no more precise. *Id.* ("The possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct."). Anticompetitive conduct, the courts say, "is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive

way." *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)); *see Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482-83 (1992) ("The second element of a § 2 claim is the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948))); *Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1208 (9th Cir. 1997).

Sometimes, a monopolist's singular activity will amount to an antitrust violation on its own. But other times, a series of activities will combine to create an antitrust violation even if no one activity is sufficiently "anticompetitive" in isolation. *See, e.g., City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1376, 1378 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."); *Twin City Sportservice, Inc. v. Finley & Co., Inc.*, 676 F.2d 1291, 1302 (9th Cir. 1982); *see also Free FreeHand Corp. v. Adobe Systems Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012); *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008) (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962)). And sometimes, an activity is so innocuous that it adds nothing to a plaintiff's section 2 claim because it is simply not anticompetitive. *See, e.g.*, *Free FreeHand*, 852 F. Supp. 2d at 1184.

Some of the conduct alleged in the complaint—specifically, the termination of the interoperability agreement with 3Shape, the Fusion Program involving a scanner discount that locks dental practices into purchasing Invisalign aligners for several years, and the contracts with DSOs to offer only Align products to and place iTero scanners in dental practices within those organizations—combine to constitute a section 2 violation. Indeed, the termination of the

interoperability agreement, as alleged in the complaint, amounts to a section 2 violation on its own. The Fusion Program and DSO contracts, at least in the context of Align's alleged monopoly power and its overall course of conduct, are problematic from an antitrust standpoint. They might well be said to "impair the opportunities of rivals" in a way that does not "further competition on the merits." *Cascade Health*, 515 F.3d at 894. Although the complaint does not include enough information about these two programs to state a standalone claim, at a minimum they combine with the termination of the interoperability agreement (and with each other) to strengthen the plaintiffs' assertion of anticompetitive conduct by a monopolist. On the other hand, the plaintiffs' allegations regarding Align's Advantage Program suggest that it is essentially a system for providing short-term volume discounts—too innocuous to add anything to the plaintiffs' section 2 claim.

1. The interoperability agreement. Even a firm with monopoly power has no general duty to engage in a joint marketing venture with a competitor. But in certain circumstances, a monopolist's termination of a cooperative venture can give rise to liability under the Sherman Act as a refusal to deal. *Aspen Skiing Co.*, 472 U.S. at 601; *see also Lorain Journal Co. v. United States*, 342 U.S. 143 (1951). The Ninth Circuit has described a refusal to deal as involving the following: (1) the "unilateral termination of a voluntary and profitable course of dealing," (2) a refusal to sell "even if compensated at retail price," and (3) a refusal to provide "products that were already sold in a retail market to other customers." *MetroNet Services v. Qwest*, 383 F.3d 1124, 1131 (9th Cir. 2004); *see Federal Trade Commission v. Qualcomm Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020). But the termination of a relationship will only violate section 2 if "the only conceivable rationale or purpose" of the termination "is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Aerotec*

*International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016);

*Qualcomm*, 969 F.3d at 994; *see also Trinko,* 540 U.S. at 409. "When a legitimate business

justification supports a monopolist's exclusionary conduct, that conduct does not violate [section

2] of the Sherman Act." *Image Technical*, 125 F.3d at 1212.

        The parties dispute whether the plaintiffs adequately allege that the "only conceivable

rationale or purpose" behind the termination was anticompetitive. They do. The allegations in the

complaint create a strong inference that the only conceivable reason for terminating the

agreement with 3Shape was to stifle competition in both the aligner and scanner markets. The

complaint alleges that the agreement resulted in tens of thousands of Invisalign orders for Align.

And, given the price of each Invisalign order, Align sacrificed millions of dollars in short-term

profits by terminating the agreement. According to the complaint, the sacrifice only made

economic sense if Align expected the termination to result in long-term gains from an eventual

enhancement of monopoly power. The plaintiffs explain in detail how the termination would run

3Shape out of the scanner market by compelling dentists to acquire the iTero scanner, which in

turn would effectively compel dentists to focus primarily or exclusively on selling Invisalign,

thus entrenching the company's monopoly power in both markets.

