PAUL HASTINGS LLP
James M. Pearl (SB# 198481)
jamespearl@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
Telephone: 1(310) 620-5700
Facsimile: 1(310) 620-5899

*Attorneys for Defendant Align Technology, Inc.*

Additional counsel on Signature Page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

SIMON & SIMON, PC d/b/a CITY SMILES and VIP DENTAL SPAS, individually and on behalf of others similarly situated,

Plaintiff,

vs.

ALIGN TECHNOLOGY, INC.,

Defendant.

CASE NO. 3:20-CV-03754-VC

**DEFENDANT ALIGN TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY**

Date: January 25, 2024
Time: 10:00 a.m.
Place: Courtroom 4, 17th Floor
Judge: Hon. Vince Chhabria

## NOTICE OF MOTION FOR SUMMARY JUDGMENT AND *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on January 25, 2024 at 10:00 A.M., or as soon thereafter as this matter may be heard in the courtroom of the Honorable Vince Chhabria at the United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom 4 – 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Align Technology, Inc. ("Defendant" or "Align") shall and hereby does move the Court for an order pursuant to Federal Rule of Civil Procedure 56 granting summary judgment in Align's favor and against Plaintiffs on all of Plaintiffs' claims. Additionally, Align shall and hereby does move the Court to preclude the expert reports and testimony of Professor R. Polk Wagner and Dr. Hal Singer pursuant to the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

This motion is based on this notice of motion and supporting memorandum of points and authorities and any additional written or oral argument presented to the Court, as well as other matters that may properly come before the Court.

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ....... 1
FACTUAL BACKGROUND ....... 3
A. Align Is an Innovator That Invests in Its Products ....... 3
1. Align Manufactures Invisalign Clear Aligners and iTero Intraoral Scanners ....... 3
2. Align Supports Doctors with Competitive Discount Programs ....... 4
B. Align Had a Limited Relationship with 3Shape, Another Scanner Manufacturer ....... 6
C. Align and 3Shape's Relationship Was Failing ....... 8
D. After Termination, Align's Sales of iTero and Invisalign Increased ....... 9
LEGAL STANDARD ....... 9
ARGUMENT ....... 10
I. Align Did Not Engage in Exclusionary Conduct ....... 10
A. Align Did Not Unlawfully Refuse to Deal with 3Shape ....... 10
1. There Is No Dispute of Material Fact That Multiple Conceivable Rationales Existed for Terminating Interoperability ....... 11
i. There Is No Dispute That It Was Conceivable for Align to Terminate Interoperability to Protect Its Patents and Its Related Claims Against 3Shape ....... 11
ii. Plaintiffs Cannot Show a Genuine Dispute of Material Fact That It Was Not Conceivable for Align to Terminate Because 3Shape Was Not Living Up to Its Commitments and Termination Was Economically Rational ....... 14
2. In Addition to the Multiple Conceivable Rationales for Termination, Plaintiffs Cannot Satisfy the *MetroNet* Elements ....... 16
3. Discovery Has Conclusively Answered the Court's Questions About Termination in Align's Favor ....... 17
4. Plaintiffs' Forthcoming Claim of Pretext Is Legally and Factually Without Support and Does Not Create a Triable Issue of Fact ....... 19
B. There Is No Triable Issue of Fact That Align's Discount Programs Are Lawful ....... 20
1. Align's Bundled Discounts Are Lawful ....... 20
2. Plaintiffs Cannot Show a Triable Issue of Fact That Align's Alleged Exclusive Dealing Was Lawful ....... 21
i. Align's Short-Term, Terminable Contracts Are Lawful ....... 21
ii. Align's DSO Contracts Are Lawful ....... 23
iii. Plaintiffs Have No Evidence That Aligner Competitors Cannot Access End Users ....... 23
C. There Is No Triable Issue of Fact That Align's Conduct Did Not Exclude Competition ....... 23

**TABLE OF CONTENTS**
**(continued)**

**PAGE**


1. There Is No Triable Issue of Fact That Align's Conduct Did Not Result in Exclusivity in the Putative Aligner Market ....24
2. There Is No Triable Issue of Fact That Competitors in Aligners Were Not in Any Way Unable to Compete in the Putative Aligner Market as a Result of Align's Conduct ....25
   i. Align's Alleged Refusal to Deal With a Scanner Competitor Did Not Result in Foreclosure in the Putative Aligner Market ....26
   ii. Align's Discounting Practices Did Not Exclude Competitors from the Putative Aligner Market ....27
3. Plaintiffs Cannot Demonstrate *Substantial* Foreclosure in the Putative Aligner Market as a Result of Alleged Bundling or Exclusive Dealing ....28

D. Plaintiffs' Monopoly Broth Theory Fails ....29
1. Certain Lawful Conduct Cannot Be Aggregated as a Matter of Law ....29
2. Plaintiffs Cannot Show Synergistic Effect ....30

II. Plaintiffs Lack Standing to Pursue Their Claims ....31

III. Plaintiffs' Expert Testimony Should Be Precluded ....32

A. Professor Wagner's Testimony on the Ultimate Legal Issue Is Improper ....32

B. Dr. Singer's Opinions Are Inconsistent with Ninth Circuit Law, and Thus Fatally Misleading ....33

CONCLUSION ....35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC*,
No. 18-3848, ECF No. 74 (2d Cir. June 14, 2019) ........................................................21

*3Shape A/S v. Align Tech., Inc.*,
No. 1:18-cv-00697-LPS (D. Del. filed May 8, 2018) ........................................................8

*3Shape A/S v. Align Tech., Inc.*,
No. 1:18-cv-00886-LPS (D. Del. filed June 14, 2018) ........................................................8

*3Shape Trios A/S v. Align Technology, Inc.*,
No. 1:18-cv-01332-LPS (D. Del. filed Aug. 28, 2018) ........................................................8

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ........................................................11, 19, 22

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ........................................................21, 22, 28, 34

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................10

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ........................................................16

*Barr Labs., Inc. v. Abbott Labs.*,
978 F.2d 98 (3d Cir. 1992) ........................................................28, 29

*Barry Wright Corp. v. ITT Grinnell Corp.*,
724 F.2d 227 (1st Cir. 1983) (Breyer, J.) ........................................................21

*Brooke Grp Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ........................................................30

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ........................................................2, 3, 20, 33

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................10

*City of Anaheim v. S. Cal. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992) ........................................................30

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*CollegeNet, Inc. v. Common Application, Inc.*,
355 F. Supp. 3d 926 (D. Or. 2018) ....................28

*Columbia Physical Therapy, Inc., P.S. v. Benton Franklin Orthopedic Assocs., P.L.L.C.*,
168 Wash.2d 421 (2010)....................5

*Dreamstime.com, LLC v. Google LLC*,
54 F.4th 1130 (9th Cir. 2022) ....................29

*Eastman v. Quest Diagnostics Inc.*,
108 F. Supp. 3d 827 (N.D. Cal. 2015) ....................21

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. and Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ....................21

*FTC. v. Publ'g Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997) ....................10

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) .................... *passim*

*Harris v. State*,
No. 745, 2019 WL 4928640 (Md. Spec. App. Oct. 7, 201 ....................5

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ....................19

*John Doe 1 v. Abbott Labs.*,
571 F.3d 930 (9th Cir. 2009) ....................31

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................33

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ....................35

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................31

*McHugh v. United Serv. Auto. Ass'n*,
164 F.3d 451 (9th Cir. 1999) ....................32

*MetroNet Servs.Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ....................11, 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Netflix Antitrust Litig.*,
506 F. Supp. 2d 308 (N.D. Cal. 2007) ....................11

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) ....................30

*Novell, Inc. v. Microsoft Corp*.,
731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.)....................11, 15

*OJ Com., LLC v. KidKraft, Inc.*,
34 F.4th 1232 (11th Cir. 2022) ....................28

*Omega Env't, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) .................... *passim*

*Pac. Bell Tel., Co. v. linkLine Commc'ns*,
Inc., 555 U.S. 438 (2009)....................10, 30

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc*.,
508 U.S. 49 (1993)....................1

*Ryko Mfg. Co. v. Eden Servs.*,
823 F.2d 1215 (8th Cir. 1987) ....................28

*Silver Mt. Dev., Inc. v. City of Silverton*,
No. 6:21-CV-00809-MK, 2022 WL 17751700 (D. Or. Dec. 19, 2022) ....................5

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ....................31

*Stein v. Pac. Bell*,
172 F. App'x 192 (9th Cir. 2006) ....................16

*UFCW Loc. 1776 & Participating Emps Health & Welfare Fund v. Teikoku Pharma USA*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017) ....................33

*Valassis Commc'ns, Inc. v. News Corp.*,
No. 17-CV-7378 (PKC), 2019 WL 802093 (S.D.N.Y. Feb. 21, 2019) ....................30

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
LLP, 540 U.S. 398 (2004)....................10, 15, 17

**Statutes**

Cal. Bus. & Prof. Code § 2400 ....................5

Tex. Occ. Code Ann. § 164.052(a)(17) ....................5

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Wis. Stat. Ann. § 180.1903 ....................................................5

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................10

Fed. R. Evid. 702 ....................................................33

## TABLE OF ABBREVIATIONS

| **Abbreviation** | **Referenced Document** |
|---|---|
| 3Shape | Non-Party 3Shape Trios A/S |
| Align | Defendant Align Technology, Inc. |
| Compl. | Plaintiffs' First Amended Class Action Complaint, dated August 14, 2020, and filed at ECF No. 29 |
| Dr. Matian | Dr. Sherwin Matian, D.D.S., the owner and operator of VIP |
| Dr. Patel | Dr. Kinnery Patel, D.D.S., an associate dentist at S&S |
| Dr. Simon | Dr. William Simon, D.D.S., the owner and operator of S&S |
| DSO | Dental Service Organizations |
| ES Model | Dr. Singer's Exclusivity Share regression model, which he ran separately for aligners and scanners |
| Hr'g Tr. | Transcript of the November 13, 2023 Evidentiary Hearing that includes the direct and cross examination of Plaintiffs' Expert Witness, Dr. Hal Singer |
| Motion | Defendant Align Technology, Inc.'s Motion for Summary Judgment and *Daubert* Motion to Preclude Expert Testimony |
| Pearl Ex.__ | Exhibit to the Declaration of James M. Pearl in Support of Defendant Align Technology, Inc.'s Motion for Summary Judgment and *Daubert* Motion to Preclude Expert Testimony |
| Plaintiffs | Collective reference to the named plaintiffs Simon & Simon and VIP |
| S&S | Simon & Simon, PC d/b/a City Smiles, a plaintiff in the *Simon & Simon* action |
| TOI Model | Dr. Singer's Termination of Interoperability regression model, which he ran separately for aligners and scanners |
| VIP | VIP Dental Spas, a plaintiff in the *Simon & Simon* action |

## INTRODUCTION

Plaintiffs' complaint is a copycat of the antitrust claim that 3Shape filed against Align for leverage in the midst of significant patent litigation. 3Shape's claim, adopted in whole cloth by Plaintiffs, was built on the false premise that Align sued 3Shape for patent infringement as a trumped-up justification to terminate a business relationship. Discovery taken by Plaintiffs in this case has confirmed the claim is meritless. Plaintiffs now cannot dispute the credibility of the Align patent claims. More importantly, discovery has confirmed that the protection of those valuable patents and patent claims drove the termination of interoperability.

Had Align continued to do business with 3Shape during the litigation, its patent suits faced the impediment of a waiver defense by 3Shape. The law says if you do business with an infringer who is using the patents at issue, you risk losing your claim to a waiver or equitable estoppel defense. Discovery in this case revealed that 3Shape *itself* identified [REDACTED] when 3Shape admitted that Align "[REDACTED]"[1] 3Shape not only [REDACTED] internally, it then [REDACTED] in the International Trade Commission case as Align feared.[2] Nor was this litigation a sham: Align and 3Shape ultimately settled their patent and antitrust litigation, with [REDACTED].[3]

In *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020), the Ninth Circuit held that the termination of a course of dealing was justified because it was a response to a patent law doctrine. That is because a refusal to deal can only be actionable if Plaintiffs can prove that "'***the only conceivable rationale or purpose' of the termination*** *'is to sacrifice short-term benefits in*

---

[1] Pearl Ex. 1, at 3Shape_Antitrust_Simon_00161194 (emphasis added); *see also* Pearl Ex. 2, Dep. Trans. of John Cusack, as Rule 30(b)(6) designee for 3Shape, Mar. 16, 2023, at 59:18-61:4, Dep. Ex. 876.