        Economics aside, the complaint's allegations regarding Align's prior conduct with

3Shape also create a strong inference that the termination was intended to be anticompetitive.

The complaint describes Align's repeated efforts to cajole 3Shape into preventing its Trios

scanner from being used for any type of aligner other than Invisalign. And after 3Shape

repeatedly refused, Align ended the agreement. This sequence of events strongly suggests that

Align's decision to sacrifice short-term profits by terminating the agreement was calculated to

accomplish a result that 3Shape previously refused to help Align achieve: the entrenchment of

Invisalign's monopoly power in the aligner market. *See Trinko*, 540 U.S. at 409 (noting that, at the pleading stage, allegations should "shed[] . . . light upon the motivation of [the defendant's] refusal to deal—upon whether it[] . . . [was] prompted not by competitive zeal but by anticompetitive malice"). Overall, the allegations about the termination are sufficient to raise a reasonable expectation that discovery will reveal evidence of illegal conduct. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Align's primary response is that the complaint fails to rule out other possible explanations for the termination. There is a general version and a specific version of this argument. In the general version, Align asserts that an antitrust plaintiff must, in the complaint itself, list other potential rationales for the refusal to deal and explain why each of them could not conceivably explain the defendant's actions. That can't be right. The cases Align cites on this issue involve summary judgment or trials, where courts often inquire whether an antitrust plaintiff presented sufficient evidence to refute an alternative rationale for the refusal to deal. *Aerotec*, 836 F.3d at 1184; *Qualcomm*, 969 F.3d at 993-97; *MetroNet*, 383 F.3d at 1130-34. Align has cited no case—nor can the Court find one—holding antitrust plaintiffs to this type of burden at the pleading stage. *Creative Copier Servs. v. Xerox Corp.*, 344 F. Supp. 2d 858, 867 (D. Conn. 2004) ("It is not required to allege the negative of every possible justification Xerox may offer for its conduct."); *see SmileCare*, 88 F.3d at 786 ("[T]he existence of valid business reasons is ordinarily a question of fact . . . ."); *Free FreeHand*, 852 F. Supp. at 1182.

The specific version of Align's argument goes something like this: (i) the complaint alleges that Align has enjoyed patent protection for its products and that it has aggressively asserted its patent rights; (ii) the Court can take judicial notice of the fact that Align sued 3Shape for patent infringement around the time it terminated the agreement with 3Shape; and (iii) the

best inference from the complaint and judicially noticeable material is that Align terminated the agreement with 3Shape because of the infringement. Therefore, according to Align, its patent justification precludes the plaintiffs from plausibly alleging that the "only conceivable purpose" for the termination was anticompetitive.

But the response to this specific argument is largely the same—it raises an issue for summary judgment or trial, not for a motion to dismiss. The mere fact that Align filed a patent infringement suit against 3Shape is not a basis for dismissing a claim alleging that the termination of the interoperability agreement violates section 2. That's especially true because the patent lawsuit raises more questions than answers. If Align doesn't want to do business with an infringer of its patents, why does it continue to do business with 3Shape in other countries? Does the patent infringement suit have merit, or is it brought in retaliation for 3Shape's refusal to comply with Align's ongoing pressure make the Trios scanner exclusive to Invisalign? How did it come about that Align discovered the alleged patent infringement right around the time that 3Shape was refusing to make its scanner exclusive to Invisalign? And given the number of patent lawsuits between Align and 3Shape, is it appropriate to conclude anything from just one of these lawsuits without a deeper analysis and more detailed timeline?

It may well be that Align has good answers to these questions, and that the existence of the patent dispute is indeed a legitimate rationale for the agreement's termination. But at this stage, the existence of the patent suit against 3Shape does not render implausible the otherwise highly plausible allegation that the only conceivable reason Align terminated the interoperability agreement was to stifle competition and entrench its monopoly power.