[2] *See* Pearl Ex. 3, 3Shape Initial Post-Hr'g Br. at 70, No. 337-TA-1091 (Oct. 5, 2018) (excerpts); *see also* Pearl Ex. 2, at 57:3-59:12, Dep. Ex. 875.

[3] Pearl Ex. 4, at ALIGNAT-PURCH00733990; *see also* Pearl Ex. 2, at 62:6-63:15, Dep. Ex. 877. Importantly, Plaintiffs have not pled that the litigation was sham and cannot make out this claim. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62 (1993).

*order to obtain higher profits in the long run from the exclusion of competition,*'" and the enforcement of patent rights is procompetitive, not anticompetitive. *See* Order denying Motion to Dismiss, ECF No. 91 ("MTD Order") at 11 (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016)) (emphasis added).

The Court can dispose of this case by answering one question: is it conceivable that Align terminated interoperability to protect its patent claims? Here, the Court does not need to look in Align's heart to determine if the waiver fear was sincere or justified, although the undisputed evidence establishes just that. But even more conclusively, the words and actions of 3Shape, who brought this doomed antitrust claim in the first instance, show that Align's decision to terminate interoperability was rational. With all the evidence in, there is no dispute that Align's patent waiver justification was not only conceivable; indeed, it was the actual reason for termination and 3Shape recognized and corroborated its legitimacy.

Without an actionable refusal to deal, summary judgment is proper because Ninth Circuit law prohibits aggregating meritless claims into a "broth." Align's termination of interoperability was lawful and cannot be included in a broth claim. To hold otherwise would improperly open the door to challenging any lawful refusal to deal. In addition, this Court held that Plaintiffs' exclusive dealing and bundling allegations, even taken together, do not amount to a Section 2 violation.[4] Discovery has confirmed this. Plaintiffs' pleading-stage allegations that Align engaged in long-term exclusive dealing with two of the largest dental service organizations never made it out of the gate. Plaintiffs have abandoned those allegations. They have now scraped together a hodge-podge of complaints about short-term, easily terminable discount programs which raise little to no antitrust concern under Ninth Circuit law and do not affect a substantial portion of the market.

Plaintiffs' bundling theory fares no better. Plaintiffs did not even attempt to meet the Ninth Circuit's mandatory discount attribution (price-cost) test from *Cascade Health Sols. v. PeaceHealth* ("*PeaceHealth*"), 515 F.3d 883 (9th Cir. 2008). The Ninth Circuit makes crystal clear that "[t]he exclusionary conduct element of a claim arising under § 2 of the Sherman Act ***cannot be satisfied*** by reference to bundled discounts unless the discounts result in prices that are below

[4] MTD Order at 18-19.

an appropriate measure of the defendant's costs." *Id*. at 903 (emphasis added).

Plaintiffs' ill-conceived broth claim cannot stand on its own for another reason: Plaintiffs cannot demonstrate the requisite synergy among the different elements of their broth claim. Indeed, Plaintiffs' refusal to deal theory is premised on increased prices, but their bundling and exclusive dealing theories are premised on improperly decreased prices. The Ninth Circuit has held that this tension cannot coexist in a broth claim. *Qualcomm*, 969 F.3d at 1001.

There is no singular or combined claim by Plaintiffs that can survive as a matter of law. This Court should therefore grant Align's motion for summary judgment.

## FACTUAL BACKGROUND[5]

### A. Align Is an Innovator That Invests in Its Products

#### 1. Align Manufactures Invisalign Clear Aligners and iTero Intraoral Scanners

In connection with its development of Invisalign, Align obtained (and still is obtaining) hundreds of patents on its technology, and spent (and still is spending) significant sums of money (well over $1 billion since inception) on R&D.[6] Several of Align's first patents for Invisalign expired in 2017, but a number of companies received FDA approval for clear aligners even before that happened.[7] Today, many companies manufacture aligners that are sold in the U.S.[8]

---

[5] Align has focused on only those facts that are, following discovery, undisputed. A more complete factual background may be found in Align's Opposition to Plaintiffs' Motion for Class Certification and *Daubert* Motion to Preclude Expert Testimony, ECF No. 323.

[6] Pearl Ex. 5, Dep. Trans. of Martin Pater, Dec. 22, 2022, at 25:25-26:5; Pearl Ex. 6, Dep. Trans. of Joseph Hogan, Jan. 13, 2023, at 86:2-87:9 (Align has spent "$1.8 billion in 25 years" on R&D), 239:24-240:20 (using "round numbers," Align has spent "$2 billion in engineering"); Pearl Ex. 7, Dep. Trans. of Srini Kaza, Feb. 3, 2023, at 115:17-24, 116:14-17 (Align invested in and obtained patents related to tooth movement); Pearl Ex. 8, Dep. Trans. of Mu Li, Dec. 20, 2022, at 50:17-51:16, 118:12-119:13, 188:9-189:9 (Align invests in its brand and in developing more products among different price points to be competitive and files patents); Pearl Ex. 9, Dep. Trans. of John Morici, Feb. 9, 2023, at 90:18-91:17 (Align invests hundreds of millions of dollars in its technology annually to digitize orthodontics), 142:13-143:15 (discussing annual investments in R&D), 173:7-22 (Align had a portfolio of several hundred patents even when its patents were expiring in 2017).

[7] *See* FDA 510k clear aligner approvals: ClearCorrect, Inc., Traditional 501(k), https://www.accessdata.fda.gov/cdrh_docs/pdf8/K082556.pdf (approval on February 6, 2009); FDA Letter to ClearPath Orthodontics Ltd, https://www.accessdata.fda.gov/cdrh_docs/pdf16/K162609.pdf (grants approval on July 6, 2017).

[8] These include Dentsply Sirona, Straumann, Henry Schein, 3M, Envista, SmileDirectClub, Byte,

Patients have an impression of their teeth made before obtaining clear aligner treatment. Dental impressions may be made using polyvinyl siloxane putty ("PVS") or a digital intraoral scanner.[9] PVS remains the "gold standard" of impression-taking.[10] Scanners have grown in popularity, as they are currently offered by Align, 3Shape, Carestream, Envista, Medit, Dentsply Sirona, and others.[11] In 2011, Align purchased Cadent and its intellectual property.[12] Cadent had introduced an intraoral scanner in 2004, the iTero HD.[13]

### 2. Align Supports Doctors with Competitive Discount Programs

Align sells its products to dentists and orthodontists (together, "doctors"), and to companies that own or are affiliated with multiple practices ("DSOs").[14] Align has run various promotions and programs to sell Invisalign, iTero, or both Invisalign and iTero together, to individual doctors and to DSOs.[15] Doctors are never required to join or participate in any promotional programs.[16]

---

Candid, and Angel Align. *See* Pearl Ex. 10, Expert Report of Babak "Bobby" Cohanim, May 5, 2023, ¶¶ 42-43, 51, 56-57 (Decl. of B. Cohanim filed herewith); Pearl Ex. 11, Expert Report of Edward Snyder, May 5, 2023, ¶¶ 56, 63, 70, 84-89 (Decl. of E. Snyder filed herewith). *See also* Pearl Ex. 8, at 24:19-24-33:22.

[9] *See* Pearl Ex. 12, Dep. Trans. of Lisa Barry, Dec. 14, 2022, at 32:1-11, 59:21-60:19, 67:14-25; Pearl Ex. 13, Dep. Trans. of Simon Beard, Dec. 22, 2022, at 138:14-139:1; Pearl Ex. 6, Hogan Dep., 31:14-33:1, 50:24-51:16; Pearl Ex. 14, Dep. Trans. of Kerri Kling, Jan. 20, 2023, at 43:25-45:3, 54:8-55:3; Pearl Ex. 8, at 53:21-54:15.

[10] *See* Pearl Ex. 7, at 124:9-125:10; Pearl Ex. 11, ¶¶ 39, 58-59, 66, 69, 109, 360. *See also* Pearl Ex. 2, at 64:2-20; Pearl Ex. 10, ¶¶ 14, 38-39, 77.

[11] Pearl Ex. 8, at 53:21-54:15; Pearl Ex. 12, at 39:15-40:5, 50:25-51:2, 71:8-10; Pearl Ex. 14, at 138:12-21; Pearl Ex. 10, ¶¶ 70-71, 76; Pearl Ex. 11, ¶¶ 61-62, 90-92, 183, 361iii.

[12] Pearl Ex. 12, at 158:9-159:12; *Align Technology Completes Acquisition of Intra-oral Scanning Leader Cadent* (May 2, 2011), https://investor.aligntech.com/news-releases/news-release-details/align-technology-completes-acquisition-intra-oral-scanning (last visited Nov. 19, 2023).

[13] *See* Pearl Ex. 15, at ALIGNAT-PURCH01931978.

[14] *See* Pearl Ex. 8, 228:1-8; Pearl Ex. 16, Dep. Trans. of Trenton Ritter, Jan. 31, 2023, at 8:1-6, 9:19-24 (DSOs comprise "roughly 20 percent" of Align's U.S. sales of *Invisalign*); Pearl Ex. 9, 15:1-14.

[15] *See, e.g.*, Pearl Ex. 8, 119:14-120:23 (testifying that Align uses "promotional efforts when appropriate to effectively market and sell our products"); Pearl Ex. 9, 164:1-8, 166:10-13; Pearl Ex. 6, at 147:6-11(testifying that promotions are "ongoing in this business" and that Align is "promoting on and off all the time"); Pearl Ex. 5, at 19:15-19, 21:10-22:2, 31:9-32:1; Pearl Ex. 12, at 40:11-41:24, 115:7-116:6; Pearl Ex. 17, Dep. Trans. of Joseph Megan, Feb. 23, 2023, at 39:21-40:11, 222:9-20, 227:21-228:3; Pearl Ex. 16, at 7:14-8:6, 12:22-14:24.

[16] Pearl Ex. 5, at 175:15-176:9, 183:1-9.

Align offers the Fusion program, a promotional program for iTero.[17] The Fusion program allows doctors to defer their payment of a full-priced iTero into three annual payments, the second and third of which might include forgiveness of or reduction in the payment owed in exchange for the doctor meeting certain goals for Invisalign case prescriptions.[18] Other companies, including Ormco and ClearCorrect, offer similar bundles.[19] 3Shape bundled its Trios scanner with Henry Schein Reveal aligners[20] and with ClearCorrect.[21]

Certain Align contracts and promotions contain terms whereby doctors agree to promote only Invisalign.[22] Doctors have always retained full discretion to prescribe whatever treatments they want while enrolled in Align promotional programs or under a contract with Align.[23] Nowhere in any of the promotions challenged by Plaintiffs do dentists promise to exclusively prescribe Align.[24] They are prevented by law from so doing.[25] These promotional discount programs are

---

[17] Pearl Ex. 16, at 13:22-14:14; Pearl Ex. 14, at 70:10-20; Pearl Ex. 11, ¶ 40; Pearl Ex. 12, at 40:11-42:6.

[18] Pearl Ex. 14, at 68:9-71:1; *see also* Pearl Ex. 16, at 12:22-15:8.

[19] *See* Pearl Ex. 11, ¶ 70 n. 72; Pearl Ex. 10, ¶¶ 75-76. *See also* Pearl Ex. 8, 179:22-180:19.

[20] *See* Pearl Ex. 18, at 3Shape_Antitrust_Simon_00359117.

[21] *See* Pearl Ex. 19, at 3Shape_Antitrust_Simon_01119739.