2. The Advantage Program, Fusion Program, and DSO contracts. The plaintiffs allege that the Advantage Program, Fusion Program, and DSO contracts are examples of "de facto

exclusive dealing arrangements." At its simplest, "exclusive dealing" involves an agreement between a seller and a buyer where the buyer agrees to purchase only the seller's product and refrains from doing business with the seller's competitors. *Allied Orthopedic*, 592 F.3d at 996; *see Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). A firm might, for instance, offer discounts or rebates that are conditioned on exclusivity. *See, e.g.*, *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 457 (1922); *see also Aerotec*, 836 F.3d at 1182. Section 2 is implicated when a seller has monopoly power, and its exclusive dealing arrangements prevent the seller's rivals from competing. *Allied Orthopedic*, 592 F.3d at 996.

But even without an explicit agreement of exclusivity, a monopolist can violate section 2 by entering arrangements that have the "practical effect" of preventing buyers from doing business with the monopolist's competitors. *Tampa Electric*, 365 U.S. at 327; *see, e.g.*, *United Shoe*, 258 U.S. at 457. For example, quantity discount programs can amount to exclusive dealing when they are "extreme." *See Aerotec*, 836 F.3d at 1181; *see also Allied Orthopedic*, 592 F.3d at 996-97. Such arrangements are commonly called "de facto" exclusive dealing. *See, e.g.*, *Aerotec*, 836 F.3d at 1182; 14 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 1800a3, 1807a (4th ed. 2019).[3]

The Ninth Circuit has articulated a couple of principles for assessing whether a contract is

---

[3] It's not clear that arrangements involving an aggregation of discounts across multiple related products raise exclusive dealing concerns. *See Cascade Health*, 515 F.3d at 909. *But see* Areeda & Hovenkamp, *supra* ¶ 1807b2. Nevertheless, such multiproduct discounts can raise antitrust concerns when they exclude equally efficient rivals that produce only one competing product because the rivals would have to give a much larger discount to compensate customers for the forsaken discount on products that they do not sell. Areeda & Hovenkamp, *supra* ¶ 1807b2; *see Cascade Health*, 515 F.3d at 909 ("[T]he primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude a rival who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundled discounter."); *see also LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc), *cert. denied*, 542 U.S. 953 (2004).

"exclusive." First, "the short duration and easy terminability of [] agreements negate substantially their potential to foreclose competition" because "a competing manufacturer need only offer a better product or a better deal" to get its own contracts. *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997). Second, "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern" because "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition any part of the relevant market." *Id.* at 1162-63; *see also PNY Technologies, Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *4 (N.D. Cal. Apr. 25, 2014); *Church & Dwight Co., Inc. v. Mayer Laboratories, Inc.*, 868 F. Supp. 2d 876, 903 (N.D. Cal. 2012), *vacated in part on other grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012).

But it is not enough for an exclusive arrangement—de facto or explicit—to foreclose competition in some relatively inconsequential portion of the market. To rise to the level of a section 2 violation, an arrangement must "substantially" foreclose market opportunities for the monopolist's competitors. *Allied Orthopedic*, 592 F.3d at 996; *Qualcomm, Inc.*, 969 F.3d at 1003. "That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited . . . ." *Tampa Electric*, 365 U.S. at 328. To determine whether foreclosure is "substantial," courts "weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." *Id.* at 329; *see also Twin City*, 676 F.2d at

1298, 1304 (holding that a contract restricting as little as 24% of the relevant market resulted in a cognizable foreclosure under section 1, which typically requires a higher level of foreclosure than section 2); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 952-53 (D. Or. 2018) (noting that, under section 2, foreclosing about 30% of the market suffices as substantial).

As a preliminary matter, the plaintiffs' allegations regarding Align's Advantage Program do not add anything to their antitrust theory. As described in the complaint, the program is essentially a system for providing short-term (one year) volume discounts. Simply alleging that "dental practices must maintain a very high prescribing level of Invisalign in order to offer competitive prices to patients" is insufficient to raise an inference that the arrangement amounts to an "extreme" quantity discount or is otherwise anticompetitive. *See Allied Orthopedic*, 592 F.3d at 997. Accordingly, the program (at least as alleged) does not contribute to the plaintiffs' section 2 claim.