[22] *See e.g.* Pearl Ex. 11, ¶¶ 152, 169; Pearl Ex. 5, at 23:2-24:4, 175:15-176:10, 179:3-16. *See also* Pearl Ex. 20, at ALIGNAT-PURCH00755902 (Reengage/AACA discount program); Pearl Ex. 21, at ALIGNAT-PURCH00765024 (Enterprise Account Group Discount Program).

[23] Pearl Ex. 5, at 23:2-18, 26:19-27:1, 28:12-17, 143:2-6, 150:16-152:1, 176:1-10.

[24] *See* Pearl Ex. 22, Expert Report of Hal J. Singer, Mar. 10, 2023, ¶ 125. *See also* Pearl Ex. 23, ALIGNAT-PURCH00580758 (Elite Doctors Program); Pearl Ex. 24, ALIGNAT-PURCH00759698 (Go Forward Program); Pearl Ex. 25, ALIGNAT-PURCH01965812 (Marketplace Development (Advanced Commitment Pricing Test Model)); Pearl Ex. 26, ALIGNAT-PURCH00026657 (Reingage Pilot Program Terms and Conditions); Pearl Ex. 27, ALIGNAT-PURCH00023143 (Tipping Growth Accelerator Pilot Program); Pearl Ex. 28, ALIGNAT-PURCH00032940 (Welcome Back Program 2020 Terms and Conditions**);** Pearl Ex. 29, ALIGNAT-PURCH00825445 (Special Markets Group Provider Program); Pearl Ex. 21, ALIGNAT-PURCH00765024 (Enterprise Account Group Discount Program).

[25] *See, e.g.*, Cal. Bus. & Prof. Code § 2400; *Columbia Physical Therapy, Inc., P.S. v. Benton Franklin Orthopedic Assocs., P.L.L.C.*, 168 Wash.2d 421, 430 (2010) (quotations omitted) (Washington); Col. Rev. Stat. 12-240-138(6)(a) (Colorado); Tex. Occ. Code Ann. § 164.052(a)(17) (Texas); Wis. Stat. Ann. § 180.1903 (Wisconsin); *Harris v. State*, No. 745, 2019 WL 4928640 at *1 n.2 (Md. Spec. App. Oct. 7, 2019) (Maryland). Federal courts are required to take judicial notice of state law. *Silver Mt. Dev., Inc. v. City of Silverton*, No. 6:21-CV-00809-MK, 2022 WL 17751700 at *5 (D. Or. Dec. 19, 2022) (Oregon) (citation omitted).

almost always less than a year and easily terminable by the dentist.[26]

**B. <u>Align Had a Limited Relationship with 3Shape, Another Scanner Manufacturer</u>**

At the center of this case is Align's relationship with 3Shape. Align spent a significant amount of time, money, and resources to qualify 3Shape's scanner, the TRIOS, for use in submitting scans for Invisalign—called "interoperability." [27]

Align and 3Shape's interoperability relationship ended in December 2017 in the U.S.—a month after Align sued 3Shape for patent infringement.[28] Align regularly evaluates potential infringement of its many patents by its competitors.[29] Align's infringement analyses are not static, and remain subject to the uncertainty of having to litigate and ultimately prove infringement.[30] Therefore, the decision of if and when to bring patent claims against potential infringers occurs in the context of other business decisions and priorities.[31] Align decided to initiate patent litigation against 3Shape in November 2017.[32] Align filed patent claims against 3Shape in the ITC and the

---

[26] Pearl Ex. 11, ¶ 174; Pearl Ex. 5, at 19:15-19 ("Most promotions are short in duration."), 161:25-162:5 (Pearl Ex. 30, ALIGNAT-PURCH00587886, GP Accelerator has six-month term), 162:14-164:1 (Ortho Accelerator has six-month term), 166:8-167:2 ("Up and Comer" no longer exists, but had a six-month term), 167:6-168:4 ("Next Level Partnership" had up to a 12-month term), 168:19-169:8 (Pearl Ex. 31, ALIGNAT-PURCH00762347, "Private Practice Contracting Pilot" ran once, from April-December 2019), 169:13-170:6 (Pearl Ex. 27, "Tipping Growth" has six-month term), 170:25-171:19 (Pearl Ex. 32, ALIGNAT-PURCH00738822, "Schulman Group" (SSG program) had 12-month term), 172:3-23 (Pearl Ex. 23, "Elite Doctors" had 12-month term), 173:3-19 (Pearl Ex. 33, ALIGNAT-PURCH00747133, "Bracket Buy Back" no longer exists, but had a six-month term), 174:16-175:11 (Pearl Ex. 26, "Reingage," now known as the AACA program, has a 12-month term), 175:15-25 (doctors are not required to join or stay in promotional programs); Pearl Ex. 24 ("Go Forward" Terms and Conditions); Pearl Ex. 25 (Marketplace Development (Advanced Commitment Pricing Test Model)); Pearl Ex. 28 (Welcome Back Program 2020 Terms and Conditions).

[27] Pearl Ex. 11, ¶¶ 63 n.51, 115; Pearl Ex. 7, at 36:15-21, 50:5-53:5, 58:22-60:6, 123:17-19, 124:2-4; Pearl Ex. 8, at 77:19-25.

[28] *See* Pearl Ex. 6, at 173:14-18, 190:16-192:4; Pearl Ex. 17, at 50:7-51:6, Ex. 1323; Pearl Ex. 34, ALIGNAT-PURCH00001736 (Dec. 20, 2017 Press Release, *Align Technology To Discontinue Acceptance of Digital Scan Submissions From 3Shape TRIOS Scanners in the United States*).

[29] *See* Pearl Ex. 35, ALIGNAT-PURCH01157307 (Dep. Trans. of Joseph Hogan, No. 337-TA-1091, June 6, 2018, at 26:23-27:7).

[30] Pearl Ex. 6, at 157:3-158:1.

[31] *Id.* at 157:3-158:1; 269:6-18.

[32] *Id.* at 173:14-18, 184:8-24; *see also* Pearl Ex. 36, ALIGNAT-PURCH00920432.

District of Delaware.[33]

After deciding to pursue patent claims against 3Shape, Align's CEO, Mr. Hogan, determined that continuing to accept scans from TRIOS scanners could fatally compromise Align's patent claims against 3Shape.[34] Namely, by accepting scans from a scanner that Align alleged to be infringing the very patents it was seeking to enforce, Align risked facing an argument that it waived enforcement of its patent claims.[35]

On December 18, 2017, Align accordingly sent a letter to its doctors who used TRIOS scanners, informing them that "[d]ue to 3Shape's infringing conduct and the resulting litigation, we terminated our Invisalign interoperability contract with 3Shape and will no longer be able to accept digital scans for Invisalign treatment and/or retention cases from TRIOS scanners in the United States effective January 17, 2018."[36] Two days later, on December 20, 2017, Align issued a public statement that due to "3Shape's infringing conduct and the resulting litigation against [3]Shape . . . , the company terminated its Invisalign interoperability contract with 3Shape and will no longer be able to accept digital scans for new Invisalign treatment and/or retention cases from TRIOS scanners in the United States[.]"[37] Align made clear that "[b]ecause the current lawsuits involve only U.S. patents, this litigation does not affect non-U.S. Invisalign customers. As a result, we will continue to accept digital scans for new Invisalign treatment and/or retention cases from TRIOS scanners outside of the U.S."[38]

In correspondence after Align announced termination, 3Shape itself [redacted]

---

[33] *See* Pearl Ex. 37, ALIGNAT-PURCH00994193.
[34] Pearl Ex. 6, at 164:1-166:19; 169:14-170:24, 276:1-16.
[35] *See* Pearl Ex. 3, at 70 (3Shape arguing to the ITC that "[redacted]"); *id.* at 75 (arguing [redacted]"). *See also* Pearl Ex. 38, ALIGNAT-PURCH01618459, Pearl Ex. 39, ALIGNAT-PURCH01618463, at Q. 2.
[36] Pearl Ex. 40, ALIGNAT-PURCH01935167; Pearl Ex. 41, ALIGNAT-PURCH01955058, and attachment, Pearl Ex. 42, ALIGNAT-PURCH01955063.
[37] Pearl Ex. 34.
[38] *Id.*

[redacted]."[39] 3Shape recognized that this reason for termination [redacted]"[40]

3Shape then actually argued before the ITC that [redacted].[41] 3Shape also countered with its own barrage of patent claims and brought an antitrust claim, which Plaintiffs copied when bringing this suit.[42] Eventually, Align and 3Shape settled all of their litigation, with 3Shape [redacted].[43] 3Shape also [redacted].[44]

### C. <u>Align and 3Shape's Relationship Was Failing</u>

Despite Align terminating interoperability to protect its patent claims, the Align-3Shape interoperability relationship was nevertheless nearing its end. The Scanner Agreement expired in [redacted]—less than a year after Align's termination of interoperability went effective—and by its terms could be [redacted].[45]

A fundamental aspect of Align and 3Shape's agreement to allow 3Shape scanners to submit Invisalign cases was the corresponding commitment by 3Shape to allow Align's iTero scanners to access 3Shape's programs for restorative dentistry.[46] Restorative dentistry, as opposed to

---

[39] Pearl Ex. 1.

[40] *Id.*

[41] Pearl Ex. 43, 3Shape Initial Post-Hr'g Br. at 178, 182, No. 337-TA-1090 (Nov. 26, 2018) (excerpts); Pearl Ex. 3, at 70 ("[redacted]" (citations omitted)).

[42] *3Shape A/S v. Align Tech., Inc.*, No. 1:18-cv-00697-LPS (D. Del. filed May 8, 2018); *3Shape A/S v. Align Tech., Inc.*, No. 1:18-cv-00886-LPS (D. Del. filed June 14, 2018); *3Shape Trios A/S v. Align Technology, Inc.*, No. 1:18-cv-01332-LPS (D. Del. filed Aug. 28, 2018).

[43] *See* Pearl Ex. 4, ALIGNAT-PURCH00733990.

[44] *Id.*

[45] Pearl Ex. 44, ALIGNAT-PURCH00784241 at § 2 (most legible at ALIGNAT-PURCH00784247).

[46] *Id.* at § 1.9; Pearl Ex. 45, ALIGNAT-PURCH00853858; Pearl Ex. 46, at 3Shape_Antitrust_Simon_00035010 (Q. 11), at -35013. *See also* Pearl Ex. 47, Dep. Trans. of

orthodontics, involves the rehabilitation of a patient's teeth through the use of crowns, bridges, implants, and other non-alignment devices.

Align promptly engaged in the necessary testing to validate 3Shape's scanners to submit for Invisalign and, within one year, enabled interoperability.[47] 3Shape, on the other hand, consistently delayed implementing interoperability between their restorative software and iTero.[48] This became a point of significant concern for Align.[49] Align's concern became so significant that it threatened to terminate interoperability globally due to 3Shape's noncompliance with its interoperability commitments.[50] Indeed, after Align terminated interoperability, 3Shape believed that Align did so because 3Shape itself failed to live up to 3Shape's end of the bargain.[51]

### D. After Termination, Align's Sales of iTero and Invisalign Increased

After termination, Align did not see a decline in Invisalign orders in the United States, largely due to the many alternative means of submitting Invisalign cases.[52] While orders from 3Shape scanners decreased, those scans never exceeded [REDACTED]% of all U.S. Invisalign case submissions in any quarter.[53] U.S. iTero sales also increased over the period following termination.[54]

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material

---

Abhishek Ganguly, Jan. 20, 2023, at 177:11-179:13, 183:11-184:5, Ex. 420; Pearl Ex. 7, 103:9-106:14, 122:21-123:9, Ex. 1146; Pearl Ex. 14, at 116:21-117:5, 144:1-18; Pearl Ex. 48, Dep. Trans. of Leon Rasovsky, Jan. 26, 2023, 77:11-19, 80:22-85:14, Dep. Ex. 824; Pearl Ex. 6, at 35:12-16.