The DSO contracts with Aspen Dental and Heartland Dental, on the other hand, raise antitrust concerns. They can be understood as requirement contracts: Align contracted with the DSOs to fill their aligner and scanner needs entirely across multiple years, and the DSOs agreed to work exclusively with Align. DSO-member practices rely on their DSO to procure supplies. While not spelled out by the complaint, one can reasonably infer from the allegations that it is difficult for a member practice to contract outside its DSO to buy unsupported products. Accordingly, if these DSOs are only offering Align's aligner and scanner, as the complaint alleges, their member practices only have meaningful access to Align's aligner and scanner. *See Pro Search Plus, LLC v. VFM Leonardo Inc.*, 2013 WL 6229141, at *6 (C.D. Cal. Dec. 2, 2013).

The Fusion Program also raises antitrust concerns: Align's discount on its iTero scanner

(tied to Invisalign purchases) means that equally efficient aligner manufacturers may find it impossible to compensate for a lost iTero discount since they do not produce scanners. *See Cascade Health*, 515 F.3d at 909 ("[T]he primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude a rival who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundled discounter."). The plaintiffs allege rival aligner companies cannot compete because they would have to offer below-cost aligner prices to offset a forsaken iTero discount. The plaintiffs also allege that the program has left 3Shape in a difficult position. Matching iTero's discounted price would allegedly require 3Shape to sacrifice a third of its revenue. Thus, 3Shape's Trios is not only tied to less desirable aligners but also is more expensive.

Both contracts must also be understood in light of the allegations describing the nature of scanner and aligner purchases. According to the complaint, scanners are large capital investments that last several years and do not lend themselves to a second purchase—especially not from a different company. Thus, at this stage, it is safe to assume that those in the Fusion Program as well as DSO-member dental practices will not soon purchase 3Shape's Trios and therefore will be unable to order anything but Invisalign. Furthermore, while both programs operate on dental practices rather than aligner end-users (patients ordering aligners from their dentists), anticompetitive concerns remain because the complaint suggests that aligner companies do not sell to individuals directly: dentists appear to be the only channel for distribution. Accordingly, considered in their totality, the plaintiffs' allegations—combined with a series of inferences in their favor—suggest that both contracts stifle competition and commit dental practices to a monopolist's products.

Nevertheless, the allegations about these arrangements—even considered together—do

not state a section 2 claim on their own. As discussed throughout this ruling, the complaint omits

information in some areas, and is vague in other areas. Moreover, although the complaint

portrays both the DSO contracts and the Fusion Program as exclusive (a conclusion that seems

dubious as to the latter), it does not adequately allege that foreclosure of market opportunity for

competitors is "substantial" within the meaning of antitrust doctrine. One might speculate that

the DSO contracts have a meaningful impact in the scanner market given that Heartland Dental

and Aspen Dental are two of the nation's largest DSOs and given that just one of the contracts

"represents the industry's single-largest scanner deployment." Indeed, the complaint alleges that

the contracts enabled Align to rapidly increase its market share in the scanner market, thereby

pushing out 3Shape. One might also assume that the Fusion Program's incentives for dental

practices to buy iTero and order Invisalign would cause a significant decline in 3Shape's market

share. And with a decline in the major mode of production for other aligners, one might expect

the market share of competing aligner companies to fall as well. The plaintiffs' allegations that

various other aligner manufacturers have attempted but failed to gain a foothold in the aligner

market support such an assumption. But neither the high-level allegations regarding the

impressive nature of the DSO scanner deployments nor the vague allegations regarding rapid

increases or decreases in market shares are sufficient for inferring that the foreclosure is in fact

*substantial*. For example, the complaint does not even estimate the percentage of the market

represented by Heartland Dental and Aspen Dental. Thus, the exclusive dealing allegations

cannot be understood as a section 2 violation on their own. Instead, they are best understood as

combining with the refusal-to-deal allegations to make a strong overall section 2 claim in both

the scanner and aligner markets. *But see 3Shape Trios A/S v. Align Technology, Inc.*, 2020 WL

6938054, at *2 (D. Del. Nov. 25, 2020) (holding that a similar complaint adequately alleged that

the DSO contracts resulted in substantial foreclosure).