[47] Pearl Ex. 7, at 42:3-11; 101:22-103:5; Pearl Ex. 44; Pearl Ex. 48, at 75:7-25, Ex. 823; Pearl Ex. 49, ALIGNAT-PURCH00004603 (validation completed Oct. 20, 2016).

[48] *See* Pearl Ex. 50, 3Shape_Antitrust_Simon_00068481 ("[REDACTED]"); Pearl Ex. 51, 3Shape_Antitrust_Simon_00042033 ("[REDACTED]"); Pearl Ex. 52, 3Shape_Antitrust_Simon_00054342 ("[REDACTED]"); Pearl Ex. 47, at 223:13-226:25, Dep. Ex. 425; Pearl Ex. 48, at 186:4-192:2.

[49] Pearl Ex. 6, at 161:8-162:12, 164:1-165:3; Pearl Ex. 14, at 91:9-94:14, 144:1-18, Ex. 513; Pearl Ex. 48, at 80:22-85:1; Pearl Ex. 47, at 224:11-226:25, 263:1-10; Pearl Ex. 7, at 103:9-106:14, 122:21-123:9, Dep. Ex. 1146.

[50] Pearl Ex. 53, ALIGNAT-PURCH01016976.

[51] *Id.*

[52] Pearl Ex. 11, ¶¶ 120-126, Figs. 16-20.

[53] Pearl Ex. 54, ALIGNAT-PURCH01544915; Pearl Ex. 22, ¶ 119, Fig. 9 (orders from 3Shape scanners never exceeded [REDACTED]%).

[54] Pearl Ex. 11, ¶¶ 120-126, Figs. 16-20.

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once a defendant "has made a prima facie case for summary judgment, the [opposing party] cannot rely on general denials; [it] must produce significant probative evidence that demonstrates that there is a genuine issue of material fact for trial." *FTC. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (citing *Anderson*, 477 U.S. at 249-50, 256-57).

## ARGUMENT

### I. ALIGN DID NOT ENGAGE IN EXCLUSIONARY CONDUCT

#### A. Align Did Not Unlawfully Refuse to Deal with 3Shape

The Supreme Court repeatedly has recognized that "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel., Co. v. linkLine Commc'ns,* Inc., 555 U.S. 438, 448 (2009) (citation omitted). Plaintiffs' termination of interoperability theory attempts to invoke "[t]he one, limited exception to this general rule that there is no antitrust duty to deal [from] the Supreme Court's decision in *Aspen Skiing*." *Qualcomm*, 969 F.3d at 993 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585 (1985). That decision is "at or near the outer boundary of § 2 liability." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 409 (2004). ***Plaintiffs have the burden of establishing that they qualify for this exception.***

"[T]he termination of a relationship will only violate section 2 if '***the only conceivable rationale or purpose' of the termination*** 'is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'" MTD Order at 11–12 (quoting *Aerotec*, 836 F.3d at 1184); *see Qualcomm*, 969 F.3d at 993–94. The Court's inquiry focuses objectively on whether the "only conceivable rationale" is to harm competition. *Id.*

The inquiry itself is an objective one, i.e., it does not turn on what Align was subjectively thinking, just what is objectively conceivable in Align's position. *See id.* And the Court can look at what actually happened, not purely theoretical musings about the rationale. In *Qualcomm*, for example, the Ninth Circuit recognized that *Qualcomm* ceased a course of dealing "in response to developments in patent law's exhaustion doctrine." 969 F.3d at 994.

The Ninth Circuit has also recognized economic arguments that refusing to deal was justified where: (1) defendant was "presumably maximizing [] profits," *MetroNet Servs.Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004); there (2) was an "independent" decision about business structure to maximize profits, *Aerotec*, 836 F.3d at 1184-85; and (3) where the defendant chose a course, as a matter of data, that was "more lucrative," *Qualcomm*, 969 F.3d at 994 (citation omitted). In *Qualcomm* and *MetroNet*, the Ninth Circuit looked to subjective evidence: that the defendant's "purpose was greater profits in both the short and long-terms," *Qualcomm*, 969 F.3d at 994, or that the defendant "attempted to change [its] prior course of dealing after it realized [it] was having a 'significantly negative' impact on its own profitability," *MetroNet*, 383 F.3d at 1132; *see Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075–77 (10th Cir. 2013) (Gorsuch, J.) (same for "goal of maximizing overall profits" across multiple products).

In addition to establishing that Align's "only conceivable rationale" is to harm competition through a sacrifice of short term profits, Plaintiffs must establish (1) the "unilateral termination of a voluntary and profitable course of dealing," (2) a refusal to sell "even if compensated at retail price," and (3) a refusal to provide "products that were already sold in a retail market to other customers." *MetroNet*, 383 F.3d at 1131-33; *see* MTD Order at 11. Plaintiffs have the burden of establishing these factors as well, and cannot.

### 1. There Is No Dispute of Material Fact That Multiple Conceivable Rationales Existed for Terminating Interoperability

Summary judgment is appropriate because there is no genuine dispute of material fact that Align had numerous "conceivable" rationales for terminating interoperability.

#### i. There Is No Dispute That It Was Conceivable for Align to Terminate Interoperability to Protect Its Patents and Its Related Claims Against 3Shape

Align terminated interoperability in order to protect the validity of its patent claims against 3Shape and, by extension, its patents. In *Qualcomm*, the Ninth Circuit recognized that Qualcomm had a conceivable basis for terminating a course of dealing with licensees where that course of dealing threatened Qualcomm's patent rights. *See Qualcomm*, 969 F.3d at 994. This is in keeping with the principle that enforcing legitimate patent rights is pro-competitive. *See In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 314 (N.D. Cal. 2007) ("As a general rule, behavior

conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws.") (citation and internal quotation marks omitted).

Consistent with this well-established law, it was not only conceivable that Align terminated interoperability in the United States, and only in the United States, after it determined that 3Shape was infringing its U.S. patents, it was what actually occurred. Align promptly announced on December 18, 2017, to its doctors who used TRIOS scanners, that "[d]ue to 3Shape's infringing conduct and the resulting litigation, we terminated our Invisalign interoperability contract with 3Shape and will no longer be able to accept digital scans for Invisalign treatment and/or retention cases from TRIOS scanners in the United States effective January 17, 2018."[55] Align's public statement two days later was no different, making clear that due to "3Shape's infringing conduct and the resulting litigation against [3]Shape . . . , the company terminated its Invisalign interoperability contract with 3Shape and will no longer be able to accept digital scans for new Invisalign treatment and/or retention cases from TRIOS scanners in the United States."[56]

3Shape agreed with Align's assessment that the patent litigation against it required Align to terminate interoperability in the United States. Shortly after Align announced termination, 3Shape



[59] Indeed, Align had in fact determined that terminating interoperability was necessary, because failing to do so could compromise the patent suits it brought against 3Shape.[60]

Thus, Align and 3Shape—the parties to the Scanner Agreement and the opponents in patent litigation—agreed on the validity and necessity of why Align terminated interoperability. 3Shape

---

[55] *See supra* n. 37.
[56] *See supra* n. 38.
[57] *See supra* n. 40.
[58] *Id.*
[59] *Id.*
[60] Pearl Ex. 6, at 166:14-19.

did not leave any of Align's concerns to doubt, as [redacted] [redacted]

> [redacted]

Thus, although Align had terminated interoperability promptly after filing its patent claims against 3Shape, 3Shape argued that the [redacted][64]

3Shape's defenses were live in the district court cases at the time the parties settled their disputes, although they ultimately failed at the ITC.[65] These defenses would have undoubtedly been strengthened if Align had not terminated interoperability promptly after initiating its claims against 3Shape. The validity of Align's patent claims—and thus the importance and conceivability of protecting them—were conclusively resolved when Align settled all pending litigation with 3Shape. As part of that settlement agreement, 3Shape [redacted].[66]

Align's concerns were proven indisputably true and there is no genuine dispute of material

---

[61] Pearl Ex. 43, at 178.
[62] *See id.* at 182.
[63] Pearl Ex. 3, at 70 (citations omitted).
[64] *See id.*
[65] *See e.g.*, Pearl Ex. 55, Expert Report of Robert Stoll, Esq., May 5, 2023, ¶¶ 46, 58, 63, 66, 73 (Decl. of R. Stoll filed herewith).
[66] Pearl Ex. 4.

fact that termination to protect Align's patent claims was conceivable—in fact, it was true.

**ii. Plaintiffs Cannot Show a Genuine Dispute of Material Fact That It Was Not Conceivable for Align to Terminate Because 3Shape Was Not Living Up to Its Commitments and Termination Was Economically Rational**

In addition to protecting its patent claims, it was also conceivable for Align to terminate interoperability as a result of (i) 3Shape's non-compliance with its own commitments under the Scanner Agreement, and (ii) the economic benefits of terminating outweighing continued interoperability. Both of these rationales were not just conceivable, but were, in fact, conceived by Align employees as a rational basis for termination.

*3Shape was not complying with the Scanner Agreement.* 3Shape made specific commitments in the Scanner Agreement and related contracts with Align that, in return for interoperability from Align, 3Shape would make Align scanners interoperable with 3Shape's restorative workflows.[67] This return interoperability was a critical element of the overall arrangement between Align and 3Shape.[68]

As the relationship progressed, however, it became clear that 3Shape had no intent to deliver on its promise to provide restorative interoperability to Align.[69] Discovery has shown that this was intentional by 3Shape, [REDACTED] [REDACTED].[70] Align was becoming increasingly aware, after numerous delays, that 3Shape was likely to never provide restorative interoperability and threatened to terminate interoperability for the TRIOS if 3Shape did not live up to its commitment to make Align's iTero scanner interoperable with 3Shape's restorative software.[71]

---

[67] *See supra* n. 47.
[68] *See supra* ns. 47, 50.
[69] Pearl Ex. 47, at 223:13-226:25; Pearl Ex. 6, at 35:12-16; 162:6-7; 164:15-19; Pearl Ex. 48, at 186:4-192:2.
[70] *See* Pearl Ex. 52 ("[REDACTED]"); Pearl Ex. 56, 3Shape_Antitrust_Simon_00026663 ("[REDACTED]"); Pearl Ex. 57, ALIGNAT-PURCH00978316; Pearl Ex. 50 ("[REDACTED]"); Pearl Ex. 51 ("[REDACTED]").
[71] *See* Pearl Ex. 46, at 3Shape_Antitrust_Simon_00035010 (Q. 11) (Align and 3Shape are [REDACTED]

Notwithstanding 3Shape's [REDACTED] it also [REDACTED].[72] As with Align's decision to protect its patent claims, 3Shape's failure to deliver on its commitments was not only a conceivable rationale for termination, but was [REDACTED]

*Termination was economically rational for Align, and thus conceivable.* There is no genuine dispute of material fact that Align did not have "a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (citation omitted). This is a prerequisite to liability under a refusal to deal theory. *Id.*; *Novell*, 731 F.3d at 1078 (affirming summary judgment where decision to no longer share source code resulted in an overall increase in Microsoft's profitability, notwithstanding potential decrease in other sales). In the absence of such a willingness, the increase in enterprise profits is a valid rationale for ceasing a course of dealing with a competitor. That is what happened here, as Align's termination of interoperability led in short order to increased sales in both iTero scanners and Invisalign.[73] 3Shape represented a tiny portion of Align's business, never exceeding [REDACTED]% of Invisalign sales.[74] Sales for Align thus suffered no impact and increased year-over-year following termination.[75]

Employees within Align anticipated this result, and advocated against entering into interoperability for fear it would hinder sales of Align's iTero scanner.[76] Others within Align viewed the economic benefits of a synergy between intraoral scanners and Invisalign to be available only through iTero, not third-party scanners.[77] As with Align's other rationales, increased iTero and Invisalign sales from terminating interoperability was actually conceived within Align.

---

[REDACTED]"); Pearl Ex. 53.

[72] *Id.*; *see also* Pearl Ex. 1.