B

To state a federal antitrust claim, a plaintiff must allege "loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). In general, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999). The plaintiffs allege that they suffered injury by paying overcharges when they purchased Invisalign and iTero at prices inflated by Align's scheme, but Align contends that their allegations are inadequate for pleading injury in both the aligner and scanner markets.

1. Injury in the aligner market. Align stresses that, absent basic details about the timing of the plaintiffs' aligner purchases, the complaint fails to plausibly allege that the plaintiffs suffered injury from the scheme. According to Align, since part of the class period predates the allegedly anticompetitive scheme, there is a possibility that the plaintiffs' Invisalign orders occurred before prices were artificially inflated. But the complaint states that the dental practices regularly purchased Invisalign throughout the class period, which extends until today. Especially given the complaint's allegations regarding the prominence of Invisalign and its allegations that both dental practices own iTero scanners, it is easy to infer that City Smiles and VIP Dental Spas ordered Invisalign during the alleged scheme.

2. Injury in the scanner market. According to the complaint, City Smiles purchased an iTero scanner during the class period at an artificially inflated price, and VIP Dental Spas

20

purchased an iTero scanner from Align in 2018, also at a price that was artificially high. Align submits extrinsic evidence to dispute these allegations. First, it submits City Smiles's iTero purchase contract to show that the purchase occurred before Align's allegedly anticompetitive conduct began. Second, Align submits an iTero purchase agreement between someone called "Sherwin Matian" and Align. Matian is the sole shareholder of VIP Dental Spas. Align argues that, while Matian (as an individual) purchased an iTero, VIP Dental Spas did not. Align contends that these purchase agreements are incorporated by reference because the plaintiffs' claims depend on their purchasing an iTero at an inflated price, and neither plaintiff has disputed the documents' authenticity.

Align is correct that the Court can consider the contracts, but they only defeat the allegations of antitrust injury in the scanner market as to City Smiles, not VIP Dental Spas. The complaint does not explicitly mention the contracts, but the plaintiffs' scanner claim "depends on" a valid antitrust injury—indeed, that's a required element of a section 2 claim. The plaintiffs allege that their scanner injury arose from purchasing an iTero scanner directly from Align at an inflated price, and they have not disputed the authenticity of the documents. *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). Since City Smiles purchased its iTero scanner in 2016—before the alleged anticompetitive conduct began—that conduct could not have inflated the price of City Smiles's iTero. The plaintiffs do not argue otherwise. But for VIP Dental Spas, the name on Align's purchase agreement does not alone establish that VIP Dental Spas is an improper plaintiff. As a practical matter, that VIP Dental Spas's sole owner, Matian, is listed on the agreement seems immaterial—one might imagine that small business owners regularly purchase items on behalf of their business.

21

Relatedly, as a legal matter, it seems quite plausible—and Align does not dispute—that Matian purchased the scanner as an agent for the corporation, giving VIP Dental Spas antitrust standing as a direct purchaser. *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2016 WL 7805628, at *14-15 (N.D. Cal. Aug. 4, 2016).

      Accordingly, Align's arguments regarding antitrust injury do not require dismissal of either defendant. Both dental practices have adequately alleged antitrust injury in their purchase of aligners, and one of them has adequately alleged antitrust injury in its purchase of a scanner.

III

      The motion to dismiss is denied. Align must file an answer within 14 days. The case management conference scheduled for April 21 is continued until May 12, 2021, and an updated joint case management statement is due 7 days before the conference.

      **IT IS SO ORDERED.**

Dated: April 8, 2021

_____

VINCE CHHABRIA
United States District Judge