[73] Pearl Ex. 11, ¶¶ 114-126, Figs. 16-20.

[74] Pearl Ex. 54; Pearl Ex. 22, ¶ 119, Fig. 9 (orders from 3Shape scanners never exceeded 4%).

[75] Pearl Ex. 11, Figs. 16-20.

[76] Pearl Ex. 14, at 52:14-54:7; Pearl Ex. 58, Transcript of Deposition of Timothy Mack, Feb. 24, 2023 at 36:17-37:3.

[77] Pearl Ex. 14, at 52:14-54:7.

### 2. In Addition to the Multiple Conceivable Rationales for Termination, Plaintiffs Cannot Satisfy the *MetroNet* Elements

Plaintiffs also cannot prove the required refusal to deal elements under *MetroNet*. To meet the *MetroNet* elements, Plaintiffs must show: (1) the "unilateral termination of a voluntary and profitable course of dealing," (2) a refusal to sell "even if compensated at retail price," and (3) a refusal to provide "products that were already sold in a retail market to other customers." MTD Order at 11 (quoting *MetroNet*, 383 F.3d at 1131).

Interoperability was not a "course of dealing" between Align and 3Shape. In fact, the Scanner Agreement was set to expire by its own terms at the end of 2018.[78] Moreover, the parties hardly had an expectation of an ongoing course of dealing because the Scanner [REDACTED] [79] This short, fixed term, nearly-expired contract hardly approaches the fifteen-year long joint lift ticket program in *Aspen Skiing*, 472 U.S. at 589–92.

Worse yet for Plaintiffs, scanner interoperability with the Invisalign system is not, and never has been, sold at a retail price as required by *MetroNet*.[80] There is no evidence that 3Shape ever requested interoperability from Align at any price, let alone at an established retail price. This is consistent with the nature of interoperability, which is a means of technological connectivity, not a retail good, such as lift tickets. *See MetroNet*, 383 F.3d at 1133 (analyzing differences between products at issue in *Aspen Skiing* and *Trinko* and explaining that *Trinko* was dismissed because it involved a service to competitors and not a retail product). Align has never charged "customers" (or competitors) for interoperability "in a retail market"—the *MetroNet* elements cannot be satisfied.[81] *See Stein v. Pac. Bell*, 172 F. App'x 192, 194 (9th Cir. 2006) (affirming summary judgment where product allegedly withheld "was not available to the public at retail").

It is telling that these facts do not fit within the *MetroNet* elements. Interoperability is not a retail product or service, and so there is no baseline against which the Court can direct Align to

---

[78] Pearl Ex. 44 (*compare* Effective Date *with* Term provision (§ 2.1)).
[79] *Id.* at § 2.2.
[80] *See* Pearl Ex. 7, at 122:9-11; Pearl Ex. 47, at 294:3-13; Pearl Ex. 48, at 185:6-185:11.
[81] *See id.*

deal with 3Shape (a non-party). As in *Trinko*, interoperability is a complex service that is only made available to rivals "at considerable expense and effort."[82] *Trinko*, 540 U.S. at 410. Accepting scans from non-party scanners is a complex process that requires ongoing validation of compatibility by ensuring that the quality of output from a competitor's scanner continues to meet the minimum requirements for Invisalign treatment, which requirements continue to evolve over time with technological improvements.[83] It would be administratively prohibitive for the Court to direct and monitor Align's certification and ongoing testing of 3Shape's TRIOS 2 and 3 scanners to scan for Invisalign submissions in the U.S.[84] Policing the ongoing testing of 3Shape scan quality and Invisalign acceptance standards is the very task that the Supreme Court directed courts not to assume. *Trinko*, 540 U.S. at 415 ("An antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations."). That is the exact remedy Plaintiffs seek here. It should be rejected, as in *Trinko* and *MetroNet*.

### 3. Discovery Has Conclusively Answered the Court's Questions About Termination in Align's Favor

In the MTD Order, the Court identified four concerns with the termination of interoperability that the Court was unable to answer at the pleading stage. *See* MTD Order at 14. Discovery has answered each of those questions, without dispute, in Align's favor:

(i.) *If Align doesn't want to do business with an infringer of its patents, why does it continue to do business with 3Shape in other countries?* Importantly, Align did not terminate interoperability out of a moral cause that it did not want to do business with an infringer. It terminated in only the U.S. ***after*** filing the litigation in the U.S. because it determined that continuing interoperability subjected it to a possible waiver defense.[85] This fear was confirmed in 3Shape documents and in 3Shape's actually asserted legal defenses.[86] Moreover, patents and patent laws vary across jurisdictions,[87] and Align only brought patent claims based on 3Shape's infringement of Align's U.S. patents and under U.S.

---

[82] Pearl Ex. 7, at 50:5-53:5, 58:22-60:6. *See also* Pearl Ex. 11, ¶ 117.
[83] *Id*. at 50:5-53:5; 120:20-122:5.
[84] 3Shape no longer sells the TRIOS 2 scanner. *See 3Shape TRIOS Intraoral scanners – Compare all models*, (https://www.3shape.com/en/scanners/trios) (last visited Nov. 19, 2023).
[85] *See supra* ns. 35-36.
[86] *See supra* ns. 2-3, 40, 42.
[87] Pearl Ex. 55, ¶ 71.



patent law.[88] 3Shape itself [redacted][89]

(ii.) *Does the patent infringement suit have merit, or is it brought in retaliation for 3Shape's refusal to comply with Align's ongoing pressure to make the Trios scanner exclusive to Invisalign?* 3Shape's [redacted] conclusively answers the question as a matter of law and common sense that Align's patent suits had merit and were far from sham litigation. While Align had requested exclusivity from 3Shape, there is no evidence that this caused Align to terminate interoperability. Even if there were such evidence, it does not, as a matter of law, defeat the other "conceivable" justifications for termination.

(iii.) *How did it come about that Align discovered the alleged patent infringement right around the time that 3Shape was refusing to make its scanner exclusive to Invisalign?* [redacted][90] In technology companies, there is almost constant deliberation of intellectual property infringement but enforcement often involves a complex determination of high costs versus the timing and likelihood of eventual relief.[91] Such was the case here as Align eventually determined that 3Shape's potential infringement warranted enforcement.

(iv.) *And given the number of patent lawsuits between Align and 3Shape, is it appropriate to conclude anything from just one of these lawsuits without a deeper analysis and more detailed timeline?* Align's termination of interoperability was not tied to a single patent lawsuit against 3Shape, but instead the initiation of the first set of patent claims against 3Shape. Align terminated interoperability in connection with bringing 3 different ITC actions against 3Shape based on 3Shape's infringement, which were shortly followed by related district court actions.[92] The resolution of these many patent claims against 3Shape and 3Shape's patent and antitrust suits against Align (with [redacted] from 3Shape to Align) answers the question as a matter of law that Align's suits were not sham suits and cannot be claimed as exclusionary acts. Enforcement of such legitimate patent rights is, as a matter of law, pro-competitive.

---

[88] *See* Pearl Ex. 34 ("Because the current lawsuits involve only U.S. patents, this litigation does not affect non-U.S. Invisalign customers. As a result, we will continue to accept digital scans for new Invisalign treatment and/or retention cases from TRIOS scanners outside the U.S."). *See also* Pearl Ex. 39, at Qs. 1, 4.

[89] *See* Pearl Ex. 1.

[90] *See* Pearl Ex. 6, at 38:15-40:10, 43:5-44:2, 148:12-18, 151:12-154:2, 154:24-155:14, Dep. Ex. 213 at ALIGNAT- PURCH01119389 (July 2015 slide deck indicating that "Align is concerned with [3Shape's] potential infringements of Align IP[.]"), Dep. Ex. 225; Pearl Ex. 59, ALIGNAT-PURCH00681956 (Allan Hyldal of 3Shape informs Align on March 31, 2016 that 3Shape is "not able to provide Invisalign with exclusive aligner support from Trios."). *See also* Pearl Ex. 47, at 124:12-127:10; Pearl Ex. 6, at 38:15-40:1.

[91] Pearl Ex. 6, at 157:3-158:6.

[92] *See supra* note 30.

### 4. Plaintiffs' Forthcoming Claim of Pretext Is Legally and Factually Without Support and Does Not Create a Triable Issue of Fact

Plaintiffs have foreshadowed that they have a fundamentally different, and incorrect, understanding of refusal to deal law, based on *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997). Plaintiffs attempt to skip over the relevant tests for legality of a refusal to deal set forth in *Qualcomm* and *MetroNet*, and straight to questions of pretext under *Kodak*. But the *Kodak* pretext inquiry arises at a different stage of the antitrust analysis—in the burden-shifting framework by which, ***if the plaintiff establishes a prima facie case of monopoly power and anticompetitive conduct as well as negative effects on competition, the burden then shifts*** to the defendant to offer "a nonpretextual claim that its conduct is indeed a form of competition on the merits[.]" *Qualcomm*, 969 F.3d at 991 (citation omitted). This assessment of pretext comes *after* the assessment of whether a refusal to deal amounts to anticompetitive conduct. Here, because there are multiple conceivable rationales for termination, the Court need not reach the pretext analysis.

As the Ninth Circuit explained, after upholding the jury verdict on exclusionary conduct in *Kodak*, "our conclusion that the [plaintiffs] have shown that [the defendant] has both attained monopoly power and exercised exclusionary conduct does not end the inquiry" because "[the defendant's] conduct may not be actionable if supported by a legitimate business justification[,]" and "[a] plaintiff may rebut an asserted business justification by demonstrating [it] is pretextual." 125 F.3d at 1212 (citations omitted.). That also is why, in *Qualcomm*, *Aerotec*, and *MetroNet*, the Ninth Circuit did not assess (or even reference) *Kodak*'s pretext question in its analysis of the refusal-to-deal test. Indeed, quite the contrary, these cases repeatedly emphasize that even an actual "intent to foreclose competition[,]" let alone the less noteworthy evidence of pretext, "is not sufficient alone to establish liability." *Aerotec*, 836 F.3d at 1184.

Even if Plaintiffs could somehow reach a pretext analysis, it is futile. There is no basis by which Align's initiation of patent litigation against 3Shape was needed as a pretext for terminating interoperability, and Plaintiffs will be unable to prove as much. [redacted]

The ITC rejected this argument, holding that "[REDACTED]."[93]

**B. <u>There Is No Triable Issue of Fact That Align's Discount Programs Are Lawful</u>**

Plaintiffs allege two types of exclusionary conduct beyond the termination of interoperability: that Align offered an unlawful bundle in the form of the Fusion program, and that Align used unlawful exclusivity terms in certain of its customer contracts. Neither claim passes muster. *First,* Plaintiffs ignore the requirements in *PeaceHealth* that, for a bundled discount to be exclusionary, Plaintiffs must show that the discounts fail a discount attribution or price cost test. Plaintiffs' inexplicable failure to follow the law of the Ninth Circuit is, as a matter of law, fatal to Plaintiffs' bundling theory. *Second,* Plaintiffs' exclusive dealing theory is equally infirm, as the majority of the programs they challenge require no purchases, are short-term, or are easily terminated by dentists. Such programs are not exclusionary under Ninth Circuit law.

**1. Align's Bundled Discounts Are Lawful**

Bundled discounting is selling two products together at discount relative to the price at which they can be bought separately. *PeaceHealth*, 515 F.3d at 906. In the Ninth Circuit, bundled discounts cannot be exclusionary within antitrust law unless the discounts, when attributed fully to the product offered by rivals, caused the defendant to price below its costs—the discount attribution test. *Id*. The Ninth Circuit has drawn a bright line rule that "the only bundled discounts condemned as exclusionary are those that would exclude an equally efficient producer of the competitive product or products." *Id*. at 909.

Plaintiffs fail *PeaceHealth*. Plaintiffs' expert conceded that he did not perform a discount attribution test.[94] Nor did he examine data of Align's rivals to determine whether they were impaired or unable to compete with Align's pricing.[95] Plaintiffs cannot show that Align's "bundled discounts would have excluded an equally efficient competitor." *PeaceHealth*, 515 F.3d at 909.

[93] Pearl Ex. 60, ALIGNAT-PURCH01031126 at -169 (Initial Determination at 40, No. 337-TA-1090 (Apr. 26, 2019)).
[94] Pearl Ex. 61, Dep. Trans. of Hal J. Singer, July 13, 2023, at 98:18-99:1; Pearl Ex. 62, Evidentiary Hearing Proceedings Trans., Nov. 13, 2023, at 93:16-21 ("I think it's fair that I did not perform a discount attribution test.").
[95] Pearl Ex. 61, at 12:18-13:8; Pearl Ex. 62, at 93:1-54, 94:7-10, 94:18-21.

There is no triable issue as to whether Align's bundled discounts excluded competition.

**2. Plaintiffs Cannot Show a Triable Issue of Fact That Align's Alleged Exclusive Dealing Was Lawful**

Exclusive dealing involves an agreement between a buyer and seller that prevents the buyer from purchasing a given good from another vendor. *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). Exclusive agreements have well-recognized economic benefits: they enhance competition between different brands and they guard against free-riding—where a rival piggybacks on a company's investment in educating customers. *See id*.[96] "[V]irtually *every* contract to buy forecloses or excludes alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.) (citations and internal quotation marks omitted) (emphasis in original). Because exclusivity can promote competition, for a contract to be unlawfully exclusionary, a plaintiff must show that competition foreclosed by exclusivity makes up a *substantial* share of the relevant market. *Allied*, 592 F.3d at 996 (emphasis added). "[A]n exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition[.]" *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 837 (N.D. Cal. 2015) (quoting *U.S. v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001)).

**i. Align's Short-Term, Terminable Contracts Are Lawful**

Short-term agreements and those that are easily terminated are not cognizable as exclusive dealing because "a competing manufacturer need only offer a better product or a better deal[.]" *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) (citation omitted); *Allied*, 592 F.3d at 997 (contracts did not amount to exclusive dealing where customers "could choose at anytime to forego the discount offered by [defendant] and purchase from a generic competitor"); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. and Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022) ("It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring

[96] Plaintiffs' own expert recognizes that exclusivity in such agreements avoids free-riding. Pearl Ex. 61, 54:5-8 (recognizing exclusive agreements are one type of vertical restraint that can correct the free-rider problem); Brief of Scholars including Dr. Hal Singer, *1-800 Contacts, Inc. v. FTC*, No. 18-3848, ECF No. 74, at 17-18 (2d Cir. June 14, 2019) (explaining the free-rider problem).

offers to initiate termination."). The Ninth Circuit has held that one-year contracts with 60-day termination clauses are short-duration and easily terminable, and therefore lawful. *Omega*, 127 F.3d at 1163-64. The Ninth Circuit again held easily terminable agreements lawful in *Allied*, even though they contained market-share discounts that increased with the volume of a customer's purchases as a percentage of its requirements. *Allied,* 592 F.3d at 995, 997.

For other contracts, courts in the Ninth Circuit only find unlawful exclusion after looking for requirements terms (*i.e.*, requiring a buyer to purchase all product from one seller) or volume share targets that prevent meaningful competition by taking a large portion of the purchasers off the market. *Aerotec*, 836 F.3d at 1181. Plaintiffs make no showing of any such conditions.

Many of the programs and initiatives which Plaintiffs' expert claims as exclusionary do not qualify as exclusive dealing under any definition because they only concern marketing, with doctors retaining discretion to prescribe as they see fit. MTD Order at 15 ("'[E]xclusive dealing' involves an agreement between a seller and a buyer where the buyer agrees to purchase only the seller's product and refrains from doing business with the seller's competitors." (citing *Allied*, 592 F.3d at 996; *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). Moreover, most programs were limited to one year or less with no restriction on a dentist's ability to terminate.[97] The following programs challenged by Plaintiffs were all one year or less (*i.e.*, doctors could exit at any time): Elite Doctor Program; Bracket Buy Back Program 2020; Go Forward Program 2020; Marketplace Development Program; Reingage Pilot Program; Tipping Growth Accelerator Pilot Program; Welcome Back Program 2020.[98] Plaintiffs' expert assumed these were exclusionary (with no evidence they actually caused exclusivity) and used them to tally foreclosure.[99] But under Ninth Circuit law, they are short-duration, easily terminable, and lawful. *See Omega*, 127 F.3d at 1164 (rivals need "only offer a better product or a better deal"); *Allied*, 592 F.3d at 997. Plaintiffs'

---

[97] *See supra* n. 25.
[98] *See id.*; *see also, e.g.*, Pearl Ex. 33 (Bracket Buy Back Terms and Conditions); Pearl Ex. 23 (Elite Doctor Terms and Conditions ); Pearl Ex. 24 (Go Forward Terms and Conditions); Pearl Ex. 25 (Marketplace Development (Advanced Commitment Pricing Test Model)); Pearl Ex. 26 (Reingage Pilot Terms and Conditions); Pearl Ex. 27 (Tipping Growth Accelerator Pilot Terms and Conditions); Pearl Ex. 28 (Welcome Back Terms and Conditions).
[99] *See* Pearl Ex. 22, ¶¶ 124-25, 153-58.

expert ignored those features of the agreements he deemed exclusive.[100]

**ii. Align's DSO Contracts Are Lawful**

The contracts with Aspen Dental and Heartland Dental that Plaintiffs alleged were exclusive[101] are no longer a source of contention. Plaintiffs' own expert confirmed they are not exclusionary.[102] Notably, Aspen switched its scanner purchases to 3Shape.[103] Aspen also offers its own brand of aligners manufactured by Dentsply.[104] Thus, the centerpiece of Plaintiffs' exclusive dealing allegations (long-term exclusive agreements with the largest DSOs) has fallen apart and is now completely abandoned by Plaintiffs and their expert.[105]

**iii. Plaintiffs Have No Evidence That Aligner Competitors Cannot Access End Users**

As the Court noted in the MTD Order "'exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern' because '[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition any part of the relevant market.'" MTD Order at 16 (quoting *Omega*, 127 F.3d at 1162-63). Plaintiffs, as a class, are wholesalers of aligners. Plaintiffs have no evidence that competing aligner manufacturers were unable to reach ultimate consumers by other means.

**C. <u>There Is No Triable Issue of Fact That Align's Conduct Did Not Exclude Competition</u>**

Plaintiffs cannot show that Align's conduct excluded competition in the putative aligner market. *First*, Plaintiffs' economic model does not show exclusion. *Second*, there is no evidence that competitors in the putative aligner market were unable to compete for customers. *Third*,

---

[100] Pearl Ex. 62, at 120:11-23.
[101] *See* Plaintiffs' Amended Complaint, Aug. 14, 2020, ECF No. 29 ¶¶ 52-56.
[102] Pearl Ex. 61, at 29:25-30:6.
[103] Pearl Ex. 2, at 253:5-16; *see also* Pearl Ex. 9, at 15:1-14 ("We don't even sell to them anymore.").
[104] Pearl Ex. 16, at 76:23-77:11; Press Release, Aspen Dental, *Aspen Dental Introduces Doctor-Guided and Tech-Driven Motto™ Clear Aligners – Giving Patients Their Tray One on Day One* (June 15, 2021), https://aspendental.mediaroom.com/latest-news?item=122970; Pearl Ex. 8, at 48:19-50:12.
[105] Pearl Ex. 61, at 29:25-30:6; Pearl Ex. 62, at 110:20-111:2.

Plaintiffs' allegation of foreclosure falls well below any applicable threshold for showing illegality at summary judgment, particularly considering the amount of market entry and competition.

**1. There Is No Triable Issue of Fact That Align's Conduct Did Not Result in Exclusivity in the Putative Aligner Market**

Plaintiffs cannot prove at trial that any of Align's conduct resulted in exclusivity because their expert's model does not measure exclusivity in aligners despite being called an "exclusivity share model."[106] Plaintiffs' expert claims that his "exclusivity share" model is "a measurement of the share of Invisalign customers that rival Aligner manufacturers cannot reach."[107] But he admitted that Plaintiffs are unable to "decipher whether a particular customer is buying outside of Align."[108] That is because Plaintiffs used only Align's data, and only measured whether a dentist ordered Invisalign using an iTero.[109] That approach omits purchases of competing products that are obviously not within Align's sales data of its own products. The Court rightly recognized that a definition of "exclusivity" that does not look at whether a doctor "has another scanner and is using the other scanner to order a bunch of competing aligners from a competing company" does not actually analyze exclusivity, and that using 'exclusivity' in such instance is "a misnomer."[110]

Indeed, Plaintiffs have conceded they do not know whether dentists ordered from rivals.[111] The class representatives ordered from rivals. VIP Dental Spas actively uses its iTero to order competing Candid aligners,[112] and Simon & Simon has used its iTero to order ClearCorrect aligners.[113] Plaintiffs' expert's model deems these dentists as exclusive to Align, even though they both freely order competitive aligners with their iTero scanner.[114] Plaintiffs' failure to look at any data outside of Align's products, combined with the fact that what limited non-Align data does

---

106 *See* Pearl Ex. 62, at 116:13-117:5, 118:18-25.
107 Pearl Ex. 22, ¶ 178.
108 Pearl Ex. 62, at 116:22-117:4, 118:4-25 ("If they buy from a rival, I don't get to see that in the data.").
109 Pearl Ex. 61, at 95:4-16.
110 Pearl Ex. 62, at 119:22-120:25.
111 Pearl Ex. 62, at 116:22-117:4; 118:4-25.
112 *See* Pearl Ex. 63, Dep. Trans. of Sherwin Matian, Jan. 8, 2023, at 26:10-17, 31:6-8. VIP Dental Spas is even listed on Candid's practice locator. *See id.* at 112:25-113:15.
113 *See* Pearl Ex. 64, Dep. Trans. of William Simon, Jan. 20, 2023, at 60:17-61:2.
114 Pearl Ex. 11, ¶ 229.

exist shows no exclusivity, means that Plaintiffs cannot show exclusivity or market exclusion.

Plaintiffs' model further fails because it only analyzes Invisalign and not the total addressable market. A foreclosure calculation or determination of actual market exclusion includes the "full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations." *Omega*, 127 F.3d at 1163 (quoting 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 570b1 at 278 (1995)). Plaintiffs have conceded they must demonstrate foreclosure of the total addressable market, as opposed to just actual purchasers.[115] There are more than 200,000 dentists in the United States.[116] Plaintiffs allege that around a quarter of those bought any Align product during the class period.[117] Plaintiffs thus ignore three quarters of the total market.

**2. There Is No Triable Issue of Fact That Competitors in Aligners Were Not in Any Way Unable to Compete in the Putative Aligner Market as a Result of Align's Conduct**

In order to have a viable theory of competitive harm, Plaintiffs must be able to show that Align's conduct excluded rivals from the putative aligner market. They cannot make that showing with respect to either Plaintiffs' refusal to deal theory or their discounting theories, both of which require a showing of competitor exclusion.

As a general matter, Plaintiffs adduced no evidence that any Align conduct or contracts caused any dentist to purchase exclusively from Align. Plaintiffs did not obtain any dentists' purchase data (despite purporting to represent tens of thousands of them) to confirm whether those dentists purchased only Invisalign, or were able to purchase competing products. The data that does exist—transaction-level data produced by rivals in discovery—shows that dentists Plaintiffs claim are subject to exclusivity actually purchased competing aligners such as [REDACTED].[118] In

[115] Counsel for the Plaintiffs conceded that the Court looks to "the share . . . of the addressable market" to assess substantial foreclosure. Hr'g. Tr. at 21:12 (Dec. 10, 2020).
[116] *See* Health Pol'y Inst., Am. Dental Assoc., Supply of Dentists in the U.S.: 2001 – 2022, data available for download at https://www.ada.org/-/media/project/ada-organization/ada/ada-org/files/resources/research/hpi/hpidata_supply_of_dentists_2022.xlsx?rev=07cff0fcb44f4ce08d6fcc16c25f9c89&hash=8164CA74EFE4EEE29F18C071E6C0E905 (last visited Nov. 19, 2023).
[117] *See* Plaintiffs' Memorandum in Support of Motion for Class Certification, July 31, 2023, ECF No. 316-1 at 11 (alleging that the proposed Class consists of 54,000 members).
[118] Pearl Ex. 11, ¶ 178 ([REDACTED]

fact, the only dentist evidence that Plaintiffs do have—their own—shows that both Plaintiffs purchased aligners from Align's rivals.[119]

**i. Align's Alleged Refusal to Deal With a Scanner Competitor Did Not Result in Foreclosure in the Putative Aligner Market**

Plaintiffs cannot demonstrate foreclosure *in aligners* as a result of the refusal to deal.[120] Undisputed evidence shows that Align's refusal to deal with a *scanner* competitor affecting scanners did not lock dentists into buying only Invisalign *aligners*.

It is undisputed that the iTero scanner is capable of exporting STL files, which are a standard, universal file type used for producing aligners by all aligner manufacturers.[121] The iTero scanner is capable of exporting an STL for every scan, even those sent to Align for Invisalign.[122] STL scans can be exported from the iTero and sent to any aligner manufacturer without any limitation.[123] Indeed, the only four doctors in the record (two of which are the parties' respective experts) all have used the STL function on iTero to order aligners from a company other than Align.[124] As noted above, both class representatives ordered competing aligners using iTero.[125]

Data produced by competitors that contains the source of submission shows that Plaintiffs are not outliers in using the iTero to order competing aligners. [REDACTED] .[127]

---

[REDACTED]).

[119] Pearl Ex. 64, at 60:17-61:2; Pearl Ex. 63, at 26:10-17, 31:6-8.

[120] Any foreclosure in the putative scanner market (of which there was none, in any event) is irrelevant in view of the fact that Plaintiffs do not have a viable claim of monopolization of the scanner market. *See infra* § II.

[121] Pearl Ex. 65, Dep. Trans. of Jay Grossman, July 28, 2023, at 59:4-17; 351:15-22; Pearl Ex. 63, at 31:25-32:7; Pearl Ex. 10, ¶¶ 41-42, 81-85; Pearl Ex. 47, at 133:7-134:7, 135:11-14.

[122] Pearl Ex. 48, 28:11-19, 29:5-30:1.

[123] *Id.* at 179:21-181:23; Pearl Ex. 47, at 152:20-153:12, 181:13-182:9.

[124] Pearl Ex. 64, at 60:17-61:2; Pearl Ex. 63, at 26:10-17, 31:6-8; Pearl Ex. 10, ¶ 84; Pearl Ex. 65, at 240:13-241:11.

[125] *See supra* notes 119-20.

[126] *See* Pearl Ex. 66, EHC-000196.

[127] *See* Pearl Ex. 67, STRAUMANN00001739 (excerpt from transactional data produced in this matter by Non-Party Straumann).

Further, any iTero owner can freely order aligners from other manufacturers using PVS.[128] PVS is inexpensive per use.[129] PVS is still popular. [REDACTED] .[132]

**ii. Align's Discounting Practices Did Not Exclude Competitors from the Putative Aligner Market**

Plaintiffs cannot show that any rival of Align was unable to compete with Align's bundled pricing, or was foreclosed from competing for customers based on allegedly exclusive contracts.[133] With respect to bundling, the Court recognized that "such multiproduct discounts can raise antitrust concerns when they exclude equally efficient rivals that produce only one competing product because the rivals would have to give a much larger discount to compensate customers for the forsaken discount on products that they do not sell." MTD Order at 15 n.3 (citing Areeda, *supra* ¶ 1807b2; *PeaceHealth*, 515 F.3d at 909; *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc)). Similarly, with respect to exclusive dealing, the Court held that "Section 2 is implicated when a seller has monopoly power, and its exclusive dealing arrangements prevent the seller's rivals from competing." MTD Order at 15 (citing *Allied*, 592 F.3d at 996). The Court acknowledged that de facto exclusivity is possible, but that to show it, Plaintiffs must show that Align's agreements "have the 'practical effect' of preventing buyers from doing business with the monopolist's competitors." *Id*. (quoting *Tampa Elec.*, 365 U.S. at 327; citing *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, at 457 (1922)).

Plaintiffs have no evidence of any rival being unable to match or beat Align's discounts. *See* MTD Order at 15 (requiring that an exclusive contract have actual or de facto effect of limiting customer's ability to deal with rivals). Under *Allied*, a contract is not exclusive if a rival can come

---

[128] *See* Pearl Ex. 10, ¶ 39.
[129] *Id.*
[130] Pearl Ex. 67.
[131] Pearl Ex. 11, Fig. 2.
[132] *Id.*
[133] *See* Pearl Ex. 62, at 93:1-5 ("I did not assess rival manufacturer costs. I didn't go and attempt to measure it."), 90:6-20.

in and outbid for the contract at regular intervals. 592 F.3d at 996. The reason Plaintiffs cannot show that doctors were forced to be exclusive or that competitors were excluded is because Plaintiffs did not take any discovery that could possibly show actual exclusionary effect with respect to either Align's customers, other doctors, or Align's competitors. Plaintiffs chose not to and have no direct evidence of actual or de facto exclusivity.

### 3. Plaintiffs Cannot Demonstrate *Substantial* Foreclosure in the Putative Aligner Market as a Result of Alleged Bundling or Exclusive Dealing

In analyzing whether foreclosure is substantial, "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 952 (D. Or. 2018) (citation omitted and internal quotations omitted); *see also OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1250 (11th Cir. 2022) (a 40% foreclosure percentage is "a threshold for liability in exclusive dealing cases") (citation omitted). After excluding the patently lawful discount programs of short duration and easy terminability, the remaining discount programs Plaintiffs challenge still do not substantially foreclose competition. The remaining contracts asserted by Plaintiffs, if treated as exclusive and exclusionary (even though they are not, *i.e.*, the Fusion program), account for just ██% or less of Invisalign sales.[134] ██% is well short of the measure of foreclosure that applies *even when there is no entry or industry growth*, as there is here.[135] *See CollegeNet*, 355 F. Supp. 3d at 952; *OJ Com.*, 34 F.4th at 1250; *cf. Omega*, 127 F.3d at 1162-63 (finding 38% foreclosure of sales through distributors overstated the size and likely effects where alternative means of reaching customers existed and an entrant gained single-digit market share); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 111 (3d Cir. 1992) (15% foreclosure not enough). But, if the Court further excludes the Fusion contracts, as it must for failure to follow the Ninth Circuit's dictates in *PeaceHealth* regarding proving unlawful bundled discounts, the foreclosure amount asserted by Dr. Singer slips to less than ███ percent.[136]

Here, however, the law "precludes a finding that exclusive dealing is an entry barrier of any significance" because of industry conditions in the putative aligner market—namely extensive

[134] *See* Pearl Ex. 11, ¶ 182.
[135] Such provisions are a quintessential means of avoiding free-riding. *See Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1234 & n.17 (8th Cir. 1987).
[136] Pearl Ex. 11, ¶ 176.

entry growth of rivals alongside increasing industry output. *Omega*, 127 F.3d at 1164 (citation omitted). Numerous aligner companies have entered: Dentsply (SureSmile and Byte), 3M (Clarity), Henry Schein (Reveal), Envista (Spark), Great Lakes (Smart Moves), OrthoFx, CDB Corporation, and more.[137] *See Barr*, 978 F.2d at 113 (entry of six players after patent expiration supported conclusion of a competitive market in an exclusive dealing attempted monopolization claim). Both parties' experts agree that aligner output has increased.[138] Thus, even if Plaintiffs meet the foreclosure level for a market without entry and vigorous competition (they cannot), that foreclosure percentage would be irrelevant in the face the significant market entry in both aligners and scanners that precludes finding exclusive dealing to be unlawful. *Omega*, 127 F.3d at 1164 (citation omitted). (And these facts also show that Align did not possess anything closer to market power in aligners—setting aside the true market of all teeth straightening devices that includes braces.[139]) No genuine issue of material fact exists to support an exclusive dealing theory of conduct.

**D. <u>Plaintiffs' Monopoly Broth Theory Fails</u>**

In analyzing monopoly broth claims the Ninth Circuit instructs courts to consider whether any single component part of the monopoly broth theory is independently actionable. *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022). If "each individual action alleged by [plaintiff] does not rise to anticompetitive conduct in the relevant market, their collective sum likewise does not." *Id.* (finding the principle that "there can be no synergistic result from a number of acts none of which show causal antitrust injury to the plaintiff" to be dispositive.) (quoting *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp*., 613 F.2d 727, 746 (9th Cir. 1979) (internal quotation marks omitted).

**1. Certain Lawful Conduct Cannot Be Aggregated as a Matter of Law**

Plaintiffs attempt to bring a monopoly broth claim to patch over their failings in establishing that certain alleged conduct of Align is actually unlawful. But a refusal to deal that is not independently unlawful can never be aggregated in a broth claim, as doing so would violate

---

[137] Pearl Ex. 11, Fig. 4.
[138] Pearl Ex. 22, Fig. 2 (showing [REDACTED] [REDACTED]); Pearl Ex. 11, ¶ 98-99, Fig. 12.
[139] Pearl Ex. 11, ¶¶ 356-57.

*Trinko* and *linkLine*. *See linkLine*, 555 U.S. at 452 (rejecting attempted "amalgamation of a meritless claim"—a wholesale refusal to deal theory); *see also New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 28 (D.D.C. 2021) (collecting cases and noting that refusals to deal "do not fit" the monopoly broth paradigm). Allowing aggregation of a lawful refusal to deal would mean, "as several scholars have persuasively explained, monopolists might face liability for refusals to deal that are categorically protected from scrutiny[.]" *Id.*

Similarly, because short-term, volume discounts and above-cost bundled discounts are lawful, they cannot be aggregated. *See Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019). Short-term, volume discounts cannot exclude competition by themselves or with other conduct, so aggregating them converts lawful conduct into an antitrust violation. *See* MTD Order at 11 ("[A] system for providing short-term volume discounts [is] too innocuous to add anything to the plaintiffs' section 2 claim."). Above-cost discounts also cannot be aggregated. The Supreme Court has "rejected . . . the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." *Brooke Grp Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990)).

Accordingly, Plaintiffs' broth claim cannot partake of a lawful refusal to deal claim or lawful discounts even if that conduct may have "anticompetitive" effects.[140]

### 2. Plaintiffs Cannot Show Synergistic Effect

Plaintiffs have failed to show that any piece of their monopoly broth theory is independently actionable.[141] But assuming Plaintiffs could somehow make three zeroes add up to one, they fail to show synergistic effect from disparate conduct. They show the opposite. Their expert claims that Align's refusal to deal increased Align's monopoly power in the aligner and

---

[140] Align does not concede that either results in anticompetitive effects.

[141] *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]f all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing."). Plaintiffs cannot aggregate conduct that enhanced competition.

scanner markets, allowing them to *increase* prices (albeit a year after termination).[142] At the same time, Plaintiffs claim that Align unlawfully engaged in improper *discounting* through bundling and exclusive deals.[143] So which is it? Plaintiffs cannot resolve the tension of whether Align's prices are too high (due to its alleged refusal to deal) or too low (due to its bundling and exclusive dealing). The Ninth Circuit recognized the absurdity of attempting to couple a refusal to deal claim (premised on increased prices) and improper discount pricing (premised on the opposite) in *Qualcomm*, and rejected the FTC's argument—like Plaintiffs' here—that the two theories can coexist. *See* 969 F.3d at 1001. Nor can Plaintiffs save their claim by invoking the idea that Align "leveraged" one market and another—that type of claim still requires at least one independently actionable type of conduct. *John Doe 1 v. Abbott Labs.*, 571 F.3d 930, 933 (9th Cir. 2009). Plaintiffs' theory is the opposite of synergy, and their broth claim fails as a result.

## II. PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS

Plaintiffs' two hand-picked class representatives lack Article III and antitrust standing to pursue their claims against Align based on monopolization of the scanner market. Plaintiffs have gerrymandered their theory of harm in such a way to leave both named Plaintiffs with iTero purchases *outside* of the class period. This deprives both Plaintiffs of standing.

Article III standing is an "indispensable part" of any case that must be present at every stage of the case. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (noting that standing must be "supported ... at the successive stages of litigation"). Injury is a prerequisite to standing, and named plaintiffs need to satisfy this standing requirement throughout the stages of the litigation. *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011) ("At least one *named* plaintiff must satisfy the actual injury component of standing in order to seek relief on behalf of himself or the class.") (emphasis in original). Both Dr. Simon and Dr. Matian purchased iTero scanners before the start of the redefined class period.[144] The Court recognized this issue at

[142] Pearl Ex. 22, ¶¶ 193, 201, 210.
[143] *Id.* at ¶¶ 123, 128.
[144] *See* Pearl Ex. 68, SIMON-ALIGN-00000730 (iTero invoice addressed to City Smiles and dated Feb. 5, 2017); Pearl Ex. 69, VIP Dental Spas' Third Am. Resps. to Align's 1st Set of Interrogs. at Interrog. No. 1 ("Plaintiff states that the only Intraoral Scanner that Plaintiff has purchased is the iTero Element 2 . . . which was purchased from Align on June 28, 2018."); Pearl Ex. 70, VIP-

the class certification stage, and denied certification with prejudice of a class seeking to represent purchasers of iTero scanners. Now, at summary judgment, Plaintiffs' claim of monopolization of the scanner market must be denied with prejudice.

## III. PLAINTIFFS' EXPERT TESTIMONY SHOULD BE PRECLUDED

### A. Professor Wagner's Testimony on the Ultimate Legal Issue Is Improper

Plaintiffs improperly offer an impermissible opinion on the ultimate legal issue of conceivable justifications for termination—through R. Polk Wagner, a professor of patent law. Professor Wagner opines that Align did not have a reasonable or rational basis for terminating interoperability in order to protect its patents;[145] and that the operative question in this case is whether protecting its patent rights justified Align's termination of interoperability with 3Shape.[146] Professor Wagner himself claims that "whether protecting patent rights justified Align's termination of interoperability is in fact 'the operative question at issue in this case'"[147]

While Align does not concede that Professor Wagner's articulation of the operative legal question is correct—it is not—it is clear that Plaintiffs are attempting to impermissibly place Professor Wagner in the shoes of the Court and the jury and use his opinions to render a verdict on the ultimate issue to be decided. Plaintiffs have admitted as much by suggesting that Professor Wagner's purpose in this case is to influence in their favor the ultimate legal issue of whether Align's termination of interoperability based on 3Shape's patent defenses was conceivable.[148] *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999) (holding that experts may not testify as to the ultimate legal meaning of facts). Testimony on this ultimate question by Professor Wagner or by any other expert is improper, and should be precluded.

---

ALIGN-00001597 (VIP iTero Purchase Contract dated June 2018); Pearl Ex. 71, VIP-ALIGN-00001881 (iTero invoice addressed to Dr. Sherwin Matian dated July 22, 2018).

[145] *See* Pearl Ex. 72, Dep. Trans. of Polk Wagner, July 6, 2023, at 101:2-8 ("[T]he patent law did not provide Align a reasonable basis for terminating interoperability in order to protect its patents[.]").

[146] *See id.* at 249:17-250:12.

[147] *See* Pearl Ex. 74, Reply Expert Report of Polk Wagner, June 30, 2023, ¶ 48.

[148] *See* Pls.' Opp'n to Admin. Mot. to Revise Case Schedule at 3-4 (ECF No. 297) (conceding that key issue in case is Align's termination of interoperability based on protecting its patent rights, and criticizing Align's patent expert for not opining on ultimate legal issue).

### B. Dr. Singer's Opinions Are Inconsistent with Ninth Circuit Law, and Thus Fatally Misleading

The testimony and opinions of Plaintiffs' economic expert, Dr. Hal Singer, should be excluded as they are not based on sufficient facts or data (Fed. R. Evid. 702(b)), not the product of reliable principles and methods (Fed. R. Evid. 702(c)), and do not reflect a reliable application of the principles and methods to the facts of the case (Fed. R. Evid. 702(d)). "Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999). Dr. Singer's opinions fail to satisfy Rule 702.

First, Dr. Singer's opinions are not based on sufficient facts or data. Dr. Singer does not assess or consider (and Plaintiffs did not obtain) any data from any rival aligner manufacturers.[149] Dr. Singer (and Plaintiffs) also did not adduce any evidence from any Align rival saying that they could not compete against the only bundling program that Dr. Singer identifies as unlawfully anticompetitive.[150] Further, Dr. Singer reached his opinions without seeking and obtaining any data from non-named plaintiff direct purchasers about whether they were, in fact, ordering (or not ordering) any rival aligners, and by disregarding the evidence that the named Plaintiffs have purchased aligners from rival manufacturers, including Candid and Straumann.[151]

Second, Dr. Singer's opinions are not the product of reliable principles and methods, because his Exclusivity Share Model is inconsistent with the prevailing law.[152] In *PeaceHealth*, 515 F.3d at 906, the Ninth Circuit adopted "a 'discount attribution' standard" which "makes [a] defendant's bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer of the competitive product." Dr. Singer ignored

---

[149] Pearl Ex. 62, at 93:1-5 ("I did not assess rival manufacturer costs."); Pearl Ex. 11, ¶¶ 29, 33, 179.

[150] Pearl Ex. 62, at 94:7-10; *see also id*. at 94:18-21.

[151] Pearl Ex. 62, at 119:22-120:25; 116-22-117:5; Pearl Ex. 61, at 95:4-16; 103:5-25; Pearl Ex. 63, at 26:10-26:11; Pearl Ex. 64, at 60:25-61:2; Pearl Ex. 75, Dep. Trans. of Kinnery Patel, Mar. 9, 2023, at 49:10-12. *See also* Pearl Ex. 11, ¶¶ 228-230.

[152] *See also UFCW Loc. 1776 & Participating Emps Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) ("[E]xclusion of opinions that are irrelevant as a matter of law or contrary to the law is appropriate through the *Daubert* process."). *See also* Pearl Ex. 11, ¶¶ 30, 165, 167-177, 179, 209-26.

*PeaceHealth* in performing his Exclusivity Share analysis, and did not perform the price-cost or discount attribution test required by the Ninth Circuit.[153] Compounding the unreliability of his Exclusivity Share Model, Dr. Singer disregarded the Ninth Circuit's holding in *Allied,* 592 F.3d at 996-97, and included short-term and easily terminable discount agreements in his Exclusivity Share Model that are of the kind that the Ninth Circuit has deemed non-exclusionary.[154] Further, Dr. Singer's Exclusivity Share Model does not actually measure exclusivity, as explained above (*supra* § I(C)(1)) and is also unreliable on that basis.

Third, Dr. Singer's opinions do not reflect a reliable application of accepted principles and methods to the facts of this case with respect to his TOI Model. Dr. Singer employs a one-year lag for his TOI Model that is unsupported by the record evidence,[155] and which the Court rightfully looked at with skepticism at the hearing on Plaintiffs' Motion for Class Certification.[156] Align has raised its prices exactly three times since the TOI, on August 31, 2018, July 1, 2019, and then on January 1, 2023.[157] These infrequent prices have been modest, and have not outpaced inflation, a key variable that affects pricing.[158] As Dr. Singer cannot point to any evidence to support his employing a one-year lag, other than a tautological correlation that he observed, and which does not exist if the lag is reduced to three months, or zero,[159] his TOI Model and related opinions are

---

153 Pearl Ex. 61, at 98:18-99:1 (testifying that he, "did not perform a cost-based test to determine whether or not Align's challenged conduct was anticompetitive"), 12:18-13:8 (testifying that, "I haven't performed what, in the literature is referred to as, a discount attribution test"); Pearl Ex. 62, at 93:16-21, 99:10-16 (testifying at hearing that he "did not perform a discount attribution test," "that the Ninth Circuit describes in peace health [sic]," and that he "did not perform any price cost test to determine whether Align's discount under fusion program were below costs"). *See also* Pearl Ex. 11, ¶ 142.

154 Pearl Ex. 62, at 125:3-125:12. *See also* Pearl Ex. 11, ¶¶ 41, 174.

155 Pearl Ex. 62, at 128:5-130:10. *See also* Pearl Ex. 11, ¶¶ 231-32, 239-42, 244-45.

156 Pearl Ex. 62, at 26:1-26-10 ("I guess I still don't understand what you did beyond looking to see where prices started to go up and then sort of assigning blame to the termination of the [inter]operatibility agreement to that price increase. I mean, it - - I'm probably missing something, but what you said so far makes it sound like you just moved the TOI effect to the right until it ran into the price increases.").

157 Pearl Ex. 17, at 126:12-127:19, 127:25-128:23; Pearl Ex. 76, ALIGNAT-PURCH00575136; Pearl Ex. 77, ALIGNAT-PURCH00575194; Pearl Ex. 78, ALIGNAT-PURCH01974421.

158 Pearl Ex. 11, ¶ 94; Figure 9, ¶ 369.

159 *Id.* at ¶¶ 233, 239-45.

unreliable and should be excluded.

Fourth, Dr. Singer's TOI Model fails to control for other potentially exclusive conduct.[160] Dr. Singer has admitted that his TOI Model lacks a crucial element: the ability to control for the effect of other potentially exclusive conduct.[161] *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 976 (C.D. Cal. 2012) (excluding expert statistical analysis that omitted "major factor"). Dr. Singer admitted that "[t]he effect of the other restraints is not modeled or controlled for in the TOI model."[162] This renders the model unreliable and means that Plaintiffs cannot accurately calculate damages for their claim. Exclusion is proper.

**CONCLUSION**

For the foregoing reasons, the Court should grant Align's Motion and enter judgment for Align on Plaintiffs' claims. The Court should further grant Align's *Daubert* Motion and exclude the Expert Reports and testimony of Professor Wagner and Professor Singer to the extent judgment is not entered on Plaintiffs' claims in their entirety.

DATED: November 20, 2023

PAUL HASTINGS LLP

By: */s/ DRAFT*
James M. Pearl

James M. Pearl (SB# 198481)
Emma Farrow (SB# 347126)
jamespearl@paulhastings.com
emmafarrow@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Los Angeles, CA 90067
Telephone: 1(310) 620-5700
Facsimile: 1(310) 620-5899

160 *Id.* ¶¶ 219, 227.

161 Pearl Ex. 62, at 133:18-20 ("Q But excuse -- Align's exclusivity and bundling conduct is not one of the control variables in your TOI model, is it? A Correct."). *See also* Pearl Ex. 11, ¶ 227.

162 *Id.* at 134:8-11.

Thomas A. Counts (SB# 148051)
Abigail H. Wald (SB# 309110)
tomcounts@paulhastings.com
abigailwald@paulhastings.com
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
Telephone: 1(415) 856-7000
Facsimile: 1(415) 856-7100

Adam M. Reich (SB# 274235)
Michael C. Whalen (*pro hac vice*)
adamreich@paulhastings.com
michaelcwhalen@paulhastings.com
71 South Wacker Drive, 45th Floor
Chicago, Illinois 60606
Telephone: 1(312) 499-6000
Facsimile: 1(312) 499-6100

Michael F. Murray (*pro hac vice*)
michaelmurray@paulhastings.com
2050 M Street, N.W.
Washington, DC 20036
Telephone: 1(202) 551-1700
Facsimile: 1(202) 551-1705

Noah B. Pinegar (*pro hac vice*)
noahpinegar@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000
Facsimile: 1(212) 319-4090

Attorneys for Defendant
Align Technology, Inc.